1
2
3
4
5

Andrew W. Hutton (172033)
  drew@law-hutton.com
**HUTTON LAW GROUP**
12671 High Bluff Drive, Suite 130
San Diego, CA  92130
Telephone:   (858) 793-3500
Facsimile:    (858) 793-3501

6
7
8
9
10
11
12

Timothy J. Tatro (175633)
  tim@tatrozamoyski.com
Peter A. Zamoyski (185579)
  peter@tatrozamoyski.com
**TATRO & ZAMOYSKI, LLP**
12760 High Bluff Drive, Suite 210
San Diego, CA 92130
Telephone: (858) 244-5032
Facsimile:  (858) 847-0032

13

Attorneys for Plaintiff

14

## IN THE UNITED STATES DISTRICT COURT

15

## SOUTHERN DISTRICT OF CALIFORNIA

16
17
18
19
20
21
22
23
24

| | |
|---|---|
| Ernest O. Abbit, on behalf of himself and on behalf of all others similarly-situated,<br><br>                    Plaintiff,<br><br>v.<br><br>ING USA Annuity and Life Insurance Company, and ING U.S., Inc.<br><br>                    Defendants. | Case No.  13CV2310GPC(WVG)<br><br>**CLASS ACTION**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

25
26
27
28

Plaintiff Ernest O. Abbit ("Plaintiff" or "Mr. Abbit"), on behalf of himself and all others similarly-situated, brings this action against defendant ING USA Annuity and Life Insurance Company ("ING") and against ING's parent company, defendant ING U.S., Inc. ("ING U.S."). Upon information and belief, as well as the investigation of his counsel, Plaintiff alleges the following causes of action:

Count 1:   Breach of contract (against ING);

Count 2:   Breach of the implied covenant of good faith and fair dealing (against ING);

Count 3:   Breach of fiduciary duty (against ING) and aiding and abetting a breach of fiduciary duty (against ING U.S.);

Count 4:   Violation of Cal. Welf. & Inst. Code §§15600, *et seq.* (Elder Abuse and Dependent Adult Protection Act) (against ING);

Count 5:   Actual and constructive fraud (against ING);

Count 6:   Violation of Cal. Bus. & Prof. Code §§17200, *et seq.* (California's Unfair Competition Law) (against ING);

Count 7:   Violation of Cal. Bus. & Prof. Code §§17500, *et seq.* (false advertising) (against ING);

Count 8:   Failure to supervise (against ING);

Count 9:   Declaratory relief re qualifying securities (against ING);

Count 10:  Violations of the California Securities Act (against ING); and

Count 11:  Control person liability (against ING U.S.).

## INTRODUCTION

1.      By order dated February 25, 2014 ("Order")[1] this Court denied ING's motion to dismiss Plaintiff's initial claims for: breach of contract ("daily interest" claim); breach of fiduciary duty; California elder abuse; California unfair competition; California false advertising; and failure to supervise. This Court did grant ING's motion, without prejudice, as to Plaintiff's claims for: breach of contract (guaranteed "premium bonus" claim); breach of the implied covenant of

---

[1] The Order is entered in this case as docket entry no. 19.

good faith and fair dealing; and concealment.

2.     Plaintiff brings his First Amended Complaint pursuant to the Order. Because this Court agreed with ING's position that the "premium bonus" credited to Plaintiff's FIA was not included in the contract's guaranteed values, and is therefore unsecured and detached from the non-forfeiture laws, Plaintiff alleges herein that the "premium bonus" offered by ING was entirely "at risk" subjecting Plaintiff's FIA to California securities laws.  Plaintiff's amendment thus adds claims under California securities laws and adds related defendant ING U.S. for control person liability as having aided, abetted, and assisted ING's violations of law. Plaintiff has adjusted the scope of the Class (defined below) consistent with the additional investigation of counsel and amended allegations herein.

3.     This case stems from a fraudulent scheme and course of conduct perpetrated by ING and its parent company ING U.S. to purposefully target a highly-vulnerable class of our society – retirees and senior citizens – for the marketing and sale of structured financial derivatives that defendants created and surreptitiously embedded in ING's "fixed index annuities" ("FIAs") product line.

4.     Defendants use the term "Secure Index" in their FIA products to portray their FIAs protective investments that have earnings "linked" to the S&P 500® Index (or similar market index) under brand names "ING Secure Index Opportunities Plus," "ING Secure Index Five," "ING Secure Index Seven," and "ING Secure Index Outlook."  In fact, defendants designed and executed the FIAs in manner that took savings and provided a meaningless index link:  *Plaintiff entrusted $1 million with ING in exchange for an FIA worth only $730,000 on the September 2010 contract date*, and since then, the S&P 500® Index has *increased 60%*, yet Plaintiff's "Secure Index" link has provided a *less-than 2%* return.  Instead of providing the promised security and income benefits, ING used the hidden structured derivatives as a tool to take retirement savings directly from Plaintiff and the Class for defendants' sole benefit.

5.      Structured derivatives (also known as "structured products") are exceedingly complex, opaque, and illiquid market-linked financial instruments. Defendants know that their sales force, Plaintiff, and members of the Class are unable to discern the existence, characteristics, complexities, behavior and pricing of the structured derivatives that defendants hid within the ING FIAs.[2]  And, that is why defendants used the derivatives to further their fraudulent scheme.   As explained by the Lead Financial Officer of the World Bank:

> The lack of transparency in the pricing of structured products is one of the major reasons they appeal to the banks and securities dealers that structure and sell them.  Since structured products are difficult for investors to price, it is also difficult for investors to know how much profit margin banks and dealers are making from their sale.

6.      Instead of telling Plaintiff and the Class about the derivatives and how the derivatives could rob them of retirement savings and income benefits (i.e., the true pricing), ING induced Plaintiff and the Class to reasonably believe that the products were suitable for protecting savings and providing income.  For example, ING created uniform sales materials that offered Plaintiff and the Class retirement solutions, including "**Mapping Your Retirement Destination**," which asked "**Where will retirement take you?**" while promising attractive benefits, including a "**guarantee**" to "**Protect Your Assets**" while "**Fueling the value of your annuity**," a "**5% premium bonus**," and various creative "**interest crediting strategies**" linking the annuities' earnings to "**the premier benchmark for U.S.**

---

[2]    ING U.S. recently reported to the SEC:

> FIAs are considered embedded derivatives, which are measured at estimated fair value separately from the host annuity contract . . . .  The estimated fair value of the FIA embedded derivatives is based on the present value of the excess of interest payments to the contract holders over the minimum guaranteed interest rate.

See ING U.S. Form S-1 filed November 11, 2012, at F-24.

3

**stock market performance**" – the S&P 500® Index.  ING targeted senior citizens with statements that the beneficial "**interest crediting strategies**" tied to the S&P 500® Index "**provides you . . . with interest potential**" beyond "**other sources of fixed income like savings accounts, certificates of deposit and savings bonds**."

7.      Upon delivery of the FIA, ING reassured Plaintiff and the Class that, although the FIA purchase was a "**big decision**," they had made the right choice: ING was a "**preferred financial services provider**" that offers "**a fresh financial planning perspective . . . while forging successful lifelong relationships**."  ING added: "**Again, thank you for the trust and confidence you have placed with us**."  This reassurance was extremely important to Plaintiff and members of the Class because **ING retained the exclusive investment discretion** that would determine whether or not the FIA would satisfy the twin goals of protection and income that ING had promised seniors in the ING-prepared brochures.

8.      As ING knew, the sales pitch claiming protection of retirement savings and income benefits was a charade, contrary to the FIA product pricing and design, and contrary to how ING had historically exercised its investment discretion under the FIAs, and how ING expected to execute the FIAs.  Further, through these written materials, ING concealed from seniors and retirees numerous material facts surrounding the existence and asymmetric valuations of the complex derivatives structure that guaranteed the loss (not protection) of retirement savings.

9.      ING also offered to the public "premium bonuses" in the FIAs to be immediately credited to the FIA and integrated with the structured derivatives. Under the California law, these FIAs with "premium bonuses" are "securities" issued by ING because, *inter alia*, they are "at risk" (not guaranteed by ING).  But, defendants did not register ING or these securities with the California Department of Corporations, nor did ING require its sales force to be similarly registered for the sale of these securities.  Also, the California Department of Insurance did not review the derivatives' valuations, pricing, suitability or disclosures.  In sum, defendants

4

had freed themselves to operate in an unregulated "no-man's land" knowing the FIAs' "premium bonuses" and integrated derivatives structures were an unregulated black box.  Only defendants understood the FIAs and how damaging they could be to Plaintiff and the Class.

10.     Notably, ING could have employed its exclusive investment discretion under the FIAs to set the pricing parameters of the structured derivatives so the twin investment goals of promised security and index income would be fulfilled.  However, ING used its exclusive investment discretion as a tool to engage in the systemic and wrongful taking of retirement savings from Plaintiff and the Class, pocketed by defendants, through its insidious design and execution of the structured derivatives that ING had embedded in the FIAs.

11.     Plaintiff and the Class (with their peak-earning years behind them) now find themselves stuck in disastrous long-term contracts with ING, subject to onerous contractual penalties (also drafted by ING).  ING never disclosed to Plaintiff and the Class the inherent conflicts of interest in the transactions whereby they have entrusted important investment decisions to ING who, in turn, abuses that trust and confidence to its sole and substantial benefit.

12.     Plaintiff and the Class have lost as much as 20% or more of their retirement savings on the first day of their long-term investment with ING as a result of ING concealing the embedded derivatives, then capitalizing on its abusive pricing decisions under its arcane FIA contracts.  In Mr. Abbit's case, he entrusted ING with $1 million of his retirement savings for ING's promised "protection" and "income benefits" that would "beat the bank."  ***ING had actual or constructive knowledge that, in exchange for Mr. Abbit's $1 million premium, it had issued him an FIA with a present value of about $730,000***.  ING concealed this loss by sending Mr. Abbit false and misleading account statements.  Only a finance expert using ING's valuation methods could reveal the FIA's true value.

13.     The harm to Plaintiff and the Class (and corresponding benefit to

5

ING) did not end at the point of sale.  ING also executed the FIAs in a faulty manner after the transaction date, violating both the contracts' express and implied terms, and violating ING's fiduciary and special obligations towards Plaintiff and the Class.  For example, in breach of its fiduciary duties and the implied covenants of good faith and fair dealing, ING abused the discretionary features of the "embedded derivatives" linked to the S&P 500® whereby ING made unilateral pricing adjustments to the derivatives that were directly contrary to then-existing market forces, intentionally preventing FIA owners from realizing contract benefits, driving the value of the FIAs below the contractual guarantees.

14.     In Mr. Abbit's case, for example, in September 2011, ING exercised its investment decision by lowering the monthly cap after Mr. Abbit's first contract year (on September 29, 2011) from 2% to 1.65%.  At that time, the implied volatility of the S&P 500® Index had actually *increased* approximately 5% relative to the issue date of Mr. Abbit's FIA.  For each 5% increase in the implied volatility of the underlying index, the monthly cap would have to *increase* (not decrease) by approximately 0.25% to compensate Mr. Abbit for the decrease in value of the FIA resulting from increased market volatility.

15.     Thus, ING abused its investment decisions on behalf of Mr. Abbit by not increasing the monthly cap.  Moreover, ING made matters far worse by actually decreasing the monthly cap in the face of increased market volatility, destroying Mr. Abbit's retirement savings even further.   ING had similarly decreased investment parameters for increases in market volatility in 2009, robbing Class members of their retirement savings to the benefit of ING.  Plaintiff and the Class could have avoided this harm by cancelling their FIAs had they been told the truth.

16.     ING's abusive contract execution practices were particularly pernicious given that ING was in a contractual, fiduciary, and special relationship with the retirees and seniors it was obligated to protect.  Instead, ING took full advantage of its superior position and knowledge of the arcane and opaque FIAs

that it had drafted, further exploiting unsuspecting retirees and seniors. To actively conceal its misconduct, ING misreported (i.e., overstated) the true value of the FIAs in account statements, sending out misinformation and affecting the ability of FIA owners to make accurate and informed investment decisions.

17.     Predictably, ING failed to adequately train or supervise its sales force regarding the performance, valuation and complexities surrounding the "embedded derivatives" contained in the annuities. ING did not even attempt to explain to its sales force the inner workings of its "embedded derivatives" index crediting strategies, how retirement savings could be destroyed by ING's pernicious product designs, or that ING was the primary beneficiary of the senior citizens' lost savings. Further, defendants knowingly or recklessly allowed unregistered sales representatives to sell securities in the state of California that were unqualified.

18.     Instead of adequately training and supervising its sales force to ensure a proper understanding of the FIAs, proper disclosures of the lost values, lack of protection, past performance and true consequences of purchasing its "Secure Index" FIAs, ING instead focused its sales force on the carrot of an extremely lucrative commission structure, urging the sales force to sell the FIAs broadly to earn a high commission, without regard to the consequences to the Class. Upfront commissions were as high as 8% of premium ($80,000 commission for $1,000,000 in premium) and included trailing annual commissions that could result in approximately 10% commissions over a 10-year period.

19.     This is not a case of 20/20 hindsight where Class members are disappointed by market losses. Here, the losses were directly caused by how ING knowingly abused its exclusive discretion to set the investment parameters for the structured derivatives embedded in the FIAs. The only meaningful avenue of recourse against defendants is the aggregation of claims utilizing a class action procedure. Mr. Abbit seeks certification of the following National Class and California Seniors Class of current and former ING FIA contract holders:

7

<u>The National Class</u>

All persons or entities that purchased a fixed index annuity contract ("FIA") from ING USA Annuity and Life Insurance Company ("ING") whereby ING, within the applicable statute of limitations and either at point of FIA purchase or while the FIA was in-force, determined and executed the "FIA rate" and/or credited the FIA with a "premium bonus." "FIA Rate" includes the FIA guaranteed interest and FIA index strategies' rates, caps and spreads.

<u>The California Seniors Class</u>

All members of the National Class that were age 65 or older, and a citizen or resident of the state of California, at the time ING determined and executed the "FIA rate" and/or credited the FIA with a "premium bonus."

20.     The California Seniors Class is a vulnerable and disadvantaged class, defined by statute as "elders," and protected by law from financial exploitation. This case is important because it highlights how a vulnerable class of seniors can be easily and purposefully duped by a highly-sophisticated financial-services giant into purchasing complex structured products that destroy retirement savings to the sole and substantial benefit of the insurance giant who created and executed the flawed products.

<u>General Information about the Parties</u>

21.     Plaintiff Ernest O. Abbit is currently 84 years of age and is, at all relevant times alleged herein, a retired senior citizen of the state of California.  Just before Mr. Abbit turned 81 years of age, and while in California, defendants acted to induce Plaintiff to purchase an ING FIA called the "ING Secure Index Opportunities Plus" with an effective date of September 28, 2010 (contract no. 90375xxx—partially redacted for financial privacy).  Defendants prepared all terms of the FIA contract, which was never subject to negotiation, and was not provided for review by Mr. Abbit before the contract date.

22.     Defendant ING USA Annuity and Life Insurance Company is organized under the laws of Iowa with its home office, located at 909 Locust Street, Des Moines, Iowa, 50309.  ING's ultimate parent company is ING Groep, N.V., a

8

global banking and financial services giant based in the Netherlands. ING offers various insurance products, dominated by its annuity business. ING's primary annuity customers are individuals seeking financial solutions for retirement that include principal protection and income benefits, such as Mr. Abbit and members of the Class. ING and its affiliates are among the top five sellers of FIAs in the U.S. with $12.2 billion of FIA assets under management as of December 31, 2012, and $12.9 billion of FIA assets under management as of December 31, 2013. ING is a top seller of annuities in the state of California.

23.    Defendant ING U.S., Inc. is organized under the laws of Delaware with its home office, located at 230 Park Avenue, New York, New York, 10169. ING U.S. states in filings with the Securities and Exchange Commission:

> We are a premier retirement, investment and insurance company serving the financial needs of approximately 13 million individual and institutional customers in the United States as of June 30, 2013. Our vision is to be America's Retirement Company™. Our approximately 7,000 employees (as of June 30, 2013) are focused on executing our mission to make a secure financial future possible—one person, one family and one institution at a time. Through our retirement, investment management and insurance businesses, we help our customers save, grow, protect and enjoy their wealth to and through retirement. We offer our products and services through a broad group of financial intermediaries, independent producers, affiliated advisors and dedicated sales specialists throughout the United States.

24.    Defendant ING is wholly-owned and controlled by its parent company ING U.S. and the respective entities are organized as follows:



9

25.     The claims against defendant ING U.S. arise out of the same conduct, transactions, or occurrence as those claims brought against defendant ING. Moreover, there is sufficient agency or community of interest between ING and ING U.S. to impute previous notice of this action commenced in September 2013 through its subsidiary ING, and thus defendant ING U.S. has received such notice.

Background of Annuities

26.     There are features common to most annuities despite their various forms.  In exchange for premiums paid by an investor, the insurance company promises to pay back the investor's deposit via periodic payments, with payments beginning either immediately (an "immediate annuity") or after an accumulation period (a "deferred annuity").

27.     There are generally two periods of time in the life of an annuity contract:  the full accumulation period (during which the investor deposits funds) and the annuitization period (during which time the investor withdraws funds in the form of periodic payments).  The investor may earn interest credits during both the accumulation period and annuitization period, but may not withdraw funds during the accumulation period.  During the annuitization period, withdrawals may be limited by law or contract.

28.     Annuities have different names, depending largely on how they earn "interest credits" on the funds deposited in the annuity.  The following provides some general descriptions of varying types of annuities:

a.     *Fixed Annuities* – generally guarantees a fixed rate of return over a time period specified in the contract on the funds deposited in the annuity.

b.     *Variable Annuities* – generally allows premium deposits to be invested in securities, such as mutual funds.  Variable annuities may offer guaranteed rates of return as well, similar to fixed annuities. Variable annuities are registered as securities with the SEC.

c.    *Indexed-Annuities* – as the name implies, these annuities generally earn interest linked-to a broad-based, recognizable equity index or other index, such as the S&P 500® Index.  Indexed annuities can also guarantee interest, like fixed annuities.

29.    The type of annuities that are the subject of this action are referred to as "fixed indexed annuities" ("FIAs").  In sales materials prepared by defendants, ING refers to Plaintiff's FIA contract as a "Single Premium Deferred Fixed Index Annuity with a 5% Premium Bonus."  ING U.S. describes ING's FIAs business in its filings with the SEC as follows:

> *Fixed Indexed Annuities (FIA).* FIAs are marketed principally based on underlying interest-crediting guarantee features coupled with the potential for increased returns based on the performance of market indices.  For an FIA, the principal amount of the annuity is guaranteed to be no less than a minimum value based on non-forfeiture regulations that vary by state.  Interest on FIAs is credited based on allocations selected by a customer in one or more of the strategies we offer and upon policy parameters that we set.  The strategies include a fixed interest rate option, as well as several options based upon performance of various external financial market indices.  Such indices may include equity indices, such as the S&P 500, or an interest rate benchmark, such as the change in LIBOR.  The parameters (such as "caps," "participation rates," and "spreads") are periodically declared by us for both initial and following periods.  Our existing FIAs contain death benefits as required by non-forfeiture regulations.   Some FIAs allow the purchase of optional living benefit riders at an additional cost.  These living benefits guarantee a minimum annual withdrawal amount for life.  The amount of the guaranteed annual withdrawal may vary by age at first withdrawal.  We have used multiple designs with varying parameters over time and all form designs and parameters make up the existing block of in-force policies.

*See* ING U.S., Form S-1, dated Sept. 13, 2013, at p. 213.

## JURISDICTION AND VENUE

30.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff (citizen of California) and ING (citizen of Iowa) are

11

citizens of different states and the amount in controversy exceeds $75,000 for Plaintiff (exclusive of interest and costs).   Further, the aggregate amount in controversy exceeds $5,000,000 for this class action (exclusive of interest and costs) and less than one-third of Class members are California residents.  See Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

31.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim occurred in this district:  Plaintiff received the false and misleading promotional materials in this district; Plaintiff entered into the FIA contract in this district; ING mailed the subject FIA contract into this district; and ING mailed the allegedly misleading periodic statements into this district.  Moreover, ING has deliberately registered to conduct business in the State of California and is believed to manage several hundred million dollars' worth of annuity products in California, much of it within this district.

## FACTS PERTAINING TO PLAINTIFF

32.     At all relevant times herein, Mr. Abbit was a resident of San Diego, California, over 65 years of age, and a retiree living on a fixed income from limited retirement funds.

33.     In or around September 2010, Mr. Abbit was shown an FIA brochure that was (i) prepared by one of the defendants; and (ii) approved by ING for use by its sales agents. The ING brochure states that "Whatever your plans, **mapping your route to retirement satisfaction means stopping at the right places to ensure your savings won't run out of 'gas' before you reach your destination**."[3]  In fact, however, ING had knowingly designed its FIA products, and related contract execution and product administration, to systematically deprive ING FIA holders of retirement savings and earnings potential (or the "gas" they needed to reach their

---

[3]  These sales materials pertain to a "Contract Form Series" that included IU-IA-3050, among other contract forms.

1   retirement destination).

2       34.     The ING-prepared brochure described its FIA product as both secure,

3   with "**guarantees**" for "**protection,**" and having an immediate head start on

4   earnings, saying "**Fixed Indexed Annuities Protect Your Assets**" and the "**ING**

5   **Secure Index Opportunities Plus Annuity**" "**offers a 5% premium bonus at the**

6   **inception of your contract**."  In reality, however, ING's execution of the ING FIA

7   did not protect assets, the 5% bonus was not secured (but entirely at risk) thus

8   depriving Mr. Abbit of the "**minimum guarantees**" and "**protection**" that ING had

9   repeatedly promised.

10      35.     ING designed the "**ING Secure Index Opportunities Plus**

11  **Annuity**" so that Mr. Abbit's $1 million premium payment was not protected, but

12  pocketed by ING, whereby ING ensured itself a risk-free windfall under the FIA's

13  structured derivatives design, the FIA contract's arcane language, undisclosed

14  valuations, and the mechanics of the FIAs' "embedded derivatives."  Thus, the

15  uniform ING FIA brochure was materially false and misleading in at least the

16  following respects:

17          a.     The statement that "Fixed Index Annuities Protect Your

18      Assets" was false and/or misleading because ING designed and

19      executed its FIAs in a manner that took significant asset values from

20      seniors; losses from which they cannot recover.

21          b.     The statement that "100% of your premium is put into the

22      contract" was false and misleading because, under the FIA's complex

23      derivatives structure, Mr. Abbit immediately lost about $270,000 of

24      retirement savings value at contract inception, paid directly to ING,

25      effectively paying an unconscionable derivatives premium to ING

26      whereby Mr. Abbit would lose 27% of his retirement savings value on

27      day 1 of his investment.

28          c.     The FIA contact would not receive "interest credited on the

13

full premium," as represented.

d.    The brochure failed to disclose that the FIA product offered to Mr. Abbit was a security, subject to extensive regulatory protections not present in the brochure or the FIA product.  Although the 5% premium bonus was to be immediately credited to the FIA (at "inception of the contract"), the bonus was subject to substantial investment risk, investment returns were tied to the bonus, and the bonus may be realizable in only very limited circumstances, making the FIA subject to California securities laws.

e.    Contrary to the brochure, the premium, 5% bonus, and credited interest were not "protected" and could be "diminished" due to movements in the index.

f.    The Monthly Cap example contained in the brochure was misleading because, although interest credits were high in 2006, comparing the net value of the FIA against the then-current risk-free rates of return over several years revealed that the FIA product lagged far behind safer investments.

g.    The FIA product name "ING Secure Index Opportunities Plus" was false and misleading because the FIA was not "secure," it was not meaningfully linked to "index opportunities," and the "plus" was a bonus that was substantially at risk and subject to securities regulations.

h.    The statements "minimum guarantees" and "interest potential" were false and misleading because those terms referred to a complex derivatives structure embedded in the FIA that, when adjusted by ING, would result in valuations that were below the "minimum guarantees" and restricted any meaningful "interest potential."

i.    Mr. Abbit would not receive interest on interest (i.e., compounded interest) in the amounts set forth in the FIA contract.

14

36.     By using the material misrepresentations and material omissions of fact described above, ING induced Mr. Abbit to purchase an ING FIA with an effective date of September 28, 2010 (contract no. 90375xxx).  A copy of Mr. Abbit's contract is attached hereto as Exhibit A.  To pay for the ING FIA, Mr. Abbit raised $1,000,000 by terminating his Individual Retirement Account and transferring the proceeds to the new ING FIA via an "IRA rollover."

37.     In early October 2010, after receiving Mr. Abbit's $1,000,000 payment, ING mailed the FIA contract to Mr. Abbit's home address in San Diego, California.  The FIA contract was not subject to negotiation.

38.     The essential terms of Plaintiff's "**ING Secure Index Opportunities Plus Annuity**" FIA included the following:

- ING had exclusive discretion to set, report, and manage the investment parameters that affect the FIA's ability to provide promised "protection" and income benefits.  Ex. A, § 6.

- The values of the FIA could never be lower than the contract's guaranteed values. Ex. A, § 5.

- The promised 5% bonus was based on Plaintiff's $1 million premium payment (Ex. A). *Id.*

- Interest was to be credited and compounded daily to the Contract's Minimum Guaranteed Contract Values, using a stated 2% annual rate. *Id.*

- The Contract contained an integration clause. *Id.*, § 8.1.

- ING was to issue an "Annual Statement of Values." *Id.*, § 8.4.

39.     Unbeknownst to Plaintiff, defendants had embedded a complex derivatives structure into the FIAs.  The FIA's terms make no express reference to the existence of "derivatives" and obscure the true prices paid for the FIA. Ex. A. Defendants knew their target market of senior citizens and retirees, including Plaintiff, who were seeking retirement savings protection and income benefits,

15

could not possibly discern the existence, mechanics, and valuations of the complex derivatives structure that ING had secretly embedded in the FIAs.

40.     ING also did not adequately train or educate its sales force, including ING's sales agent that ING paid to sell the ING FIA to Plaintiff, concerning the existence and intricacies of the exotic derivatives embedded in the annuities or their asymmetric exchange of values.  ING kept these embedded derivatives secret from Plaintiff with false and misleading descriptions in sales literature, such as "minimum guarantees" and "income benefits."

41.     In reports to the Securities and Exchange Commission, however, ING U.S. said its "FIAs [fixed indexed annuities] are considered embedded derivatives, which are measured at estimated fair value separately from the host annuity contract . . . ."  In the same SEC filing, ING U.S. added that the embedded derivatives are difficult to value because they lack available pricing and the valuations rely on "unobservable inputs."  Thus, defendants had performed extensive valuations of the "embedded derivatives" and FIA, and therefore had contemporaneous knowledge of the true value of the FIA contracts that were sold to Plaintiff (for which Plaintiff paid $1 million but received an FIA worth only $730,000).

42.     The FIA contract included a cover letter from Michael Smith, ING's chief executive officer for its annuity business, explaining that: "**Our commitment to you does not end at the issuance of your enclosed contract.  Rather, our commitment to you begins**."  Mr. Smith, on behalf of ING, added:  "**Again, thank you for the trust and confidence you have placed with us**."

43.     Immediately following ING's reassuring cover letter—emphasizing ING's "**commitment**" and thanking Mr. Abbit for his "**trust and confidence**"— was the contract data page, which purported to confirm the promised addition by ING of a "**bonus**" of $50,000, added to Mr. Abbit's annuity premium, equal to 5% of Mr. Abbit's $1,000,000 premium payment.  ING and its sales agent (who is not

licensed to sell securities in California) failed to disclose to Plaintiff that the inclusion of the premium bonus credited "at inception of the contract" was integrated within the FIA in such a way as to constitute a "security" under California law because the "premium bonus" was "at risk" and detached from the non-forfeiture laws.

44.     The FIA contract also explained how the Minimum Guaranteed Strategy Value would be calculated using "87.5% of the portion of the Single Premium elected to the Strategy..." for the Index Strategies alternative chosen by Mr. Abbit, and that he would receive guaranteed "Interest credited daily at the Applicable Minimum Guaranteed Rate."

45.     ING then added a bonus to Mr. Abbit's premium amount, equal to $50,000, or 5% of Mr. Abbit's $1,000,000 premium amount.  The Contract Data Page within the FIA contract documents further confirmed the amount of the 5% bonus, and Mr. Abbit's election to have the entire Single Premium of $1,050,000 allocated to the Monthly Cap Index Strategy.  By including the premium bonus within the strategies, Plaintiff was at risk of losing the bonus (and income thereon) due to the efforts of defendants and their business enterprise.

46.     Expert review has revealed that, on the contract date, the embedded derivative structure, hosted in the "ING Secure Index Opportunities Plus" FIA contract sold to Mr. Abbit, was worth approximately 66 cents per dollar of premium paid, or $663,000 of Mr. Abbit's $1,000,000 premium, even taking into consideration the "premium bonus" added to Plaintiff's FIA by ING.  This dramatic day-one shortfall is mostly attributable to the monthly capped crediting formula (what ING refers to as the "embedded derivative"), which ING unfairly priced to favor ING at the expense of Mr. Abbit.

47.     By including the insurance-like features of the contract (i.e., withdrawals and so-called "death benefits"), the value of the "ING Secure Index Opportunities Plus" FIA contract sold to Mr. Abbit increases slightly to

17

approximately 73 cents per dollar of premium paid, or about $730,000 of his $1,000,000 premium. The death benefit, itself, is worth only 7 cents on the dollar, using conservative assumptions. In any event, these insurance features clearly do not make up for the enormous shortfall caused by the unfavorable Monthly Cap crediting formula, and do not protect Mr. Abbit's retirement savings.

48. Sometime shortly after year-end 2011, ING sent to Mr. Abbit's home address in San Diego, California a "Year End Statement" that reported various FIA values "As of 12/31/2011" and "As of 09/28/2020." This "Year End Statement" was false and misleading when issued because the reported FIA values did not accurately account for the loss in value of the credited premium and premium bonus, and did not properly account for the daily interest credits promised under the FIA.

49. Sometime shortly after September 2012, ING sent to Mr. Abbit's home address in San Diego, California an "Annual Statement" that reported various FIA values "As of 09/28/2011" and "As of 09/28/2012." This "Annual Statement" was false and misleading when issued because the reported FIA values did not accurately account for the loss in value of the credited premium and premium bonus, and did not properly account for the daily interest credits promised under the FIA.

50. Shortly after reviewing the September 2012 "Annual Statement," Mr. Abbit first noticed the low values attached to the FIA relative to how the S&P 500® Index had performed over the same period (the S&P Index had increased 25% since September 2010) but the FIA was not earning any meaningful interest. Mr. Abbit then reallocated the FIA premium and bonus to various other ING interest crediting strategies in hopes of increasing the interest credits under the FIA. Unbeknownst to Mr. Abbit, ING would continue to abuse its investment discretion under the FIA because, regardless of the investment strategy chosen by Mr. Abbit, ING ensured Mr. Abbit could never recapture his lost retirement savings.

51. Sometime shortly after year-end 2012, ING sent to Mr. Abbit's home address in San Diego, California a "Year End Statement" that reported various

annuity values "As of 01/01/2012" and "As of 12/31/2012." This "Year End Statement" from ING was false and misleading because the reported FIA values did not accurately account for the loss in value of the credited premium and bonus, and did not properly account for the daily interest credits promised under the FIA.

52.    Unbeknownst to Mr. Abbit, it did not matter which interest-crediting strategy he chose—Mr. Abbit would have lost retirement savings under any of the strategy alternatives offered by ING due to the faulty design and execution of the ING FIAs. For example, for all five interest-crediting strategies under the FIA, using parameters quoted as of September 28, 2012, using that day's S&P 500® implied volatility (18.99%), and assuming the same guaranteed minimum rate of 2% applies to 87.5% of the initial premium under each of the alternative strategies, the Plaintiff loses a significant amount of retirement savings under *any* offered strategy—and those losses inure to the sole and substantial benefit of ING:

| Strategy | True Value per $1.00 of Premium |
|---|---|
| Fixed Rate | $0.79 |
| Point-to-Point Participation | $0.81 |
| Point-to-Point Cap | $0.79 |
| Monthly Average | $0.82 |
| Monthly Cap | $0.73 |

53.    Mr. Abbit initially chose the "Monthly Cap Index Strategy." The "Monthly Cap Index Strategy" is an extraordinarily complex formula for calculating returns. This strategy is a summed, monthly-return annuity, with a cap (and no floor) on monthly returns. Each contract year, the 12 capped-with-no-floor monthly-changes in the index are added together (without compounding) and the resulting sum is then credited to the Accumulation Value for the year. The credited annual return cannot be negative, and therefore it is the guaranteed contract value acts as a "floor." The monthly cap for the first year was set at 2% and was

19

guaranteed to never be greater than 25%, nor less than 0%.

54.     The parameters set by ING under the complex formula under the monthly cap strategy has the effect of dramatically reducing the interest-credits to the FIA contract holders, causing ING to take a disproportionate share of the investments' appreciation.  For example, assuming the 2% monthly cap is maintained throughout the contract term, the index credits generated by ING's monthly-cap formula over the 20-year period from August 31, 1990 to August 31, 2010 would equal 3.2% compounded annually.  For the same 20-year period, Vanguard's S&P 500® Index fund returned 8.2% compounded annually – a difference of 5.0% annually!  Assuming after the first year that ING reduces the monthly cap to 1%, the compound annual return would be only 0.7%, with nearly all the S&P 500® Index return (profit) taken by ING.

55.     In the case of Mr. Abbit, from September 28, 2010 to present, the S&P 500® Index has **increased 60%**, yet Mr. Abbit has earned **less than 2%** interest credits from the strategies supposedly "linked" to the S&P 500® Index.

56.     Because ING designs and executes the interest-crediting strategies to offer very little actual returns for FIA contract holders, the likelihood that investors will end up with the bare minimum guaranteed returns under the contract (that are not at all "linked" to the S&P 500® Index) are very high.  For example, with an implied volatility of approximately 25% and a monthly cap of 2% (terms similar to Mr. Abbit's), expert review estimates the probability of being credited the minimum guaranteed contract value return at the end of the surrender charge period is approximately 66% as of Mr. Abbit's contract date, resulting in an economic loss approximating $270,000 on the contract transaction date.  If the monthly cap is decreased to 1.65%, with no change in implied volatility, the probability of being credited the guaranteed minimum return at maturity is increased to approximately 77%, and obviously the FIA value further declines (increasing Plaintiff's losses). All these results show that the manner in which ING designed the interest-crediting

strategies and executed the FIA contracts (by setting the parameters) results in FIA contracts that neither protect retirement savings nor offer meaningful income benefits for the FIA holder, contrary to ING's promises.

57.     Even during the contract term, ING continued to abuse its investment discretion by setting ING's discretionary investment parameters in a manner that favored ING, but further reduced the FIAs' values to the detriment of Plaintiff and the Class.  For example, in September 2011, ING lowered the monthly cap after Mr. Abbit's first contract year (on September 29, 2011) from 2% to 1.65%.  At that time, the implied volatility of the S&P 500® Index had actually *increased* approximately 5% relative to the issue date of Mr. Abbit's FIA.  For each 5% increase in the implied volatility of the underlying index, the monthly cap would have to *increase* (not decrease) by approximately 0.25% to compensate Mr. Abbit for the decrease in FIA value resulting from increased market volatility.  Thus, ING abused its investment decisions on behalf of Mr. Abbit by not increasing the monthly cap – in fact, ING made matters far worse by actually decreasing the monthly cap 0.35% in the face of increased market volatility, destroying Mr. Abbit's retirement savings further.   Before Mr. Abbit purchased his FIA, ING had similarly decreased investment parameters for increases in market volatility in 2009, robbing Class members of their retirement savings to the benefit of ING.

**FACTUAL ALLEGATIONS COMMON TO THE CLASS**

ING Employs a Scheme, using Uniform Marketing, to Target Seniors and Retirees
Seeking Protection of Retirement Savings and Income Benefits

58.     Defendants specifically target a protected class of seniors, retirees, and prospective retirees seeking financial retirement solutions with the sale and administration of their FIAs.  Defendants purposefully design the FIAs to be an attractive retirement solution for its target market of seniors and retirees.  As explained by ING U.S. in filings with the Securities and Exchange Commission: "FIAs are marketed principally based on underlying interest-crediting guarantee

21

features coupled with the potential for increased returns based on the performance of market indices. . . .  Our target market for annuities include individual retirees and pre-retirees seeking to accumulate or receive distributions of assets for retirement."  ING U.S. further explains:  "For an FIA, the principal amount of the annuity is guaranteed to be no less than a minimum value based on non-forfeiture regulations that vary by state."  See Voya Form S-1/A, Mar. 18, 2014, pp. 215-16.[4]

59.     Defendants' product designs allow ING to create uniform marketing materials that promote its FIAs to the target market of seniors and retirees under various product names that further the appearance of promised, guaranteed, secure retirement savings and broad-based market income benefits, using product names like "ING Secure Index Opportunities Plus Annuity," the "ING Secure Index Seven Annuity" and the "ING Secure Index Five Annuity."  ING prepares these sales materials in their home offices and ING requires, through agreements with its sales agents, that only these uniform ING-approved sales materials be used in connection with selling FIAs.  The uniform marketing materials prepared by ING correspond to uniform FIA contracts also drafted and issued by ING, as discussed further below.

60.     To induce Plaintiff and the Class into purchasing ING FIAs, ING prepared and disseminated uniform product brochures promoting the FIA product line, stating that the FIAs are suitable for "**Mapping Your Retirement Destination**."  The ING brochures portray happy retirees contemplating travel, using maps for plotting the "**Road to Retirement**." The uniform ING brochures tells seniors that the "**ING Secure Index**" annuities "**Protect Your Assets**" with "**minimum guarantees**" and also offer "**Protection for Life**."  The brochures also tell seniors that FIAs contain "**Interest-Crediting Strategies**" for "**Fueling the value of your annuity**."  In sum, ING claims the "**ING Secure Index**" and similar annuities are designed to provide "**protection of principal**" with income benefits ("Index Opportunities") superior to bank investments (i.e., income benefits that

---

[4] "Voya Financial" is a new entity name being adopted by ING U.S.

"beat the bank"). In the case of the "ING Secure Index Opportunities Plus Annuity," ING promises various income benefits, including an upfront "**5% Premium Bonus**" for "**Fueling the value of your annuity**."

61.    In exchange for ING accepting the risk to "protect" the FIA's values, ING placed limits, or caps, on Mr. Abbit's investment returns, derivative of movements in the S&P 500® Index. These limits or caps can be thought of as what Mr. Abbit was selling, or giving up, in exchange for the protection he was purchasing (even though ING referred to this interest crediting feature as a beneficial way to "beat the bank"). The derivatives were embedded in index crediting strategies in Mr. Abbit's contract, and included the following (in the contract form, the indexing period is referred to as the "Contract Year"):

a.    Fixed Rate Strategy:  Interest is credited at a fixed rate that is declared at the beginning of each contract year by ING.

b.    Point-to-Point Participation Index Strategy:  An annual index credit is calculated as a percentage (equal to the strategy participation rate) of the annual point-to-point increase, if any, in the S&P 500® Index during the Contract Year and is floored at zero. The participation rate is declared in advance by ING, is guaranteed for one year, and may change annually.

c.    Point-to-Point Cap Index Strategy:  An annual index credit is calculated as the annual point-to-point increase, if any, in the S&P 500® Index during the Contract Year, up to a stated index cap, and is floored at zero.  The index cap is declared in advance by ING, is guaranteed for one year, and may change annually.

d.    Monthly Average Index Strategy:  An annual index credit is calculated as a percentage (equal to the strategy participation rate) of the monthly averaged increase, if any, in the S&P 500® Index during the Contract Year, less a stated index spread, and is floored at zero.  The participation rate and index spread are declared in advance by ING, are guaranteed for one year, and may change annually

e.    Monthly Cap Index Strategy:  An annual index credit is calculated as the sum of the monthly increase, up to a stated monthly cap, in the S&P 500® Index during each month of the Contract Year. The annual

23

index credit is floored at zero.  The monthly cap is declared in advance by ING, is guaranteed for one year, and may change annually

62.     However, the examples provided by the brochures can be misleading. For example, the brochure for the "ING Secure Index Opportunities Plus" FIA shows the Monthly Cap strategy providing a 11.75% "Interest Credit in 2006." Although the Monthly Cap would have provided a better return in that particular year, the interest credit returns must be evaluated relative to the net Accumulated Value of the FIA, and how it performs over time, since the ING FIAs typically involve long-terms to get past the bonus recapture and surrender charge periods. When evaluated in that context against the risk-free return of the 10-year U.S. Treasury, and based on historical data, it is clear that the ING FIA is underperforming even though it had a stellar year in 2006:



ING Issues Uniform FIA Contracts that Contain
"Premium Bonuses" and/or "Embedded Derivatives"

63.     ING prepares non-negotiable contract forms for its product line of FIAs, identified by the "IU-IA" coding in the FIA form number.  Plaintiff purchased

24

ING FIA Form No. IU-IA-3050.  See Ex. A.  The contract forms drafted by ING are uniform and contain identical or similar language:

| Form # | Product Name | ING Investment Discretion/Bonus | Guaranteed Value is equal to . . . | Guaranteed Value Interest |
|---|---|---|---|---|
| IU-IA-3026 | ING Selectra Multi-Strategy | ING Discretion; No Bonus | "87.5% of the portion of the Single Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3032 | ING Secure Index Opportunities Plus | ING Discretion; Includes Bonus | "87.5% of the portion of the Single Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3034 | ING Secure Index Seven | ING Discretion; No Bonus | "100% of the portion of the Initial Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3033 | ING Secure Index Five | ING Discretion; No Bonus | "100% of the portion of the Initial Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3050 | ING Secure Index Opportunities Plus | ING Discretion; Includes Bonus | "87.5% of the portion of the Single Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3054 | n/a | ING Discretion; No Bonus | "100% of the portion of the Initial Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3064; IU-IA-3065; IU-IA-3066; IU-IA-3067 | ING Envoy Nine Fixed Index; ING Envoy Six Fixed Index | ING Discretion; No Bonus | "100% of the portion of the Initial Premium elected to the Strategy…" | "Interest credited daily at the applicable Minimum Guaranteed Strategy Value Rate" |
| IU-IA-3119 | ING Lifetime Income Annuity | ING Discretion; No Bonus | "90% of the Single Premium…" | "Interest credited daily at the Minimum Guaranteed Contract Rate" |

64.    ING employs complex and opaque derivative structures in all of its FIAs.  As explained by ING's parent company, ING U.S. in filings with the Securities and Exchange Commission:

> *GMAB, GMWB, GMWBL, FIA, Stabilizer and MCG*:  We also issue certain products that contain embedded derivatives and are measured at estimated fair value separately from the host contract. These embedded derivatives include annuity GMAB, GMWB, GMWBL, FIAs and Stabilizer. . . .  Changes in estimated fair value of these derivatives are reported in Other net realized capital gains (losses) in the Consolidated Statements of Operations.

* * *

25

> The estimated fair value of the FIA contracts is based on the present value of the excess of interest payments to the contract owners over the growth in the minimum guaranteed contract value. The excess interest payments are determined as the excess of projected index driven benefits over the projected guaranteed benefits. The projection horizon is over the anticipated life of the related contracts which takes into account best estimate actuarial assumptions, such as partial withdrawals, full surrenders, deaths, annuitizations and maturities.

Voya 3/18/2014 Form S-1/A, p. 142.

> We include the impact of the change in value of the embedded derivative associated with the FIA contracts in gross profits for purposes of determining DAC amortization.

Voya 3/18/2014 Form S-1/A, p. 146.

65.    The derivatives in the seemingly benign FIA are "wolves in sheep's clothing" vastly unlike the cash consideration that Plaintiff and the Class believed was deposited into the FIAs. ING kept these embedded derivatives – or "wolves" – secret from Plaintiff and the Class with false and misleading descriptions, such as "minimum guarantees" and "income benefits."

66.    Derivatives are dangerous financial products, even for the world's most savvy and sophisticated investors. Warren Buffett calls derivatives "financial weapons of mass destruction" and "time bombs." The *New York Times* adds that derivatives "are often weapons of mass deception" and "[f]or some derivatives, a desire for deception is the only reason they exist." [5]

67.    Derivatives are especially dangerous to a vulnerable class of senior citizens, such as Plaintiff and the Class, who lack the knowledge and understanding of such complex financial products. These dangers increase exponentially when the mastermind behind the hidden derivatives structure is a highly-sophisticated financial institution (like ING) that, as a counterparty offering its "trust and

---

[5]  <u>Wielding Derivatives as a Tool for Deceit</u>, published by *The New York Times* on June 27, 2013.

Plaintiff's First Amended Complaint - 13CV2310GPC(WVG)

confidence," is a direct beneficiary of the seniors' investment losses.

ING Uses the Derivatives and FIA Provisions to Further its Own Interests
And Cover its Own Losses, to the Detriment of Plaintiff and the Class

68.     ING is capable of taming the "wolves" (i.e., derivatives) so that they behave more like guard dogs, protecting retirement savings and providing promised income benefits.   The key to protection of investment principal and shared income benefits is the proper placement of the structure's "floor" and "caps" so that there is a fair and symmetric transfer of risk (principal protection) in exchange for shared reward (shared income benefits).

69.     The FIA contracts (drafted by ING) put the key investment discretion and responsibilities upon ING – the only party to the contract with the expertise to value the complex embedded derivatives.  That is, ING retains the key investment decision of the FIAs' fair and symmetric transfer of risk (asset protection) in exchange for shared reward (income benefits).  ING's contractual responsibility for establishing and adjusting the pricing parameters of the sensitive derivatives structure is critical to the fair transfer of risk for reward.   ING has abused its investment discretion.  For example, as of the date of this filing, **Mr. Abbit has or will receive extremely nominal (<2%) interest credits tied to the S&P 500® Index under the annuity, whereas the S&P 500® Index, itself, has returned <u>60%</u> over the same time period**.  Furthermore, over the same period, the 10-year U.S. Treasury (the "bank" ING purports to "beat") has provided far safer and superior returns than the ING FIA sold to Mr. Abbit.

70.     Although ING could have used the embedded derivatives to protect savings and provide meaningful income benefits, ING unleashed the wolves instead, breaching its obligations and abusing its investment discretion.   ING breached its obligations towards Plaintiff and the Class by tipping the structures' "floor" and "caps" in ING's favor, in an asymmetric and unfair manner, devouring savings to the sole benefit of ING.   ING literally pulled the "floor" out from

27

underneath Plaintiff and the Class, and lowered the "caps" to benefit defendants.

71.     After ING receives the FIA premium, it invests up to 97% to 100% of the FIA premium in high quality fixed income securities and as little as 0% to 3% in purchased call options on the S&P 500® Index.  The investment in the high quality fixed income securities is used to support the very low guaranteed interest rate under the FIA.  ING's investment in S&P 500® call options is used to support the "Accumulated Value" under the FIA – i.e., the interest crediting strategies that are supposed to be linked to the S&P 500® and bonus.

72.     Because high quality fixed income securities include U.S. Treasuries that are essentially risk-free, and because the guaranteed interest rate offered by ING is typically less than the risk-free rate, this investment structure established by ING is a very bad deal for Plaintiff and the Class, and a great deal for defendants, especially when the "caps" are set too low.  Plaintiff and the Class would be better off investing in high-grade fixed income securities, as ING did.

73.     ING retains little, if any risk, under this scheme.  Essentially all the risk is on Plaintiff and the Class.  For example, in situations of increased market volatility that would adversely impact ING's purchased S&P 500® call options, instead of bearing those losses, ING simply decreased the "caps" under the FIA contracts so that Plaintiff and the Class bore the losses caused by the increase in market volatility.  For example, ING explained to Class members in 2009:

> In recent months, high levels of market volatility have significantly increased expenses associated with the Company's administration of the Monthly Average Index strategy with index spread. . . .  [T]he renewal rate for [the Monthly Average Index] strategy has been significantly affected by the increase in the cost of options, futures and other derivatives that the Company utilized to credit participation in the index.

74.     In other words, ING used the investment parameters to pass along defendants' investment risk to Class members.  As the fiduciary and investment advisor under this scheme, ING should have done the exact opposite – it should

28

have accepted the risk it had agreed to, and adjusted the parameters in a manner whereby the FIA maintained at least a neutral or better valuation in the face of increased market volatility that were hurting the seniors' FIA valuations.

**ING Knows that the True Values of the Subject Contracts
Are Less Than the Contract's Minimum Guaranteed Values**

75.    As explained by ING U.S. in filings with the SEC, "We also issue certain products [including FIAs] that contain embedded derivatives that are measured at estimated fair value separately from the host contract."  See Voya Mar. 18, 2014 Form S-1/A, p. 99.  ING U.S. adds:

> The fair value of the obligation is calculated based on actuarial and capital market assumptions related to the projected cash flows, including benefits and related contract charges, over the anticipated life of the related contracts.  The cash flow estimates are produced by market implied assumptions.  These derivatives are classified as Level 3 liabilities in the fair value hierarchy.

*Id*. at F-58.

76.    Statement of Financial Account Standards No. 157 defines Level 3 pricing as the most unobservable of all fair value levels, indicating use of complex valuation techniques to determine price.  In sum, there are no readily-available market quotations or other references for a prospective FIA purchaser to test price.

77.    Back-testing Plaintiff's ING FIA reveals how poorly it was priced relative to risk-free investments, in both good and bad markets.  For example, assuming a 10-year contract period, by September 2010 (the month Plaintiff purchased his ING FIA) there were over 3,900 historical examples available for ING to test using a 5% bonus and the 2% Monthly Cap established by ING.  In these 3,900 historical examples, Plaintiff's FIA would have outperformed the risk-free 10-year U.S. Treasury only twice (each time barely).  The rest of the time, the 10-year U.S. Treasury easily outperforms the volatile and riskier ING FIA, as demonstrated in the following chart:

29

78.     The consistent receipt of less-than risk-free rates of return (on a riskier investment) results in a significant investment loss suffered by the FIA contract holder.  Based on well-accepted modeling of level 3 assets of this type, discounting the FIA's expected future cash flows back to the FIA contract start date, ING knew, or should have known, in exchange for Mr. Abbit's $1 million premium, it had issued him an FIA with a present value of only about $730,000, a breach of FIA's guaranteed values and non-forfeiture provisions of Cal. Ins. Code §10168.25.

79.     ING also did not tell the senior citizens that they were grossly overpaying for the purported "protection" of their savings, and that the senior citizens were receiving no real value for effectively selling price appreciation to ING.  In fact, ING had tilted this undisclosed exchange of values under the derivatives structure so far in ING's favor that the transaction amounted to a theft of retirement savings that was pocketed – not protected – by ING put the senior citizens in a deep financial hole.

ING Undertakes a Solemn, Special and Fiduciary Relationship
With Seniors and Retirees that it Agrees to Protect

80.     The essential terms of the uniform FIA contracts drafted by ING make ING responsible for the establishment, adjustment, reporting and management of the investment parameters that determine the annuities' ability to provide seniors and prospective retirees the promised "protection of principal" and "Index Opportunities" for "Fueling the value of your annuity" "to ensure your savings won't run out of 'gas' before you reach your destination." As explained by ING U.S.: "The parameters (such as "caps," "participation rates," and "spreads") are periodically declared by us for both initial and following periods." Voya Form S-1/A dated March 18, 2014, p. 215. Defendant also agreed to accept premiums from Plaintiff and Class members, credit interest and premium bonuses (if applicable) to account values, administer the FIAs in a way that guaranteed interest credits daily, and to issue accurate periodic statements that were not misleading.

81.     Further, defendants know that the core embedded derivatives at the heart of the ING FIAs are an unregulated black box that only defendants can decipher. As such defendants' duties towards Plaintiff and the Class must be heightened for public policy and other considerations.

82.     ING recognizes that the senior and retirees are counting on ING to fulfill its obligations to protect retirement savings and provide meaningful income benefits. ING reassures Plaintiff and the Class in writing: "**We appreciate your recent purchase and would like to take this opportunity to assure you of our commitment to serving your financial needs**." Further, ING welcomes Plaintiff and the Class to ING as their "**preferred financial services provider**." ING sealed the relationship by stating: "**Our commitment to you does not end at the issuance of your enclosed contract. Rather, our commitment to you begins. . . . Again, thank you for the trust and confidence you have placed in us**."

ING Knows the Values of the Contracts are below
The Contractual Guarantees and is motivated to keep it that Way

83.     ING knows at the point of sale and throughout the term of the FIA contracts whether or not the valuations of the embedded derivatives are askew.  That is, ING is required to compute the fair value of the embedded derivatives throughout the term of the FIA contracts for purposes of reporting its financial obligations owed to its FIA holders.

84.     ING U.S. states in its SEC filings:

> The Company records an embedded derivative liability for its FIA contracts for interest payments to contract holders above the minimum guaranteed contract value.  The guarantee is treated as an embedded derivative and is required to be accounted for separately from the host contract. The fair value of the obligation is calculated based on actuarial and capital market assumptions related to the projected cash flows, including benefits and related contract charges, over the anticipated life of the related contracts.  The cash flow estimates are produced by market implied assumptions.   These derivatives are classified as Level 3 liabilities in the fair value hierarchy.

See Voya Form S-1/A dated March 18, 2014, p. F-58

85.     By moving the investment parameters against Plaintiff and the Class, ING U.S. is able to portray more favorable financial results to its investors.  For example, ING moves the investment parameters downwards, against Plaintiff and the Class, it reduces its expenses and obligations under the FIAs.  As a result of the harm to Plaintiff and the Class caused by reducing the "caps" (and therefore the expenses and obligations associated with the FIAs), ING U.S. was able to report more favorable financial results to its investors:

> ***Interest credited and other benefits to contract owners/policyholders decreased $123.2 million from $854.1 million to $730.9 million primarily due to lower option costs of FIAs***, a decrease in average crediting rates on MYGA renewals and lower average account values due to the continuing run-off of MYGAs. Favorable mortality on annuities with life contingencies also contributed to the decrease.

* * *

***The favorable unlocking of DAC/VOBA in 2011 resulted primarily
from prospective assumption changes related to investment margins
on FIAs***, or anticipated earned investment income less credited interest.

See Voya Form S-1/A dated March 18, 2014, p. 99 (emphasis added).

ING Did not Educate, Train or Supervise its Sales Force
<u>Concerning the Existence and Valuation of the Embedded Derivatives</u>

86.     ING did not train or educate its sales force concerning the existence
and intricacies of the exotic derivatives embedded in the annuities or their
asymmetric exchange of risk-for-reward that vastly favored ING.  Instead, ING
plied its sales force with upfront commissions of up to 8% of the initial premium
and automatic trailing commissions for each year the contract is in force.  For
example, ING's commission structure ensures that the sales agent (that ING left
untrained and uneducated in structured derivatives) who sold Mr. Abbit's
$1,000,000 FIA could receive up to $100,000 over the contract term!

<u>Fraudulent Concealment and Equitable Tolling</u>

87.     ING has affirmatively and fraudulently concealed its unlawful
scheme, conspiracy and course of conduct from Plaintiffs and the Class.  Plaintiff
and other Class members did not know, and could not reasonably have known, of
defendant's fraudulent scheme and could not have reasonably discovered the falsity
of defendant's representations, advertising and similar documents, nor could
plaintiffs and the Class reasonably have known the concealed information until
shortly before the filing of this Complaint.

88.     In periodic statements, ING was contractually obligated to properly
report the values of the subject FIAs.  The periodic statements reveal that ING did
not properly credit the guaranteed interest to the guaranteed contractual values, and
did not properly maintain the minimum contractual values, as ING was obligated to
do contractually and pursuant to Cal. Ins. Code §10168.25.  Further, ING knew their
unreported actual present value of the FIAs was far below the minimum guaranteed

33

values that ING was reporting to Class members, misleading Plaintiff and the Class into believing that the FIAs were performing better than they actually were.

89.     ING sent each Class member similar statements of value incorrectly stating the FIAs' true valuations and that those valuations were far less than the guaranteed values under the FIA contracts.  Without this information, Plaintiff and the Class were unable to make informed investment decisions, including whether or not to surrender their ING FIA for more value than the FIA was actually worth.

90.     To this day, defendant continues to fraudulently conceal its practices from the Class and public alike. ING has refused to release or provide information about its practices in a way that plaintiffs and/or the class could have discovered its fraudulent scheme and practices. Although ING's initial decision to engage in these practices was made years ago, defendants have repeatedly decided since then to continue concealing its fraudulent practices.

91.     ING has uniformly ensured that its sales force is not informed concerning ING's fraudulent scheme, described herein.  ING motivates its sales force to keep negative information away from the Class by awarding renewal commissions to the ING sales force for each year the annuity continues to remain in-force.

92.     As a result of the foregoing, Plaintiff and the Class could not reasonably discover the unlawful practices described herein and did not do so until just recently.  The vast majority of Class member still do not know that they have been injured by ING's misconduct.

93.     ING's conduct is continuing in nature.  There is a substantial nexus between the fraudulent conduct that has occurred within the statute of limitations and misconduct prior to that time.  The acts involve the same type of illicit practices and are recurring, continuous events.

94.     The statute of limitations applicable to any claims brought by Plaintiff and other Class members as a result of the conduct alleged herein has been

tolled as a result of ING's fraudulent concealment.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff Abbit brings this action on behalf of himself and all other individuals and entities similarly-situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), due to misconduct and violations of law alleged herein.

96.     Mr. Abbit seeks certification of the following National Class and California Seniors Class of current and former ING FIA contract holders:

### The National Class

All persons or entities that purchased a fixed index annuity contract ("FIA") from ING USA Annuity and Life Insurance Company ("ING") whereby ING, within the applicable statute of limitations and either at point of FIA purchase or while the FIA was in-force, determined and executed the "FIA rate" and/or credited the FIA with a "premium bonus."  "FIA Rate" includes the FIA guaranteed interest and FIA index strategies' rates, caps and spreads.

### The California Seniors Class

All members of the National Class that were age 65 or older, and a citizen or resident of the state of California, at the time ING determined and executed the "FIA rate" and/or credited the FIA with a "premium bonus."

97.     The National Class and the California Seniors Class are collectively referred to herein as "the Class."  The Class excludes defendant, any parent, subsidiary or affiliate of the defendant, any entity in which defendants have a controlling interest, and the respective officers, directors, employees, agents, legal representatives, heirs, predecessors, successors, and assignors of such excluded persons or entities.

98.     This case is properly brought as a class action under Rules 23(a) and (b) of the Federal Rules of Civil Procedure for the reasons set forth in the following paragraphs.

99.     *Numerosity*.  The members of the Class are so numerous that separate joinder of each member of the Class is impracticable.  Based upon review of ING's financial reports filed with the California Department of Insurance, Plaintiff

35

estimates that the Class exceeds 10,000 individuals and related entities (such as insurance trusts) and all of those individuals and entities (and their locations) can be readily identified through defendants' customer records and the Class can readily be notified of the pendency of this action.

100.    *Commonality*.  There are numerous, substantial questions of law and fact common to the Class relating to ING's scheme to deprive the Class of the full benefits of the FIA contracts, including the promised bonus and the daily interest credits under the contracts' provisions.  The common questions include, but are not limited to:

a.    Whether the ING-prepared sales materials were false and misleading.

b.    Whether the ING sales materials and FIA contract forms were uniform and substantially similar as to crediting of daily interest, promised protection at guaranteed values, ING exclusive investment discretion, and material omission of the embedded derivatives.

c.    Whether ING embedded, in its FIA contracts, complex derivative structures that caused Class members to lose retirement savings for which Class members received little or no benefit and ING undertook little or no risk (but reaped the rewards).

d.    Whether ING owed special and/or fiduciary obligations to senior citizens and retirees who had purchased the ING FIAs.

e.    Whether defendants targeted retirees and seniors for sale of its FIAs.

f.    Whether ING abused its investment discretion and decisions under the FIAs by making adjustments to the interest

crediting strategy factors and parameter that caused Class members to be harmed.

g.      Whether ING failed to properly report to Class members, the FIAs' actual present values.

h.      Whether ING falsely reported the FIA contract values in periodic statements mailed to Class members.

i.      Whether ING has engaged in a marketing campaign promoting FIA's with premium bonuses that violated California securities laws.

j.      Whether ING intentionally and/or negligently misrepresented or omitted critical information in its written materials regarding bonus terms.

k.      Whether ING used misleading advertising in connection with the sale of FIAs that purported to pay a premium bonus and credit interest daily.

l.      Whether Plaintiff and members of the Class are entitled to damages, specific performance, injunctive relief, restitution, disgorgement and equitable relief against ING.

101.    The amount of restitution and damages awardable to Plaintiff and each member of the Class can easily be determined from ING's customer database and related records.

102.    *Typicality*.    Plaintiff's claims are typical of the Class because Plaintiff was subject to actions by ING that are substantially similar from Class member to Class member, such as (i) the subject ING FIA contracts employ "embedded derivatives" and related index strategies are uniform and priced similarly; (ii) the investment discretion employed by ING under the contracts was uniform through the use of standardized rate sheets issued by ING; (iii) the ING FIA contracts provide for premium bonus and daily interest credits are both uniform

37

and consistent; (iv) the subject ING FIA contracts and related sales materials were uniform and prepared by ING; (v) ING uniformly breached the calculation of the Minimum Guaranteed Contract Value under the ING annuity contracts; (vi) ING uniformly misreported actual contract values to Class members; and (vii) ING uniformly used an "upfront" premium bonus to induce individuals to purchase ING's FIAs and failed to register as securities, with the California Department of Corporations, the premium bonus FIAs.

103.  *Adequacy of Representation*.  Plaintiff is an adequate representative of the Class.  Plaintiff purchased an ING FIA within the statute of limitations (and any tolling thereof) and suffered immediate losses as a result of ING's faulty design and execution of embedded complex derivative structures in Mr. Abbit's FIA contract.  ING also sold Plaintiff and unregistered security and otherwise deprived Plaintiff of benefits of the minimum guarantees due Plaintiff under the FIA provisions, causing Plaintiff to suffer harm.  Specifically, pursuant to the uniform FIA contract with ING, ING was obligated, *inter alia*, to add a 5% bonus and to credit interest each day to the minimum guaranteed values.

104.  Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all other individuals similarly situated.  To this end, Plaintiff has retained competent counsel, experienced in complex civil litigation involving insurance products.  Moreover, there is no hostility between Plaintiff and the unnamed Class members.

105.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.  The law firms of Hutton Law Group and Tatro & Zamoyski, LLP have the resources, commitment and experience to prosecute the issues associated with this type of litigation.  Plaintiff's counsel has previously represented purchasers of insurance products in a variety of class actions against insurance companies in federal and state courts throughout the country.

106.  *Predominance*.  There is a well-defined community of interest in the

38

relevant questions of law and fact affecting Class members.   The numerous, substantial questions of law and fact common to the Class related to ING's uniform deprivation of contractual benefits promised to Plaintiff and Class members predominates over any individual issues of law and fact, including but not limited to, the following:

a.      whether ING uniformly omitted key risks and material information from Plaintiff and the Class;

b.      whether ING abused its investment discretion under the annuity contracts;

c.      whether ING breached the FIA contracts by improperly calculating guaranteed values and interest credits;

d.      whether ING failed to properly treat FIAs with premium bonuses as "securities" under California law;

e.      whether ING issued false and misleading periodic statements to Plaintiff and the Class;

f.      whether ING committed elder abuse as defined in Cal. Welf. & Inst. Code §15600 *et seq.*;

g.      whether ING committed unfair, unlawful and/or fraudulent business practice, in violation of Cal. Bus. & Prof. Code §17200, in its marketing, promotion, solicitation, sales and issuance of deferred annuities to Plaintiff and Class members;

h.      whether ING engaged in false and misleading advertising in violation of Cal. Bus. & Prof. Code §17500, *et seq.*;

i.      whether ING fraudulently concealed information about its FIAs from Plaintiff and the Class in violation of California law;

j.      whether ING breached its obligation of good faith and fair dealing to Plaintiff and the Class;

k.      whether Plaintiff and the Class are entitled to damages; and

39

l.     whether the Class is entitled to injunctive, declaratory, and/or other relief.

107.    The claims of Plaintiff and the other Class members have a common origin and share a common basis.  The claims originate from the same illegal conduct on the part of defendants.

108.    *Superiority*.  A class action is a superior procedure for the fair and efficient adjudication of this case as compared to other available methods because (a) prosecution of claims by Plaintiff or the Class members individually are impractical, as the costs of prosecution may exceed what Plaintiff or any one Class member has at stake; (b) it is desirable to concentrate litigation of the claims herein within this forum; and (c) the proposed Class is manageable.  Economies of time, effort and expense will be fostered and the action will cause an orderly and expeditious administration of Class claims.

109.    The potential of nearly identical claims makes certification of the Class convenient and desirable, particularly for those individuals who might otherwise be left without a viable remedy.  Virtually all of the underlying issues in this case are amenable to resolution through the class action procedure.  In the alternative, a failure to certify the Class may result in an enormous number of lawsuits involving the same core issues, which concern common issues and standardized documents, with the potential for disparate results in cases that are substantially the same.  Furthermore, such separate actions would result in the expenditure of unnecessary time and expense, not only by the courts involved and Plaintiff and other Class members, but ING as well.  In addition, Class members – many who are elderly – would be discouraged from pursuing their claims individually with the prospect of significant expenses, and individuals would therefore be without sufficient strength to meaningfully prosecute ING.

110.    Class action treatment of this litigation is the only proper and workable solution.  The class action would be manageable by focusing on the key

40

issues: (1) the representations in uniform sales materials and the terms of the uniform FIA contracts; (2) the investment discretion employed by ING and how ING adjusted investment parameters to rob Plaintiff and the Class of retirement savings and income benefits; (3) the reporting of contractual values to Plaintiff and Class members; and (4) applying the legal remedies to the Class as a whole.

111.   Class treatment will provide a means to notify Class members of their rights and avoid typical burdens of actions, including the difficulty of finding an attorney to prosecute an important matter concerning their retirement savings.

112.   When all the recognized factors are considered in determining whether this matter should be certified as a class action, none is more compelling than the obvious fact that to deny certification would effectively deny the opportunity to be heard to many individuals and would at the same time potentially create an unmanageable and protracted series of individual lawsuits, at best.  At worst, it would leave thousands of senior citizens who need class certification without a practical remedy of any sort.  Thus, the denial of class treatment in this case would not only burden the court system, but would also result in the denial of justice to senior citizens who cannot afford to pursue their individual claims since ING has their money and will retain their money unless justice prevails.

**CAUSES OF ACTION**
**First Cause of Action**
**(Breach of Contract - Against ING)**

113.   Plaintiff hereby repeats and re-alleges all the preceding paragraphs, and incorporates the same as though fully set forth herein.  This Court has previously upheld Plaintiff's claim for a breach of the contract claim, by Order dated February 25, 2014, for ING's failure to properly execute the contractually required daily interest credits at the contract's guaranteed values and rates (i.e., daily compounding at the stated contract rate).

114.    Plaintiff and members of the Class entered into uniform written FIAs with ING, as alleged herein.  The uniform written FIAs are substantially similar to Plaintiff's contract, attached hereto as Exhibit A, and included form nos. IU-IA-3026; IU-IA-3032; IU-IA-3033; IU-IA-3034; IU-IA-3050; IU-IA-3054; IU-IA-3064; IU-IA-3065; IU-IA-3066; and IU-IA-3067.  Discovery will confirm the similarity of these contract forms as well as possibly identify additional contract forms not currently known by Plaintiff.

115.    These contract forms are substantially similar in that each of these contract forms is for an ING FIA offering savings protection and concurrent income benefits linked to equity indexes (i.e., index strategies), with daily compounding of interest at a stated guaranteed interest rate.

116.    The essential terms of these uniform annuity contracts of insurance were that ING agreed to be responsible for the establishment, adjustment, reporting and management of the investment parameters that affected the FIAs' ability to provide promised savings protection and income benefits for Plaintiff and members of the Class, commensurate with ING's uniform FIA product claims, and to pay a death benefit in the event the annuity owner died.

117.    ING also agreed to accept premiums from Plaintiff and members of the Class, credit interest and premium bonuses (if applicable) to those premiums, and to administer the contracts in a way that guaranteed interest credits daily, and to issue accurate periodic statements that were not misleading.

118.    Plaintiff and members of the Class, in return, agreed to pay premiums under the contract.  Plaintiff and other members of the Class have performed all material contractual obligations to Defendant, including payment of premiums (said payment being required in order for the contract to take effect).

119.    The savings protection and income benefits promised to Plaintiff and members of the Class was not achievable unless ING maintained the present value of the FIAs at or above the minimum guaranteed values under the FIA terms.

120.    The FIA contracts contained death benefits and are therefore contracts that contain life insurance.

121.    ING breached the following express and/or implied terms of the FIA contracts in at least the following respects:

a.    ING did not maintain the principal amount of the FIA at the guaranteed amount, which was to be no less than a minimum values in non-forfeiture regulations (e.g., Cal. Ins. Code §10168.25);

b.    ING abused its exclusive investment discretion under the FIA contracts in a manner that caused the present value of the FIA contracts to fall below the stated minimum guaranteed values, causing harm to Plaintiff and the Class to the sole and substantial benefit of ING;

c.    For FIA contracts with a "daily compounding" provision, ING credited interest to the FIA contract's minimum guaranteed values at less-than the stated guaranteed rates under the FIA;

d.    ING charged expenses and/or reduced interest credits through undisclosed means, not provided for in the uniform FIA contracts;

e.    ING issued false and misleading periodic statements in violation of the FIA contract provisions;

f.    For the California Seniors Class, ING knew, or should have known, that the FIA calculation of the minimum guaranteed values of the FIA misrepresented the actual present value of the FIA, in violation of California Insurance Code §780;

g.    For the California Seniors Class, ING knew, or should have known, that the name "Secure Index" or "Secure Index Opportunities Plus" (in the case of premium bonus FIAs) was false and misleading when made, in violation of California Insurance Code §780, because ING did not execute the FIA contracts in a manner that offered

43

"security" and income benefits meaningfully linked to the "index;"

      h.    For the California Seniors Class, ING did not obtain a permit from the California Insurance Commissioner to sell in California FIAs that are securities (i.e., the "ING Secure Index Opportunities Plus" FIA) in violation of California Insurance Code §827. As a result the subject FIAs are void under California Insurance Code §831.

122.    As a proximate result of these breaches of contracts by ING, Plaintiff and members of the Class have suffered a loss of monies and interest thereon in amount to be proven at the time of trial.

## Second Cause of Action
### (Breach of Implied Covenant of Good Faith and Fair Dealing - Against ING)

123.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

124.    The relationship of insurer and insured exists between ING on the one hand, and Plaintiff and the other members of the Class on the other hand. The relationship of insurer and insured creates a duty, implied in law, extending from ING to Plaintiffs and the Class to deal fairly with them and in good faith. As a result, there is an implied covenant of good faith and fair dealing in each FIA contract. ING must not do anything to injure the right of the insured to receive the full benefits of the FIA contract.

125.    Because of the special and/or fiduciary relationship inherent in the status of Plaintiff and members of the Class as "senior citizens," and the unique nature of an FIA contract holding retirement savings whereby ING drafted the contract and retains important and exclusive investment decisions, ING's obligations attendant to its duty of good faith are heightened.

126.    ING breached the implied covenant of good faith and fair dealing in at least the following respects:

a.    By acting contrary to ING's marketing and sales materials, by failing to protect the retirement savings of Plaintiff and members of the Class while providing income benefits, as promised;

b.    ING did not maintain the aggregate present value of the FIA contract's embedded derivatives (including ING's calculation of projected interest credits), premium bonus (if applicable) and contract benefits (such as death benefits) at the FIAs' stated minimum guaranteed values;

c.    ING abused its exclusive investment discretion under the FIA contracts in a manner that caused the present value of the FIA to fall below the minimum guarantees under the FIA contract;

d.    ING charged expenses and/or reduced interest credits through undisclosed means, not provided for in the uniform FIAs;

e.    ING issued false and misleading periodic statements to Plaintiff and the Class that prevented them from making informed investment decisions, such as whether to terminate the FIA;

f.    For the California Seniors Class, ING knew, or should have known, that the FIA calculation of the minimum guaranteed values of the FIA misrepresented the actual present value of the FIA, in violation of California Insurance Code §780; and

g.    For the California Seniors Class, ING did not treat its prospective insureds with good faith and fair dealing in the marketing of the ING FIAs, including the provision of false and misleading sales brochures that misrepresented the FIAs ability to protect savings and provide income benefits;

h.    For the California Seniors Class, ING did not obtain a permit from the California Insurance Commissioner to sell in California FIAs that are securities (i.e., the "ING Secure Index Opportunities Plus"

45

1  FIA) in violation of California Insurance Code §827.  As a result the

2  subject FIAs are void under California Insurance Code §831.

3  127.   As a proximate result of these breaches of the implied covenants,

4  Plaintiff and members of the Class have suffered a loss of monies and interest

5  thereon in amount to be proven at the time of trial.

6  **Third Cause of Action**
**(Breach of Fiduciary Duty - Against ING)**
7  **(Aiding and Abetting a Breach of Fiduciary Duty – Against ING U.S.)**

8  128.   Plaintiff hereby repeats and re-alleges all the preceding paragraphs,

9  and incorporates the same as though fully set forth herein.  This Court has

10  previously upheld Plaintiff's claim for breach of fiduciary duty against ING by

11  Order dated February 25, 2014.

12  129.   Plaintiff and the Class were specifically targeted by defendants as

13  potential purchasers of ING FIAs because Plaintiff and members of the Class were

14  actually or likely retired and/or seeking retirement planning and solutions.  By

15  offering to hold and protect retirement savings, particularly of those who are defined

16  by statute as "elderly," "retirees" or "senior citizens," ING undertook special

17  obligations towards the Plaintiff and the Class inherent in its fiduciary and special

18  relationships with Plaintiff and the Class.

19  130.   Defendants drafted FIA contracts whereby the essential terms of were

20  that ING agreed to be responsible for the establishment, adjustment, reporting and

21  management of the investment parameters that directly and substantially affected

22  the FIAs' ability to provide promised investment protection and income benefits for

23  Plaintiff and members of the Class.

24  131.   ING held a confidential position of trust with Plaintiff and the Class,

25  by holding their retirement savings and retaining the key and exclusive investment

26  decisions and discretions that directly affected the ability of the investment to

27  protect retirement savings and offer income benefits, as promised by ING.

28

132.    Defendants created, designed and embedded a complex derivatives structure within the annuity that was kept hidden from Plaintiff and members of the Class.

133.    Defendants knew that Plaintiff and the Class were likely unaware of the derivatives structure embedded in the ING FIAs and therefore knew that it was impracticable for Plaintiff and members of the Class to properly make the important investment decisions surrounding the establishment, adjustment, reporting and management of the valuation parameters of the structured derivatives embedded in the FIA contracts.

134.    Defendants knew that even if Plaintiff and members of the Class could discern the existence of the complex derivatives structure that Plaintiff and the members of the Class had no reasonable or practical means of determining the true value and price of the derivatives structures that was embedded in the FIAs.

135.    Defendants did not present the true mechanics and valuations of the complex derivatives structure to either insurance or securities regulators, nor did defendants submit any related pricing parameters or related disclosures for regulatory review, thereby placing additional obligations upon ING to act in a trustworthy, responsible and fiduciary manner towards Plaintiff and members of the Class that ING had promised to protect.

136.    In the context of retaining and being vested with the most important and influential investment decisions under the FIA contracts, in particular setting the pricing parameters of the embedded derivatives that would determine the success or failure of the investment, on behalf of Plaintiff and the Class, ING represented to Plaintiff and the Class within the FIA contracts the following:

- "We appreciate your purchase and would like to take this opportunity to assure you of our commitment to serving your financial needs."

- "That's why we want to thank you and welcome you to the growing number of contract owners who have chosen the ING family of companies as their preferred financial services provider."

- "Our commitment to you does not end at the issuance of your enclosed contract.  Rather, our commitment to you begins."

- "Again, thank you for the trust and confidence you have placed with us."

137.    ING knowingly undertook to act on behalf of Plaintiff and members of the Class with respect to the establishment and adjustment of the pricing parameters of the derivatives structure embedded by Defendant in its FIA contracts.

138.    By virtue of their contractual relations, ING acted as agent on behalf of, and for the benefit of, Plaintiff and members of the Class in the selection of pricing parameters for the embedded derivatives that would directly influence the success or failure of the FIA contracts of Plaintiff and members of the Class.  ING was duty-bound to act with the utmost good faith towards Plaintiff and the Class with respect to setting the pricing parameters of the unseen and enigmatic embedded derivative embedded in the FIA.

139.    ING breached its fiduciary duties to Plaintiff and the Class (including breaches of the duties of loyalty and candor) in at least the following respects:

a.    By misrepresenting the FIA product in uniform sales brochures, and failing to correct disclosures, as explained above at ¶35;

b.    By failing to disclose the existence of embedded derivatives under the FIA contracts;

c.    By failing to explain the risks inherent in owning an FIA with a complex derivatives structure, that the product is difficult to price, and the product may behave unpredictably in various markets;

d.    By failing to disclose that ING had a history of adjusting investment parameters in a manner that reduced the value of the FIA in order to compensate ING for investment losses that it was experiencing;

e.    By failing to disclose that the embedded derivatives structure and/or premium bonus were not evaluated by any regulators as possible securities, and that the states' insurance departments to not

48

review the FIAs for product pricing and derivatives' behavior;

f.      By failing to disclose Defendant's inherent conflicts of interest in retaining investment decisions under the FIA contract that directly harmed Plaintiff and the Class to the sole and substantial benefit of Defendant;

g.      By failing to disclose the illusory nature of the bonuses, if applicable to the annuity contract;

h.      By failing to protect the retirement savings of Plaintiff and members of the Class while providing income benefits, as promised;

i.      By failing to properly credit the annuities owned by Plaintiff and members the Class with premium bonuses (if applicable) and with daily guaranteed interest credits; and

j.      By charging expenses and/or reducing interest credits through undisclosed means, not provided for in the uniform annuity contracts.

140.    ING U.S. aided and abetted ING's breaches of fiduciary duty.  ING U.S. owned, operated, and/or controlled ING throughout the relevant period of the factual allegations of this complaint.  ING U.S. acted for, on behalf of, aided, abetted, encouraged, and rendered substantial assistance to ING in furtherance of the wrongful acts alleged herein, including ING's breaches of fiduciary duties to Plaintiff and the Class.  In aiding and abetting and substantially assisting the commission of the acts complained of, defendants acted with an awareness of their wrongdoing and realized that their conduct would substantially assist the accomplishment of the wrongful conduct and scheme alleged herein.  In performing these acts, defendants ratified such acts, or both, and benefited financially from their scheme.

141.    As a result of the wrongful conduct of defendants, Plaintiff and the Class have suffered and continue to suffer economic and non-economic losses, all

1  in an amount to be determined according to proof at trial.

2      142.    In addition, the wrongful acts of defendants were done maliciously,

3  oppressively, and with the intent to mislead and defraud, and Plaintiff and the Class

4  are entitled to punitive and exemplary damages to be ascertained according to proof,

5  which is appropriate to punish defendants.  Each of these violations was achieved

6  because defendants willingly, knowingly, and/or recklessly sought to gain their own

7  financial advantage to the disadvantage of Plaintiff and the Class.

8      143.    As a direct and proximate result of defendants' violations of its

9  fiduciary duties, Plaintiff and the Class have been injured, and suffered and continue

10  to suffer economic and noneconomic losses, all in an amount to be determined

11  according to proof at trial.  In light of the foregoing, Plaintiff requests that the court

12  deem this a constructive fraud, and require defendants to immediately rescind the

13  FIA contracts to which Plaintiff and the Class are subject.

**Fourth Cause of Action**
**(Financial Elder Abuse, California Welfare & Institutions Code**
**Section 15600, *et seq*. – Against ING)**

16      144.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and

17  incorporates the same as though fully set forth herein.  This Court has previously

18  upheld Plaintiff's financial elder abuse claim against ING by Order dated February

19  25, 2014.

20      145.    ING's conduct constitutes financial abuse under Cal. Welf. & Inst.

21  Code § 15657.5, *et seq*., as defined in Cal. Welf. & Inst. Code § 15610.30.

22      146.    At all relevant times, ING took and/or assisted in the wrongful taking

23  of retirement savings from Plaintiff and the Class (who are all age 65 or older) for

24  their own wrongful use, with intent to defraud, and/or with undue influence taking

25  advantage of ING's unfair advantage under the contracts.  ING's wrongful taking

26  include the sale of unqualified securities to Plaintiff and certain members of the

27  Class who purchased FIAs with "premium bonuses" that were not guaranteed, and

28  detached from the non-forfeiture provisions of state law, and were therefore wholly

50

unprotected.

147.    ING held a confidential, position of trust or fiduciary relation with Plaintiff and the Class, holding their retirement savings and acting as "trusted" advisors, and they each trusted and relied on ING for their retirement planning, insurance and financial affairs.

148.    ING's wrongful acts were done maliciously, oppressively, and with the intent to mislead or defraud, thereby warranting punitive and exemplary damages appropriate in an amount to be ascertained according to proof pursuant to Cal. Civ. Code § 3294 *et seq*.

149.    Under Cal. Welf. & Inst. Code § 15657.5, *et seq*., ING is liable to the California Seniors Class for reasonable attorneys' fees and costs for investigating and litigating this claim.   Under Cal. Civ. Code § 3345, ING is liable to the California Seniors Class for treble damages and penalties because: (a) ING knew or should have known its conduct was directed to a senior citizen; (b) its conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) Plaintiff and the Class are senior citizens who are more vulnerable than others to ING's conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) Plaintiff and the Class actually suffered substantial physical, emotional and economic damages resulting from Defendant's conduct.

150.    Under Cal. Welf. & Inst. Code § 15657, *et seq*., ING is liable to Plaintiff and to members of the California Seniors Class for their pain and suffering.

**Fifth Cause of Action**
**(Fraud – Against ING)**

151.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

152.    By virtue of ING's contractual, fiduciary and other special

51

relationships with Plaintiff and the Class, ING was obligated to tell the full truth concerning the FIA products it sold to Plaintiff and the Class.  To fulfill these obligations, ING was required to keep Plaintiff and the Class accurately and fully informed concerning the valuations and other material matters related to the FIAs, and to execute the FIA contracts for the benefit of the Plaintiff and the Class so that performance was consistent with ING's representations about the FIAs:

- The FIAs offered "**guarantees**" to "**protect**" retirement savings while offering investment earnings "linked" to the S&P 500® Index;
- The FIAs would "**Protect Your Assets**" while "**fueling the value of your annuity**" "**to build up your retirement savings**";
- The FIAs were designed to provide "**protection of principal**" with income benefits ("Index Opportunities").

153.   In connection with the marketing, solicitation, application, underwriting, acceptance, sales, purchase, operation, retention and administration of its FIA contracts, defendants have employed a scheme and common course of conduct to induce Plaintiff and the Class into purchasing FIA contract that contained hidden and embedded structured derivatives that defendants used to take retirement savings from Plaintiff and the Class, and pay those lost retirement savings directly to defendants.  ING's execution of the FIA contracts was grossly and unfairly valued in favor of defendants, to the detriment of Plaintiff and the Class.  Through this common course of conduct, ING, either itself specifically or through its agents, intentionally, or with reckless disregard, misrepresented, omitted, and/or concealed the following material facts from Plaintiff and members of the Class:

a.   By misrepresenting and omitting material facts in the FIA product in uniform sales brochures, as explained above at ¶35, to prospective insured in violation of law, including California Insurance Code §332 and California Civil Code §1710;

b.   By failing to disclose the existence of embedded derivatives under the FIA contracts;

c.     By failing to disclose ING's inherent conflicts of interest in retaining investment decisions under the FIA contract that directly harmed Plaintiff and the Class to the sole and substantial benefit of ING;

d.     By failing to disclose the true nature of the bonuses, that the full bonus was at risk of loss, and a security under California law;

e.     By failing to protect the retirement savings of Plaintiff and members of the Class while providing income benefits, as promised;

f.     By failing to properly credit the FIAs owned by Plaintiff and members the Class with daily guaranteed interest credits;

g.     By misrepresenting FIA values in account statements; and

h.     By charging expenses and/or reducing interest credits through undisclosed means, not provided for in the uniform annuity contracts.

154.     These misrepresentations and concealment of facts were material to the decisions of Plaintiff and members of the Class to purchase and maintain the FIA products issued and administered by ING.     Defendants knew the misrepresentations and concealment of material facts were false, or alternatively, made misrepresentations of facts with reckless disregard for whether those representations were true.

155.     Plaintiff and the Class relied upon the misrepresentations and concealment of facts (e.g., the FIAs contained exotic structured derivatives embedded in the contracts that made the economic value grossly unfair to Plaintiff and the Class).     Plaintiff and the Class indicated their reliance by purchasing and maintaining the flawed FIAs and paying the premiums with the retirement savings they sought to protect.     Plaintiff's and the Class members' reliance on these representations and concealment of facts was reasonable and justifiable.

156.     Plaintiff and members of the Class have suffered and continue to suffer economic and non-economic losses because of defendants' wrongful

53

conduct.  The amount of such losses will be determined according to proof at trial. The wrongful acts of defendants, and each of them, set forth in this Count were done maliciously, oppressively, and with the intent to mislead and defraud, and Plaintiff and the Class are entitled to punitive and exemplary damages to be ascertained according to proof.

## Sixth Cause of Action
### (Unlawful, Deceptive and Unfair Business Practices – against ING)

157.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.  This Court has previously upheld Plaintiff's unfair competition claim against ING by Order dated February 25, 2014.

158.    In marketing and selling FIAs to Plaintiff and the Class as described above, Defendant engaged in unlawful deceptive and unfair business acts and deceptive and misleading advertising within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.

159.    ING's acts of unfair competition and unlawful practices include each of the violations of law alleged herein including, *inter alia*, California Welfare & Institutions Code Section 15600, *et seq*., Cal. Civ. Code §1710, and Cal. Ins. Code §§332, 780, 781, 827, 10168.25 (and any related provisions), as explained above.

160.    As a result of the conduct described above, ING has and will be unjustly enriched at the expense of Plaintiff and the Class.  Specifically, ING has been unjustly enriched by receiving substantial monies and profits from the sale of their FIA products that were promoted and sold through advertisements that omitted, either directly or by implication, the true risks of such products for purchase by senior citizens.  Further, both Plaintiff and the Class have been deprived of money or property as a result of ING's wrongful conduct and unlawful acts and practices and, therefore, have sustained injury in fact.

161.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Class seek a court order requiring ING to immediately cease such acts of unfair competition and enjoining them from continuing to deceptively advertise or conduct business via the unlawful or unfair business acts and practices and deceptive and misleading advertising complained of herein.  Plaintiff and the Class also request an order requiring Defendant to engage in a corrective advertising campaign.

162.     Plaintiff and the Class additionally request an order requiring ING to disgorge its ill-gotten gains as described above and awarding Plaintiff and the Class full restitution of all monies and property wrongfully acquired by defendants by means of such unlawful business practices, acts of unfair competition and false advertising, plus interest and attorney fees, so as to restore an and all monies Plaintiff and the Class which were acquired and obtained by means of such deceptive, unfair or unlawful business practices.

## Seventh Cause of Action
### (Unfair, Deceptive and Misleading Advertising – Against ING)

163.     Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.  This Court has previously upheld Plaintiff's false advertising claim against ING by Order dated February 25, 2014.

164.     California Bus. & Prof. Code § 17500, *et seq*. prohibits unfair, deceptive and misleading advertising.

165.     ING's uniform sales materials and standardized annuity contract forms deceived and misled Plaintiff and the Class as to the ability of the ING FIAs they purchased from ING to protect retirement savings and offer income benefits as compared to alternative investments, and thus also constitute deceptive or misleading advertising in violation of, *inter alia*, Cal. Bus. & Prof. Code § 17500, *et seq*.

166.   ING either knew or recklessly disregarded that such advertising was deceptive, misleading or otherwise inadequate.

167.   The above-described unfair, unlawful, deceptive and misleading advertising and business acts conducted by ING still continue to this day, and present a threat to Plaintiff, the Class and the general public in that ING has failed to publicly acknowledge its wrongdoing or publicly issue adequate corrective notices and advertising to purchasers of its annuity products and to the public generally.

168.   The advertising and marketing brochures, along with the sales techniques utilized by ING, are, in fact, false and misleading in that ING made repeated express representations:

a.   By misrepresenting and omitting material facts in the FIA product in uniform sales brochures, as explained above, to prospective insured in violation of law, including California Insurance Code §332 and California Civil Code §1710;

b.   By representing ING's FIA products were "**guaranteed**" to "**protect assets**";

c.   By representing ING's FIA products provided a way of "**fueling the value of your annuity**" "**to build up your retirement savings**";

d.   By representing ING's FIA products are appropriate investments for senior citizens;

e.   By representing ING's FIA products satisfy "**protection of principal**"; and

f.   By representing ING's FIA products financial security and peace of mind.

169.   These representations were made by ING with the intent to induce and did, in fact, reasonably induce Plaintiff and the Class to purchase the ING's FIA

products and thus deprived them of monies and property as a result of ING's acts and practices.  Had Plaintiff and the Class known the actual facts, they would not have purchased the flawed FIAs.

170.    As a result of the conduct described above, ING has been and will be unjustly enriched at the expense of Plaintiff and the Class.  Specifically, ING has been unjustly enriched by receiving substantial monies and profits from the sale of their deferred annuity products that were promoted and sold through advertisements which affirmatively misrepresent, either directly or by implication, the true risks and attributes of such products for purchase by senior citizens.

171.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff and the Class seek a court order requiring ING to immediately cease such acts of unfair competition and enjoining them and/or their affiliates from continuing to deceptively advertise and market their deferred annuity products.  Plaintiff and the Class also request an order requiring ING to engage in a corrective advertising campaign.  Plaintiff and the Class further request an order requiring ING to disgorge their ill-gotten gains as described above and awarding Plaintiff and the Class full restitution of all monies wrongfully acquired by ING through such acts of unfair competition and deceptive and misleading advertising, plus interest and attorney fees so as to restore any and all monies and property to Plaintiff and the Class which were acquired and obtained by means of such deceptive and misleading advertising.

172.    Plaintiff and the Class also seek damages pursuant to Cal. Bus. & Prof. Code § 17500.3(c).

## Eighth Cause of Action
## (Failure to Supervise – against ING)

173.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.  This Court has previously upheld Plaintiff's claim for failure to supervise against ING by Order dated

February 25, 2014.

174.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

175.    ING is independently liable to Plaintiff and the Class for its failure to properly train and supervise its sales agents responsible for selling ING FIAs to Plaintiff and the Class.   These FIAs were embedded with complex structured derivatives for which the ING sales agents received little or no pricing information, no training, no testing, and no meaningful supervision or controls designed to ensure that the agents understood the true suitability of these products for senior citizens or the information needed to explain to the senior citizens exactly what they were buying.

176.    ING also failed to supervise its agents by allowing unregistered representatives to sell securities in California.   In doing so, ING side-stepped important regulatory rules and notices.   In any event, ING either knew or should have known that industry standards for the sale of structured products by their representatives required a "seller-beware" approach to the issuance of FIAs by virtue of regulatory notices, such as NASD Notice to Members 5-50.

177.    Despite ING's execution of an outrageous price disparity to the structured derivatives designed by ING, and the danger of those derivatives to the retirement savings of Plaintiff and the Class, ING's management personnel and the compliance personnel under their control failed to properly communicate to Plaintiff and the Class the high risk imposed by an investment design that would benefit only ING at the expense of Plaintiff and the Class.

178.    Likewise, ING violated well-accepted standards for derivatives transactions and the related internal and compliance policies mandated by entities, such as FINRA, and those typically engaged in the derivatives trading industry.

179.    Thus, ING is separately liable to Plaintiff and the Class for losses in the accounts and other damages due to their failure to properly supervise their sales

58

1   agents.

2

3                           **Ninth Cause of Action**
       **(Declaratory Relief re Qualifying Securities – against ING)**

4       180.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and

5   incorporates the same as though fully set forth herein.

6       181.    ING was the issuer of the subject FIA contracts called "ING Secure

7   Index Opportunities Plus" FIAs that contained integrated "derivatives" and so-

8   called "premium bonuses."  Plaintiff seeks a declaration by this Court that the "ING

9   Secure Index Opportunities Plus" FIAs are "securities" under California law (i.e.,

10  Cal. Corp. Code §25019) for purposes of informing Plaintiff's other California-only

11  Causes of Action, including Plaintiff's Breach of Fiduciary Duty claim (heighted

12  and expanded obligations in sale of unregistered securities to fiduciaries), Plaintiff's

13  §17200 Unfair Competition Claim (anticompetitive for ING to be selling

14  unregistered securities), and Plaintiff's claim for violation of Cal. Corp. Code

15  §25401.

16      182.    As a result of ING having violated Cal. Corp. Code §25110, Plaintiff

17  and certain members of the Class may also have a cause of action for rescission

18  under Cal. Corp. Code §25501.5 and §25503.

19      183.    ING represented to the public at large, including Plaintiff and

20  members of the Class, in uniform sales materials, that the "ING Secure Index

21  Opportunities Plus" FIAs contained "premium bonuses" as follows:

22          a.    "The ING Secure Index Opportunities Plus Annuity . . .

23      provides you with minimum guarantees and interest potential that you

24      may not be able to find in other sources of fixed income like savings

25      accounts, certificates of deposit and savings bonds.  In addition, it offers

26      a **5% premium bonus**[6] at the inception of your contract."

27  ────────────────────

28  [6]  The emphasis is contained in the original text and the original text also contains
    the following footnote:

b.   "**5% Premium Bonus**.  In addition, at the inception of your annuity contract, a 5% premium bonus will be immediately credited to your accumulation value.  For example, if your premium is $100,000, your premium bonus will be $5,000, and your accumulation value will be $105,000."

c.   "The premium bonus is 5% of the single premium paid. The premium bonus is credited at contract issue and applied pro rata to each strategy in the same ratio as the premium elected to each strategy. The premium bonus will earn interest credits in the same way as the premium elected to each strategy."

184.    Upon delivery of the subject "ING Secure Index Opportunities Plus" FIAs, ING represented the following to purchasers of the subject contracts:

a.   The "Allocation of the Initial Premium" includes the "premium bonus" (in the case of Plaintiff, the "Premium Amount" contained on the "Delivery Statement" shows "$1,050,000.00" – 5% of Plaintiff's $1 million premium paid).

b.   The "Amount of the Single Premium" contained in the "Contract Data Page" includes the "premium bonus."

185.    After delivery of the subject "ING Secure Index Opportunities Plus" FIAs, ING mailed to Plaintiff and members of the Class who had purchased "ING Secure Index Opportunities Plus" FIAs periodic account statements showing the amount of the "Initial Premium" and "Bonus Paid at Issue" included the "premium

---

Products offering a bonus may offer lower credited interest rates, participation rates, index caps, monthly caps, and/or higher index spreads than products not offering a bonus.  Over time, and under certain circumstances, the amount of the bonus may be more than offset by the lower credited interest rates, participation rates, monthly caps, index caps and/or higher index spreads.  Interest rates, participation rates, index caps, monthly caps, and index spreads are subject to change.

60

1    bonus" in cash amounts.

2          186.    Thus, ING had represented to Plaintiff and members of the Class who

3    had purchased the subject "ING Secure Index Opportunities Plus" FIAs that they

4    had in fact been paid and received the 5% premium bonus in cash at "inception of

5    the contract" and at "contract issue," as represented.  ING did not guarantee the

6    "premium bonus," therefore the "premium bonus" received by Plaintiff and

7    members of the Class was at risk of loss under the FIAs integrated with a derivatives

8    structure.

9          187.    The FIAs, with integrated derivatives and "premium bonuses,"

10   satisfies in form and/or substance the "risk capital test" under the California

11   Securities laws in each of the following respects:

12          a.    The funds raised by ING through the sale of the subject

13          "ING Secure Index Opportunities Plus" FIAs are used by defendants to

14          raise funds for an investment enterprise operated by defendants to profit

15          from investment strategies implemented by defendants with the use of

16          Plaintiff and Class members' investment funds.  Defendants profit from

17          their enterprise using these investment funds through investment

18          appreciation, interest, dividend, option premiums, and similar returns.

19          Defendants also profit from the related derivatives structure and ING's

20          investment discretion to adjust investment parameters in a way that

21          unlocks favorable DAC tax benefits, increases reported earnings of the

22          enterprise, and reduces reported liabilities of the enterprise.

23          b.    The subject "ING Secure Index Opportunities Plus" FIAs

24          are offered to the public at large, including those persons retired,

25          approaching retirement, and/or their prospective beneficiaries, and

26          include a portion of the population 65 years of age and older (persons

27          age 65 years and older are estimated to be approximately 13% of the

28          U.S. population).

c.    Plaintiff and members of the Class who had purchased "ING Secure Index Opportunities Plus" FIAs are substantially powerless to effect the success defendants' enterprise. ING retains the exclusive investment discretion under the FIAs on how the subject contract's investment parameters will be established by ING. Plaintiffs and members of the Class are given no choice in how defendants choose to invest the subject investment proceeds, and the strategy choices made available by ING to Plaintiff and members of the Class do not materially impact the success of defendants' enterprise. For example, if defendants' investment enterprise is adversely impacted by increased market volatility, defendants will adjust investment parameters under the contracts to defendants' benefit, and to the detriment of the investors, who are then subject to risk of loss of the previously-credited "premium bonuses."

d.    The "premium bonuses" paid to Plaintiff and members of the Class who had purchased "ING Secure Index Opportunities Plus" FIAs are substantially at risk because the bonuses are inadequately secured, and are not guaranteed by ING under the contract or otherwise. In valuation models, under certain reasonably-expected market circumstances, only some or none of the premium bonus may ever be realized by the owner of the FIA.

e.    Any exemptions under California law do not apply because the "premium bonus" is paid separately by defendants, and not part of the FIA's owners paid premium, and the ability of the premium bonus to be profitable is dependent upon how defendants account for the derivatives separately from what they refer to as the "host contract." See filings by ING U.S. with the Securities and Exchange Commission.

188.    The "premium bonus" as contained in the FIAs, with integrated

derivatives, satisfies in form and/or substance, federal law for "investment contracts" (for purposes of the California qualification analysis) in each of the following respects:

      a.    Defendants' scheme alleged herein involves an investment of money (e.g., "premium bonus") in a common enterprise with profits solely to come from the efforts of persons other than Plaintiff and the Class.

      b.    Plaintiff and the Class were told, and reasonably believed, that their investment with ING could profit and/or provide investment returns from the promised "premium bonus" paid to, and credited to, their contracts at contract inception.

      c.    The "ING Secure Index Opportunities Plus" FIAs contained "premium bonuses" that are/were an investment in a common enterprise premised upon a reasonable expectation of profits to be derived from the investment management of persons other than Plaintiff and the Class.

189.    Plaintiff therefore sues for injunctive and declaratory relief that the "ING Secure Index Opportunities Plus" FIAs are securities under California law for purposes of notifying Plaintiff and certain members of the Class that their FIAs are/may be eligible for rescission and or damages available under applicable law, and enjoining defendants from selling "ING Secure Index Opportunities Plus" FIAs until after these FIAs are properly qualified by the California Department of Corporations.

### Tenth Cause of Action
### (Violations of the California Securities Act – against ING)

190.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

191.    ING, in connection with the offer, sale, or purchase of a security –

namely, the "ING Secured Index Opportunity Plus" FIA with a "premium bonus" – ING violated Cal. Corp. Code §25401 directly or indirectly, as alleged herein: (a) Employed a devise, scheme, or artifice to defraud; (b)  Made untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) Engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit upon Plaintiff and other members of the California Class who purchased the "ING Secured Index Opportunity Plus" FIA with a "premium bonus."

192.    As a result of ING's violation of Cal. Corp. Code §25401, Plaintiff seeks relief under Cal. Corp. Code §25501 and §25501.5.

### Eleventh Cause of Action
### (Control Person Liability – against ING U.S.)

193.    Plaintiff hereby repeats and re-alleges all preceding paragraphs, and incorporates the same as though fully set forth herein.

194.    ING U.S. materially aided and abetted the solicitation and sale of securities to Plaintiff and certain members of the California Seniors Class who purchased securities from ING.

195.    ING U.S. materially aided and abetted the material misrepresentations and omissions in uniform written solicitation materials and uniform contract forms in connection with the sale of securities to Plaintiff and certain members of the California Seniors Class who purchased securities from ING.

196.    ING U.S., directly and indirectly, controls ING, who is liable for violation of the securities laws identified above, including the material misrepresentations and omissions in uniform written solicitation materials and uniform contract forms in connection with the sale of securities to Plaintiff and certain members of the California Seniors Class who purchased securities from

ING, as set forth throughout this complaint.

197.    Further, ING U.S. knowingly provided substantial assistance to ING in targeting retirees and seniors with false and misleading sales brochures for the "ING Secure Index Opportunities Plus" FIA that contained a so-called "premium bonus," as explained herein.

198.    ING also materially assisted ING in violations of Cal. Corp. Code §25110, as described herein.

199.    As a direct and proximate result of these violations of the California Corporations Code, Plaintiff and members of the California Class has suffered damages and other harm in an amount to be proven at trial.

200.    Defendants therefore are liable jointly and severally with and to the same extent as ING.  See Cal. Corp. Code §§25403, 25504, 25504.1.

201.    Plaintiff therefore sues for injunctive and declaratory relief that the "ING Secure Index Opportunities Plus" FIAs are securities under California law for purposes of notifying Plaintiff and certain members of the Class that their FIAs are/may be eligible for rescission and or damages available under applicable law.

## PRAYER

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment against defendants as follows:

A.    For an order certifying the Class as defined herein, appointing Plaintiff as Class representative, and appointing his counsel as Class counsel;

B.    For an order requiring disgorgement and return of defendants' ill-gotten gains to Plaintiff and the Class;

C.    For a declaration by this Court that the "ING Secure Index Opportunities Plus" FIA with offered "premium bonus" is a "security" under California law for which qualification was not obtained

65

by the California Department of Corporations, and for which a permit was not received from the California Department of Insurance;

**D.**     Injunctive relief preventing defendants from offering for sale in the state of California "ING Secure Index Opportunities Plus" FIA with offered "premium bonus," if declared by this Court a "security" under California law;

**E.**     For establishment of a claims administration process whereby Class members may tender their FIAs if the FIAs are found to be securities or otherwise void or voidable under applicable law;

**F.**     For distribution of any moneys recovered, via fluid recovery or *cy pres* recovery where necessary to prevent defendants from retaining any of the profits or benefits of their wrongful conduct, on behalf of Plaintiff or the Class;

**G.**     For imposition of a constructive trust;

**H.**     For compensatory, benefit of the bargain, special and general damages according to proof;

**I.**     For punitive and exemplary damages pursuant to Cal. Civ. Code § 3294 due to clear and convincing evidence of defendants' oppression, fraud or malice;

**J.**     For reasonable attorneys' fees and costs of investigation and litigation under Cal. Welf. & Inst. Code § 15657.5;

**K.**     For costs of suit, pre-judgment interest and post-judgment interest; and

**L.**     For such other and further relief as the Court may deem necessary or appropriate.

///

///

///

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a jury trial of all claims triable by a jury.

3

4    DATED: March 27, 2014                **HUTTON LAW GROUP**

5

6                                         */s/ Andrew W. Hutton*

7                                         _____

     ANDREW W. HUTTON

8

9                                         12671 High Bluff Drive, Suite 130
                                          San Diego, CA  92130

10                                        Telephone:   (858) 793-3500
                                          Facsimile:    (858) 793-3501

11                                           drew@law-hutton.com

12                                        **TATRO & ZAMOYSKI, LLP**

13

14                                        */s/ Timothy J. Tatro*

15                                        _____

     TIMOTHY J. TATRO

16                                        PETER A. ZAMOYSKI
                                          12760 High Bluff Drive, Suite 210

17                                        San Diego, CA 92130
                                          Telephone: (858) 244-5032

18                                        Facsimile: (858) 847-0032
                                             tim@tatrozamoyski.com

19                                           peter@tatrozamoyski.com

20
                                          Attorneys for Plaintiff
21

22

23

24

25

26

27

28

Plaintiff's First Amended Complaint - 13CV2310GPC(WVG)