1   Andrew W. Hutton (172033)
2       drew@law-hutton.com
     HUTTON LAW GROUP
3   12671 High Bluff Drive, Suite 130
4   San Diego, CA  92130
     Telephone:    (858) 793-3500
5   Facsimile:    (858) 793-3501

6
7   Timothy J. Tatro (175633)
        tim@tatrozamoyski.com
8   Peter A. Zamoyski (185579)
        peter@tatrozamoyski.com
9   TATRO & ZAMOYSKI, LLP
10  12760 High Bluff Drive, Suite 210
     San Diego, CA 92130
11  Telephone:    (858) 244-5032
12  Facsimile:    (858) 847-0032

13  Attorneys for Plaintiff(s)

14

15          IN THE UNITED STATES DISTRICT COURT

16          SOUTHERN DISTRICT OF CALIFORNIA

17

18  Ernest O. Abbit, on behalf of himself       Case No. 13-CV-2310-GPC(WVG)
     and on behalf of all persons similarly
19  situates,                                    **CLASS ACTION**

20                  Plaintiff,                    **PLAINTIFF'S MEMORANDUM OF**
                                                  **POINTS AND AUTHORITIES IN**
21  v.                                            **SUPPORT OF MOTION FOR CLASS**
                                                  **CERTIFICATION, APPOINTMENT**
22  ING USA Annuity and Life Insurance           **OF CLASS REPRESENTATIVE AND**
     Company, and ING U.S., Inc.                  **APPOINTMENT OF CLASS**
23                  Defendants.                   **COUNSEL (REDACTED)**
24

25
                                                  DATE:      June 19, 2015
26                                                TIME:      1:30 p.m.
                                                  JUDGE:     Honorable Gonzalo P. Curiel
27                                                CTRM:      2D (2nd Floor - Schwartz)
28

# **TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    FACTUAL BACKGROUND ......................................................................... 2

       A.    Facts and Evidence Common to All Class Members .......................... 2

             1.   ING Targets Retirement Savings with its Secure Index
                  FIAs ........................................................................................... 2

             2.   ING's Derivatives Structure Depletes Class Member
                  Savings ...................................................................................... 3

             3.   ING Issues Uniform, Non-Negotiable Contract Forms.............. 4

             4.   ING's Special, Fiduciary and Good Faith Duties to the
                  Class........................................................................................... 5

             5.   Derivatives and Pricing Are Not Explained to Sales
                  Agents ........................................................................................ 5

             6.   ING's Knows Class Members are Seeking Safety ..................... 6

             7.   ING's Motive is to Protect Itself – Not Class Members ........... 6

             8.   Damages Calculations Can Be Achieved on Class-wide
                  Basis........................................................................................... 7

       B.    Facts Concerning Plaintiff Ernest Abbit ............................................ 7

III.   STANDARD OF REVIEW ........................................................................... 9

IV.    ARGUMENT ............................................................................................... 10

       A.    The Classes are Ascertainable ......................................................... 10

       B.    Rule 23(a) is Satisfied ...................................................................... 11

             1.   Numerosity .............................................................................. 11

             2.   Commonality ........................................................................... 11

             3.   Typicality................................................................................. 12

             4.   Adequacy ................................................................................. 13

       C.    Rule 23(b)(3) is Satisfied ................................................................. 14

             1.   Common Issues Predominate on Breach of Contract
                  Claim........................................................................................ 14

             2.   Common Issues Predominate on ING's Breach of Duties ....... 17

             3.   Common Issues Predominate on Other California Claims ...... 18

i

4.   Superiority ............................................................... 23

V.   CONCLUSION ............................................................................ 24

13-CV-2310-GPC(WVG)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbit v. ING USA Annuity and Life Ins. Co.*,
  999 F. Supp. 2d 1189 (S.D. Cal. 2014) ..................................................... 1, 15, 17

*Alba v. Papa John's USA*,
  2007 U.S. Dist. LEXIS 28079 (C.D. Cal. 2007) .................................................. 23

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................ 9

*Brakke v. Econ. Concepts, Inc.*,
  213 Cal. App. 4th 761, 153 Cal. Rptr. 3d 1 (2013) ........................................... 19

*Cartwright v. Viking Industries*,
  2009 U.S. Dist. LEXIS 83286 (E.D. Cal. 2009) ................................................. 24

*In re Conseco Life. Ins. Co. Lifetrend Ins. Sales & Mktg Lit.*,
  270 F.R.D. 521 (N.D. Cal. 2010) ....................................................................... 16

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .............................................................................. 10

*Ellsworth v. U.S. Bank, N.A.*,
  2014 U.S. Dist. Lexis 81646 (N.D Cal. 2014) .................................................... 16

*People ex rel. Gallegos v. Pac. Lumber Co.*,
  158 Cal. App. 4th 950 (2008) ............................................................................. 19

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................ 11, 12, 13, 14

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .............................................................................. 12

*Iorio v. Asset Marketing Inc.*,
  2006 U.S. Dist. LEXIS 94948 (S.D. Cal. 2006) ................................................. 20

*Lemieux v. Schwan's Home Serv.*,
  2013 U.S. Dist. LEXIS 127032 (S.D. Cal. 2013) ................................................ 9

iii

*Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ............................................................. 23

*Makaeff v. Trump Univ., LLC*,
  2014 U.S. Dist. LEXIS 22392 (S.D. Cal. 2014) ................................... 17

*Mass. Mutual Life Ins. Co. v. Superior Ct.*,
  97 Cal. App. 4th 1282, 119 Cal. Rptr. 2d 190 (2002) ......................... 20

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
  268 F.R.D 652 (S.D. Cal. 2010) ............................................. 1, 11, 18, 21

*Negrete v. Allianz Life Ins. Co. of N. America*,
  238 F.R.D. 482 (C.D. Cal. 2006) ................................................... 20, 21

*Ortega v. J.B. Hunt Transport, Inc.*,
  258 F.R.D. 361 (C.D. Cal. 2009) ........................................................ 14

*Paulus v. Bob Lynch Ford, Inc.*,
  139 Cal. App. 4th 659 (2006) ............................................................. 19

*Podolsky v. First Healthcare Corp.*,
  50 Cal. App. 4th 632, 58 Cal. Rptr. 2d 89 (1996) ............................. 19

*Schnall v. Hertz Corp.*,
  78 Cal. App. 4th 1144, 93 Cal. Rptr. 2d 439 (2000) ......................... 19

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO, CLC v. ConocoPhillips Co.*,
  593 F.3d 802 (9th Cir. 2010) ............................................................... 9

*Vasquez v. Superior Court*,
  4 Cal.3d 800 (1971) ........................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ................................................................... 9, 12

*Wang v. Chinese Daily News*,
  709 F.3d 829 (9th Cir. 2013) ............................................................... 9

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) ........................................................... 19

iv

*Zinser v. Accufix Research Inst., Inc.,*
   253 F.3d 1180 (9th Cir. 2001) .................................................................. 14, 23

**Statutes, Rules & Regulations**

Federal Rules of Civil Procedure
   Rule 23 ...................................................................................................................... 1
   Rule 23(a) ............................................................................................... 9, 11, 14
   Rule 23(a)(1) ...................................................................................................... 11
   Rule 23(a)(2) ...................................................................................................... 11
   Rule 23(a)(3) ...................................................................................................... 12
   Rule 23(a)(4) ...................................................................................................... 13
   Rule 23(b) ............................................................................................................. 9, 14
   Rule 23(b)(3) .......................................................................... 9, 14, 20, 23
   Rule 23(b)(3)(A) ............................................................................................... 23
   Rule 23(b)(3)(B) ............................................................................................... 23
   Rule 23(b)(3)(C) ............................................................................................... 23
   Rule 23(b)(3)(D) ............................................................................................... 24

California Business & Professions Code
   § 17200 ............................................................................................................ 11, 18
   § 17500 ...................................................................................................... 11, 18, 19

California Corporations Code
   § 25401 ................................................................................................................... 21
   § 25501 ................................................................................................................... 21
   § 25501.5 ............................................................................................................... 21

California Insurance Code
   § 332 ......................................................................................................................... 19
   § 780 ......................................................................................................................... 19
   § 781 ......................................................................................................................... 19
   § 827 ......................................................................................................................... 19

California Welfare & Institutions Code
   § 15600 ................................................................................................................... 11
   § 15610 ................................................................................................................... 18
   § 15610.30 ............................................................................................................. 22

13-CV-2310-GPC(WVG)

# I.      **INTRODUCTION**

This class action stems from the launch and execution of an arcane financial product called an equity-indexed annuity or fixed indexed annuity ("FIA") created by defendants ING USA Life and Annuity Co. and its parent ING U.S., Inc. (collectively "ING" or "defendants").   Plaintiff Ernst O. Abbit's core claim concerns ING's abusive design, execution and pricing of an undisclosed options/derivatives/hedging structure embedded in the ING FIAs whereby defendants transferred risks to Plaintiff and other similarly situated individuals that were contrary to ING's claims of "guarantees" "protection" and "income benefits." Defendants' covert transfer of these risks to Plaintiff and other similarly situated individuals caused them to overpay ING for their FIAs, resulting in both lost savings and lost earnings pocketed – not protected – by ING.

On February 25, 2014, this Court upheld the majority of Plaintiff's claims in its ruling on ING's motion to dismiss. *Abbit v. ING USA Annuity and Life Ins. Co.*, 999 F. Supp. 2d 1189 (S.D. Cal. 2014).  Plaintiff filed his First Amended Complaint on March 27, 2014 to cure pleading deficiencies. *See* Docket No. 20 ("FAC").  By his FAC and motion under Fed. R. Civ. P. 23 ("Rule 23"), Plaintiff seeks to: (1) certify the Classes and Subclass at § IV.A below (referred to generally as the "Class"); (2) appoint Plaintiff Ernest O. Abbit as the Class representative; and (3) appoint Plaintiff's undersigned counsel as Class counsel.

Plaintiff's motion amply satisfies the applicable Rule 23 requirements. Thousands of individuals were subject to the same nefarious derivatives structure that caused them to overpay for the ING FIAs.  The marketing and contract forms are uniform; the Class is ascertainable; ING has the demonstrated capacity to remedy FIA values across the Class; methods for calculating damages are proven, reliable and efficient; and the Class claims are subject to Class-wide proof.  Federal courts have also found the class action device suitable in similar cases. *See, e.g.*, *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D 652 (S.D. Cal. 2010).

## II.   FACTUAL BACKGROUND

In 2005, ING launched a "family" of three similarly structured FIAs with common design and execution features, each bearing the name "Secure Index." ING's president of the U.S. annuity business explained the purpose behind the Secure Index family in an ING public announcement:  "*We believe people are looking for ways to save with opportunities to grow their savings*, and annuities can be an attractive alternative because of the combination of guarantees and benefits unique to annuities. . . .  Index annuities, such as *the annuities in the ING Secure Index family, offer protection from market risk with minimum guarantees and the potential for higher credited interest than may be available with traditional saving vehicles*."  *See* Ex. A to the Declaration of Andrew W. Hutton (hereinafter "Ex. __").  Defendants' announcement is on their public website.[1]

In 2006, ING's Product Approval and Review Procedure ("PARP") for the Secure Index Family expressed ██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ Ex. C, p. 7105. █████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Ex. D, p. 17810.

### A.   Facts and Evidence Common to All Class Members

#### 1.   ING Targets Retirement Savings with its Secure Index FIAs

ING's V.P of Annuity Distribution explains:  "Our secure series of products, when developed, was designed to fit the need of conserving people's principal.  It was in the marketplace, with the variable annuities growing, *a lot of fear and concern of losing value in their retirement asset*.  *The age bank that we target the products towards are those that are nearing retirement, so the intent of the product is to protect principal as a primary way*."  Ex. H, p. 30:6-15.

---

[1]   http://unit.ing.us/about-ing/newsroom/press-releases/ing-introduces-ing-secure-index-family-indexed-annuities

Likewise, ING designed uniform Secure Index marketing materials to appeal to individuals, approaching or in retirement, as a suitable haven for retirement savings.   FAC ¶59.   ING supplied sales agents with the uniform marketing brochures to use with Secure Index consumers for "***Mapping Your Retirement Destination***" that asked the same question:   "***Where will retirement take you?***" These uniform sales materials all promised a "***guarantee***" to "***Protect Your Assets***" while "***Fueling the value of your annuity***," and various creative "***interest crediting strategies***" linking the annuities' earnings to "***the premier benchmark for U.S. stock market performance***" – the S&P 500® Index.  ING said the S&P 500® Index "***provides you . . . with interest potential***" beyond "***other sources of fixed income like savings accounts, certificates of deposit and savings bonds***."   FAC ¶¶58-59; Exs. L - P. ████████████████████████████████████████████

████████████████████████████████████████████ Ex. B.

### 2.   ING's Derivatives Structure Depletes Class Member Savings

The Secure Index FIAs are, however, a wolf in sheep's clothing.  From all appearances, the FIA contracts are safe, with "guarantees" of "protection" and a variety of strategies tied to the diverse set of equities in the S&P 500 Index. However, behind the veneer of "guarantees," "protection" and "income benefits" resides an insidious ██████████████████████████████████

████████████████████████████████████████████

██████ Ex. C, p. 7104 █████████████; Ex. D, p. 17811 █████████████

ING embeds the hidden "derivatives" structure in ***every*** Secure Index FIA contract.  FAC ¶41. ████████████████████████████████████████

████████████████████████████████████████████

██████████ Ex. F, p. 8205.  Further, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ *Id.*  ING internal presentations make clear what ***every*** Class member

3

1   is unknowingly purchasing with their retirement savings: ████████████

2   ████████████████████████████ Ex. G, p. 8291.

3         These derivatives or options, in conjunction with ING's exclusive investment

4   discretion under the FIAs, are the mechanism or structure through which ING

5   transmits risk to Class members.   FAC ¶69; Ex. I, ¶33. To illustrate, if ING

6   experiences losses in its investment portfolio, ING increases its target ROI (to

7   catchup its losses).   To reach its higher ROI target, ING reduces interest-crediting

8   rates on its FIAs, thereby transmitting ING's portfolio losses to Class members.

9   Ex. E, pp. 56:20–59:11.   During the 2009 financial crisis, ING suffered "significant

10   losses" within its investment portfolio.   In response, ING reduced interest-crediting

11   rates on both new and existing Secure Index family FIAs.   Ex. E, pp. 59:12–60:11.

12   Likewise, when ING's "hurdle rate" (i.e., weighted average cost of capital)

13   increased following the financial crisis, ING increased its targeted ROI in response,

14   putting downward pressure on interest crediting rates.   Ex. E, pp. 62:14 – 64:4.   The

15   surreptitious risk transfer, from ING to Plaintiff and the Class, causes the Secure

16   Index FIAs to suffer low purchase date valuations.   Ex. I, ¶¶33, 58.

17         **3.   <u>ING Issues Uniform, Non-Negotiable Contract Forms</u>**

18         ING hides the "derivatives" and "options" in standardized, uniform contract

19   forms that do not vary materially either within the Secure Index family of FIAs, or

20   from Class member to Class member.   FAC ¶¶44, 63-64, and 114-119; FAC, Ex. A;

21   Ex. Q.   Each of the Secure Index contract forms guarantee that the value of the

22   contracts are maintained at minimum levels, and that interest will be compounded

23   daily on those amounts.   *Id*.   As the only party to the contracts with the financial

24   expertise to understand the hidden derivatives and options, ING retains the exclusive

25   investment discretion in every Secure Index FIA on how and where to set the pricing

26   parameters of those derivatives and options.   FAC ¶¶63, 69, 80.   ING can exercise its

27   discretion to protect investors' assets, but instead chooses to abuse that discretion to

28   guarantee that ING will earn its desired profits.   FAC ¶¶13, 19; Ex. I, ¶49.

4

**4.    ING's Special, Fiduciary and Good Faith Duties to the Class**

ING undertakes a solemn, special and fiduciary relationship with the Secure Index FIA purchasers (i.e., Class members) it has agreed to protect.  ING knew that it was targeting Class members' retirement savings with the sale of its Secure Index FIAs.  *See* § II.A.1 above; Ex. B.  ING is also the only party to the contract that can reasonably discern the existence, behavior and valuation of the "derivatives" and "options" embedded in the Secure Index FIAs.  FAC ¶¶5, 39, 134.  ING drafted the arcane contracts, the contracts were non-negotiable, and ING reserved for itself the exclusive ability to hold Class retirement assets and retain key investment decisions.  FAC ¶¶130-131.  Much like a stockbroker with discretionary trading privileges (i.e., acting as a fiduciary), a special and fiduciary relationship arises from ING's exclusive discretion to set the valuation parameters of the hidden "derivatives" that determined the value of Class members' investments.  Ex. I, ¶49.

ING knows that Class members are counting on ING to protect what is perhaps Class members' most important asset, and ING reassures Class members with a cover letter upon contract delivery stating:  "***We appreciate your recent purchase and would like to take this opportunity to assure you of our commitment to serving your financial needs***."  Further, ING welcomes Plaintiff and the Class to ING as their "***preferred financial services provider***."  ING sealed the relationship by stating: "***Our commitment to you does not end at the issuance of your enclosed contract. Rather, our commitment to you begins. . . . Again, thank you for the trust and confidence you have placed in us***."  FAC ¶82; FAC, Ex. A, p. 2.

**5.    Derivatives and Pricing Are Not Explained to Sales Agents**

ING training of sales agents does not include any explanation of the Secure Index FIAs' options, derivatives and/or hedging structures that ING described internally as █████████████████████████████████  Ex. F, p. 8203; Exs. J, K.  Nor does ING require its agents to understand derivatives and hedging structures that transmit market risks and other risks from ING to Plaintiff

5

and members of the class.  FAC ¶¶17, 40, 86.  ING's V.P. of Annuity Distribution Chad Tope confirmed ING's view that this decision not to train sales agents affects the Class uniformly:  "[t]here's not a need for them [sales agents] to understand the options and the derivative market place to understand how our product works . . . ." Ex. H, p. 104:4-19.  Similarly, Mr. Tope testified that Class members as a group also do not need to understand the derivatives and hedging structure: "there's no need for them [Class members] to understand the hedging."  Ex. H, p. 105:1-7.

**6.    ING's Knows Class Members are Seeking Safety**

At the point of every Secure Index FIA purchase transaction, ING reviews Class members' financial objectives, including whether the Class member is a conservative investor seeking minimum guarantees and capital preservation.  Ex. H, pp. 83:23–87:3.  Further, ███████████████████████████████████████ ██████████████████████████████  Ex. U, p. 14535.  ███████ ████████████████████████████████████████████████████ ████████    Ex. B.    However, unbeknownst to Class members seeking financial objectives of capital preservation and minimum guarantees, ING is really selling them risky and volatile unregistered options contracts.  FAC ¶17.  In doing so, ING set the stage to rob Plaintiff and Class members of the promised "protection" from market risks, "guarantees" and "income benefits."  Ex. I, ¶33.

**7.    ING's Motive is to Protect Itself – Not Class Members**

ING's internal pricing plans (i.e., PARPs) for the Secure Index family of products reveal that ING did not intend to insulate class members' savings from market risks.  Instead, ████████████████████████████████ ████████████████████████████████████████████████ ██████████  Ex. C, p. 7104 ██████████████; Ex. D, p. 17811 ███████████. Chad Tope, ING V.P of Annuity Distribution, expressed ING's motive to protect itself and shareholders saying, "you know, we are a stock-driven company so, you know, individuals buy shares of our stocks, we have to provide value in return to

6

our shareholders" and "hedging designs are set up to help the organization protect itself." Ex. H, pp. 92:4-22; 105:11-106:5.  Thus, ING's design and execution of the Secure Index FIAs gives rise to a conflict of interest between all Class members and ING (and its shareholders) that affects the Class similarly.  FAC ¶¶11, 139, 153.

**8.  Damages Calculations Can Be Achieved on Class-wide Basis**

Like the undisclosed "bonds" and derivative "call options" that reside in the Secure Index FIAs purchased by Plaintiff and  members of the Classes, the present value of the FIA components in each Secure Index FIA can be valued or priced through expert analysis. Ex. I, ¶¶34, 38, 39.  Expert analysis of the purchase-date data for each Secure Index FIA in the California Class reveals  the present value of the transactions between ING and contract holders (1) is measurable with reliable and effective methods on a class-wide basis; and (2) that California Class members overpaid for their ING Secure Index FIAs.  *Id*.  Plaintiff expects to prove at trial that for most (if not all) Class members, the purchase date value of the investment received from ING was less than the value that ING guaranteed under the contract.

**B.  Facts Concerning Plaintiff Ernest Abbit**

Mr. Abbit is a California senior citizen, representative of a group of similarly situated individuals targeted by ING for the sale of its Secure Index FIAs.  FAC ¶21.  In or around September 2010, Matthew Copley, an appointed sales agent for ING, solicited Mr. Abbit for the purchase of an ING Secure Index FIA.  Ex. R, p. 35.  Mr. Copley showed Mr. Abbit one of the uniform ING Secure Index FIA brochures that ING had given to Mr. Copley for purposes of soliciting Secure Index FIAs.  FAC ¶33; Ex. P. This brochure is nearly identical to brochures that ING used to solicit Class members to purchase Secure Index FIAs.  Exs. L–O.

In connection with his appointment to ING, Mr. Copley was required to take a training course regarding ING products.  Ex. K.  In this training and otherwise, ING never explained to Mr. Copley that the Secure Index product contained derivatives, nor did ING explain to Mr. Copley how to value the contract.  Ex. R,

7

p. 71.  ING also did not ever explain to Mr. Copley that the premium bonus under the FIA was subject to market risk.  *Id*. p. 72.  Mr. Copley testified that if an FIA was worth only about $0.70 per $1.00 of premium paid, "it wouldn't be a principal-protected product."  *Id*.  Further, Mr. Copley testified that if the Secure Index FIA was not principal protected it would not be suitable for Mr. Abbit.  *Id*., pp. 72-76.  In sum, before Mr. Copley sold the ING Secure Index FIA, ING did not tell him what he was really selling:  "I don't know the internal workings inside the investment.  I simply presented what the end result was.  So anything involving derivatives is really above my level of expertise."  *Id*., p. 75.

By using the alleged material misrepresentations and material omissions of fact, through agent Copley, ING induced Mr. Abbit to purchase a Secure Index FIA with an effective date of September 28, 2010.  FAC ¶36.  To pay for the ING FIA, Mr. Abbit raised $1,000,000 by terminating his Individual Retirement Account and transferring the proceeds to the new ING FIA via an "IRA rollover."  FAC ¶36.

In early October 2010, after receiving Mr. Abbit's $1,000,000 payment, ING mailed the Secure Index FIA contract to Mr. Abbit's home address in San Diego, California.  The contract included a cover letter from Michael Smith, annuity business CEO, explaining that: "***Our commitment to you does not end at the issuance of your enclosed contract.  Rather, our commitment to you begins***."  Mr. Smith, on behalf of ING, added:  "Again, ***thank you for the trust and confidence you have placed with us***."  The Secure Index FIA contract was substantially similar to contracts issued to other Class members and was not subject to negotiation.  Ex. H, pp. 79-81; Ex. Q.

The essential terms of Plaintiff's "ING Secure Index Opportunities Plus Annuity" FIA included ING's exclusive discretion to set, report, and manage the investment parameters that affect the FIA's ability to provide promised "protection," income benefits and bonus (FAC Ex. A, § 6); the FIA values could never be lower than the Minimum Guaranteed Contract Value (FAC Ex. A, § 5);

and interest was to be credited and compounded daily to the Contract's Minimum Guaranteed Contract Values.  *Id.  See also,* FAC ¶63 and Ex. Q.  The FIA's terms make no express reference to the existence of "derivatives" and obscure the true prices paid for the FIA.  FAC, Ex. A.  Like other Class members, Mr. Abbit grossly overpaid for his Secure Index FIA.  Ex. I, ¶¶34, 36, 37.

## III.   STANDARD OF REVIEW

"A party seeking class certification must satisfy the requirements of . . . Rule 23(a) and the requirements of at least one of the categories under Rule 23(b)." *Wang v. Chinese Daily News*, 709 F.3d 829, 832 (9th Cir. 2013).  "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.   The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2550 (2011) (internal quotation marks and citations omitted).  "Where a putative class satisfies all four requirements of 23(a), it still must meet at least one of the three additional requirements outlined in 23(b)." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010).  Also, federal courts have required a class to be currently and readily ascertainable based upon objective criteria, particularly in a Rule 23(b)(3) action. *Lemieux v. Schwan's Home Serv.*, 2013 U.S. Dist. LEXIS 127032 (S.D. Cal. 2013).

"The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  The Court may be required to "examine the merits of the underlying claim . . . only inasmuch as it must determine whether common

9

1   questions exist; not to determine whether class members could actually prevail on

2   the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n. 8

3   (9th Cir. 2011) (citations omitted).

## IV.    ARGUMENT

### A.    The Classes are Ascertainable

ING maintains Secure Index FIA contract data for all purchasers that

includes ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  I, V.  This and other data maintained by ING is sufficient to

compute contract valuations and damages on a class-wide basis. Ex. I at ¶¶ 34, 36

(n.10), 106.   Based upon the availability of this data, Plaintiff's claims, expert

analysis and the evidence adduced to date, Plaintiff proposes the following classes:

### The Multi-State Class

**All persons or entities that, when a resident of either the state of California, Florida, Illinois, Pennsylvania or Texas, purchased a Secure Index fixed index annuity contract from ING USA Annuity and Life Insurance Company within the applicable statute of limitations.**

As discussed in detail below at § IV.C.1, the Multi-State Class will pursue only the breach of contract claim for ING's failure to maintain the contracts' minimum guaranteed contract values.

### The California Class

**All persons or entities that, when a resident of California, purchased a Secure Index fixed index annuity contract from ING USA Annuity and Life Insurance Company within the applicable statute of limitations.**

As discussed in detail below at §§ IV.C.1 and 2, the California Class will pursue (in addition to breach of contract) claims for breach of the implied covenant

10

of good faith and fair dealing; breach of fiduciary duty; fraudulent concealment; violations of Cal. Bus. & Pro Prof. Code §§ 17200, *et seq*. and §§ 17500, *et seq*.; and claims under the California Securities Act.

### The California Seniors Subclass

**All members of the California Class that were age 65 or older on the date of purchase.**

As discussed in detail below at §§ IV.C.3, in addition to the claims of the California Class, the California Seniors Subclass will pursue a claim for Violation of Cal. Welf. & Inst. Code §§ 15600, et seq. (Elder Abuse and Dependent Adult Protection Act).

### B.   Rule 23(a) is Satisfied

#### 1.   Numerosity

Numerosity is satisfied when the proposed class is "so numerous that joinder of all members is impracticable." Rule 23(a)(1).

███████████████████████████████████████████

███████████████████████████████████████████

Ex. I at 9; Ex. V.  ████████  of members of the California Seniors Subclass were age 65 or older on the purchase date.  Ex. B.  Thus, joinder of all members of the proposed Classes and Subclass is impracticable.  See *In re Nat'l W. Ins. Deferred Annuities Litig*., 268 F.R.D. 652, 660 (S.D. Cal. 2010) (more than 16,000 annuity polices in the National Class; nearly 2,500 annuity policies in the California Class).

#### 2.   Commonality

Commonality is satisfied when there are "questions of law or fact common to the class." Rule 23(a)(2).  Commonality is "construed permissively." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1019 (9th Cir. 1998). "All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id*.

11

1   The U.S. Supreme Court describes a commonality test: "Their [class] claims
2   must depend upon a common contention . . . .  That common contention must be of
3   such a nature that it is capable of class-wide resolution – which means that
4   determination of its truth or falsity will resolve an issue that is central to the validity
5   of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.

6   As explained in detail in § II.A above, the common contention of Plaintiff
7   and the Class is that ING's product design and execution utilized a hidden
8   derivatives structure to transfer risks to Plaintiff and the Class, causing them to
9   overpay for their Secure Index FIA contracts. *See, e.g.*, Ex. I at ¶33.  This common
10  contention is capable of class-wide resolution through common evidence, including,
11  *inter alia*, pricing memoranda (Exs. C, D), ████████████████████████████████
12  ████████████████████████████████ (Ex. E, pp. 56-64), uniform Secure
13  Index FIA contracts (FAC, Ex. A; Ex. Q), uniform training of sales agents (Exs. J,
14  K), uniform sales materials (Exs. L–P) and expert analyses of FIA contract data
15  (Ex. I).

16  ### 3.   **Typicality**

17  Typicality requires that "the claims or defenses of the representative parties
18  are typical of the claims or defenses of the class."  Rule 23(a)(3).  "Under the
19  Rule's permissive standards, representative claims are typical if they are reasonably
20  co-extensive with those of absent class members; they need not be substantially
21  identical." *Hanlon*, 150 F.3d at 1020.  The purpose of this requirement "is to assure
22  that the interest of the named representative aligns with the interests of the class."
23  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992).

24  The claims of Plaintiff and the Class are aligned and co-extensive.  Plaintiff
25  and the Class received uniform marketing materials targeting their retirement
26  savings.  Exs. L–P.  ING issued to Plaintiff and each Class member a uniform
27  Secure Index FIA contract.  FAC ¶¶59, 63; FAC, Ex. A; Ex. Q.  The Secure Index
28  FIAs included hidden derivatives and related hedging structure that ING used to

1  transmit market risks and losses to Plaintiff and members of the Class that helped

2  ING ███████████████████████████████████████████ Ex. I,

3  ¶33. ████████████████████████████████████████████

4  ███████████████████ that operated to deplete the savings of Plaintiff and class

5  members.  Ex. E, pp. 56-64.  Plaintiff and each Class member also seek to enforce

6  the same breach of contract claims with respect to the Secure Index FIA contracts'

7  minimum guaranteed values, including ING's failure to compound interest daily.

8  FAC ¶¶59, 63, 114-122.

9          **4.   <u>Adequacy</u>**

10         Rule 23(a)(4) requires that "the representative parties to fairly and adequately

11  protect the interests of the class."  Rule 23(a)(4).  "The inquiry has two parts:

12  (1) does the named plaintiff have any conflicts of interest with the other class

13  members; and (2) will the named plaintiff and his counsel prosecute the action

14  vigorously on behalf of the class?"  *Hanlon*, 150 F.3d at 1020.

15         Plaintiff has no conflict with other class members.  Plaintiff is seeking the

16  same remedies, based on the same core operative facts, as are being pursued on

17  behalf of other members of the Class.  Further, Plaintiff – who is now 84 years of

18  age – has more than demonstrated that he will vigorously prosecute the action on

19  behalf of the Class.  For example, Mr. Abbit was clear when he testified: "I feel that

20  ING designed a retirement product which does not in any way provide what the

21  provisions say it will do, and I feel that – that – you know, I'm really tired of elder

22  abuse.  I'm tired of people taking advantage of our people, my people, and I'm sick

23  and tired of people putting up false banners, which ING did, and telling me

24  something that is not true." Ex. T, p. 65.

25         Likewise, Plaintiff's chosen counsel, Hutton Law Group and Tatro &

26  Zamoyski, LLP, have extensive experience in litigation of complex financial

27  products, securities and insurance, including dozens of class action lawsuits.  Ex.

28  W.

### C.     Rule 23(b)(3) is Satisfied

With the four requirements of Rule 23(a) satisfied, this Court should certify the proposed class if at least one of the requirements of Rule 23(b) is satisfied. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Plaintiff has alleged that Rule 23(b)(3) is satisfied in this case because "[t]here is a well-defined community of interest in the relevant questions of law and fact affecting Class members." FAC ¶112. The Classes are cohesive and bound by numerous common questions including "[t]he numerous, substantial questions of law and fact common to the Class related to ING's uniform deprivation of contractual benefits promised to Plaintiff and Class members [that] predominates over any individual issues of law and fact." *Id.*

A party seeking class certification under Rule 23(b)(3) must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that a class action to be "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). Both prerequisites are amply satisfied here.

### 1.     <u>Common Issues Predominate on Breach of Contract Claim</u>

The predominance inquiry asks the following question: do common questions of law and fact present a significant aspect of the case such that they can be resolved for all members of the class in a single adjudication? *Hanlon, supra*, 150 F.3d at 1022. In answering this question, "the Court looks to whether the focus of the proposed class action will be on the words and conduct of the defendants rather than on the behavior of individual class members." *Ortega v. J.B. Hunt Transport, Inc.*, 258 F.R.D. 361, 367 (C.D. Cal. 2009).

Plaintiff brings a breach of contract claim for ING's failure to maintain the contracts' minimum guaranteed values. FAC ¶¶88, 119, 121. As explained above in § IV.A, the breach of contract claim is brought on behalf of the Multi-State Class, the California Class and the California Seniors Subclass. Plaintiff alleges

14

1  that ING breached the contractual provision governing minimum guaranteed
2  contract values by failing to calculate and compound interest each day at the stated
3  rate, as provided for under each FIA contract.  FAC ¶¶ 38, 49, 51, 63, 80, 113;
4  *Abbit*, 999 F. Supp. at 1197-98.[2]  Plaintiff further alleges that ING breached this
5  contractual provision by setting the pricing of the undisclosed derivatives structure
6  so low that the true values of the contracts were below those minimum values
7  guaranteed by the Secure Index contracts.  FAC ¶¶ 34, 35(h), 88, 102, 119, 121,
8  125; Ex. I, ¶22.

9  The common factual and legal issues surrounding Plaintiff's breach of
10  contract claim predominate over any individual questions.  Plaintiff and each Class
11  member purchased the subject contracts.  FAC, Ex. A; Ex. I, ¶22.  ING drafted each
12  non-negotiable contract, which do not vary in substance from Class member to
13  Class member, and which uniformly govern the minimum contract values.  FAC
14  ¶63; FAC Ex. A; Ex. Q.  For example, each Secure Index FIA provides a minimum
15  guaranteed value and daily compounding of interest.  *Id.*  Further, ING's calculation
16  of contract values (including the crediting strategy parameters, index returns, and
17  minimum guaranteed values) are uniform for all contract holders.   Ex. E,
18  pp. 114:24–115:23.   Thus, whether ING breached the uniform contractual
19  provisions governing guaranteed values simply compares ING's uniform
20  calculations for each Class member against a proper valuation of the contract.  Ex.
21  I, ¶¶28, 35, 37.

22  Given the uniformity of contract language, uniformity of execution and
23  contract valuation, and straightforward damages determinations, Plaintiff proposes
24  a Multi-State Class for ING's breaches of the FIA contracts.  Plaintiff has identified

25
26  [2]  This Court dismissed Plaintiff's claim that ING breached FIA contracts by not
guaranteeing the premium bonus.  *Abbit*, 999 F. Supp. at 1197.  After this ruling,
27  however, ██████████████████████████████████
██████████████   Thus, whether ING breach the FIA contracts for failure to
28  guarantee premium bonuses may be a question common to Class members.

15

a discrete and manageable set of states with breach of contract laws similar to California; namely, Florida, Illinois, Pennsylvania and Texas.  Exs. Q, R.  The Ninth Circuit has "implicitly approved the use of sub-classing to account for variations in state law".  *Ellsworth v. U.S. Bank, N.A.*, 2014 U.S. Dist. Lexis 81646 at *71 (N.D Cal. 2014) (citing *Mazza v. American Honda Motor Co., Inc*., 666 F.3d 581, 594 (9th Cir. 2012).  "One way of accounting for 'isolated and relatively minor variations' [from state to state] is 'by grouping similar state laws together and applying them as a unit.'"  *Id.*

Breach of contract claims are particularly well suited for class certification because "the law relating to the element of breach does not vary greatly from state to state."  *In re Conseco Life. Ins. Co. Lifetrend Ins. Sales & Mktg Lit*., 270 F.R.D. 521, 529 (N.D. Cal. 2010) (certifying a 48-state breach of contract class in a case involving form policy contracts).  *Ellsworth,* at *69 ("[b]ecause the contract laws of the various states are capable of being organized into groups with similar legal regimes, the court finds that common issues predominate.").

Here, a survey of various state authorities, including jury instructions, codes, and case law demonstrates a high degree of overlap in state law requirements for proving a breach of contract claim.  Even where breach of contract elements may differ slightly, they share the same *functional content* and overlap in many respects, thus promoting manageability of a multi-state claim.  (*See* Ex. R: Survey of Key States.)  For example, as general rule, and in California, a plaintiff must prove on a breach of contract claim: (1) that plaintiff and defendant entered into a contract (the Secure Index FIA); (2) that plaintiff performed (paid the premium); (3) the contract was breached (ING failed to satisfy minimum guaranteed values); and (4) resulting damages (Ex. I, ¶¶37-38).  Ex. R (elements of California breach of contract).

States in the proposed Multi-State Class require no more than California's elements and also each have the same measure of damages (i.e., benefit of the bargain).  Further, the period of the other states' statute of limitations are either the

16

1   same as, or more liberal than, California's statute of limitations.  Ex. R.  Thus,

2   Plaintiff satisfies "groupability" of breach of contract laws similar to California, for

3   purposes of predominance and superiority.[3]  *Makaeff v. Trump Univ., LLC*, 2014

4   U.S. Dist. LEXIS 22392, *48 (S.D. Cal. 2014) (citations omitted).

5            **2.    Common Issues Predominate on ING's Breach of Duties**

6        Plaintiff alleges, "ING undertakes a solemn, special and fiduciary

7   relationship with seniors and retirees that it agrees to protect."  FAC ¶¶80-82.  This

8   Court upheld Plaintiff's claim on ING's motion to dismiss by citing alleged facts

9   common to all class members. *Abbit*, 999 F. Supp. 2d at 1199 ("Defendant targets

10  senior citizens with products that falsely promise security. . . .  Defendant promises

11  investors continued commitment, thanking them for ongoing trust and confidence in

12  Defendant as their 'preferred financial services provider.'. . .  Defendant drafted all

13  contractual materials and structured pricing parameters . . . taking advantage of

14  Defendant's superior knowledge and bargaining power.").    Likewise, the

15  relationship of insurer and insured implies a duty of good faith in the dealings

16  between ING and the Class similarly breached.  FAC ¶¶123-127.

17       Discovery confirms these allegations for ING's breach of duties are subject

18  to class-wide proof.  For example, ING designed (and had superior knowledge of)

19  the Secure Index products used to target individuals' retirement savings.  Exs. C, D.

20  Plaintiff and other Class members received Secure Index FIA contracts that each

21  contained insurance and included standardized letters from ING thanking them for

22  their ongoing trust and confidence in ING.  FAC, Ex. A.  Discovery confirms that

23  ING drafted the essential terms of the uniform FIA contracts making ING

24  responsible for the establishment, adjustment, reporting and management of the

25  investment parameters that determine the FIAs' ability to provide the promised

26  "protection" from market risks.  Ex. H, pp. 79-81.

27
28  [3]  Plaintiff respectfully requests the opportunity to provide further detailed multi-
    state analyses for purposes of class certification, if this Court so requires.

### 3.   Common Issues Predominate on Other California Claims

Members of the California Class maintain the following statutory claims: (1) Unlawful, Deceptive Business Practices, Cal. Bus. & Prof. Code, §§ 17200, *et seq.* ("UCL"); (2) False Advertising, Cal. Bus. & Prof. Code, §§ 17500, *et seq.* ("FAL"); and (3) Violations of California's Securities Act.  The California Class also pursues claims for fraudulent concealment and equitable tolling.  Members of the California Seniors subclass maintain an additional claim for violation of California's Elder Abuse law, Cal. Welf. & Inst. Code, §§ 15610, *et seq.*

Consumer fraud actions based on standardized practices, such as those alleged here, are precisely the types of cases that California courts have determined present common issues of law and fact suitable for class certification.  *Vasquez v. Superior Court*, 4 Cal.3d 800 (1971) ("Frequently numerous consumers are exposed to the same dubious practice by the same sellers of the proof of the prevailing's of the practice as to one customer would provide proof for all.").

Courts have certified classes based on a common course and conduct in misrepresenting annuity products to the public.  In *Nat'l Western.*, the court certified the plaintiff's UCL claims,[4] false advertising claims,[5] elder abuse claims,[6] and unjust enrichment based on the defendant's uniform sales marketing materials.

#### a.   California UCL and FAL Claims

Plaintiff has alleged ING's Secure Index business practices as having violated California's UCL as either (1) unlawful, (2) unfair, or (3) fraudulent practices.  FAC ¶¶153, 155, 159; Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Plaintiff

---

[4]  "Common issues predominate in plaintiffs' unfair competition law claims." *Nat'l Western, supra*, 268 F.R.D. at p. 668.

[5]  "The court also finds that common questions predominate as to Plaintiffs' False Advertising Law claim." *Id.*

[6]  "Moreover, since the elder abuse claims premised on the same acts, the court again finds that common questions predominate." *Id.* at 669.

18

has also alleged that ING's advertising practices were unfair, deceptive and misleading. FAC ¶¶165, 168; Cal. Bus. & Prof. Code §§ 17500, *et seq*. With respect to the UCL, California courts have consistently interpreted its language broadly. *See, e.g., People ex rel. Gallegos v. Pac. Lumber Co.,* 158 Cal. App. 4th 950, 959 (2008) ("The UCL is broad in scope . . . .); *Paulus v. Bob Lynch Ford, Inc*., 139 Cal. App. 4th 659, 676 (2006) ("The Legislature intended this "sweeping language" to include anything that can properly be called a business practice and that at the same time is forbidden by law . . . thus the scope of the UCL is broad.").

The unlawful prong of the UCL raises common questions for all California Class members of whether ING violated the California Insurance Code, including requirements that ING maintain the minimum guaranteed values of the Secure Index FIAs. Cal. Ins. Code §§ 332, 780, 781, 827; FAC ¶159. Likewise, California's FAL makes it unlawful for any business to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500. Whether an advertisement is "misleading" is judged by the effect it would have on a reasonable consumer. *Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F.3d 1087 (9th Cir. 2010). *See* Ex. I, ¶39 ("no reasonable investor would grossly overpay for an investment that purported to be 'protected' from market risks.").

The UCL "fraud" prong also raises questions common to all California Class members and whether they, as members of the public, were "likely to be deceived" rather than "actually deceived." *Podolsky v. First Healthcare Corp*., 50 Cal. App. 4th 632, 647-48, 58 Cal. Rptr. 2d 89 (1996); *Schnall v. Hertz Corp*., 78 Cal. App. 4th 1144, 1167, 93 Cal. Rptr. 2d 439 (2000). The common issues predominate and sidestep individual questions of reliance because relief under the UCL is available without any proof of deception, reliance, or damages. *Brakke v. Econ. Concepts, Inc*., 213 Cal. App. 4th 761, 772, 153 Cal. Rptr. 3d 1 (2013). Similarly, Plaintiff's

19

1    claims for fraudulent concealment and equitable tolling rely on class-wide proof,

2    such as the material omissions from the standardized contracts and periodic

3    statements issued to each Class member.  FAC ¶¶87-94; Ex. E, pp. 114:24–115:23

4    (uniform calculation of contract values).

5          Liability under either the specific false advertising provisions of the FAL or

6    the broader provisions of the UCL, may be found without any individualized proof

7    of deception and solely on the basis a defendant's conduct was likely to deceive

8    customers.  *Mass. Mutual Life Ins. Co. v. Superior Ct*., 97 Cal. App. 4th 1282,

9    1289, 119 Cal. Rptr. 2d 190 (2002).  Similarly, for fraud claims with elements of

10   reliance and causation, courts have determined (in the context of sale of deferred

11   annuities, such as the Secure Index FIAs) that common questions predominate

12   when the misrepresentations are uniform.  In *Iorio v. Asset Marketing Inc.*, Judge

13   Gonzales certified a class of annuity consumers on a California fraud cause of

14   action where the defendant misrepresented its annuity products through uniform

15   brochures and marketing materials, it created and approved – even though there

16   were some variances in the statements made by sales persons.  In addressing the

17   critical issue of reliance, the court noted "certification is appropriate where

18   plaintiffs received uniform written material containing the alleged

19   misrepresentations."  *Iorio*, 2006 U.S. Dist. LEXIS 94948 at *12 (S.D. Cal. 2013)

20   (citing *Occidental Land, Inc. v. Superior Court*, 18 Cal. 3d 355, 361 (1976).  These

21   uniform materials were sufficient to overcome the objection that class members

22   may have relied on individualized statements since the "required . . . distribution of

23   uniform marketing material means that common issues predominate" and that the

24   expectation sales persons would review the brochure with the customer "is

25   sufficient evidence of uniformity to satisfy Rule 23(b)(3)."  *Iorio*, at 13-14.

26         Likewise, in *Negrete v. Allianz Life Ins. Co. of N. America*, 238 F.R.D. 482,

27   491 (C.D. Cal. 2006), the court found as adequate class-wide proof evidence of

28   uniform written marketing materials that were misleading – because the materials

20

failed to disclose the annuities are worth less than promised.  The court held that such evidence gives rise to "common sense inference that no rational class member would purchase the annuities" with adequate disclosure of the material facts regarding the annuities' true value.  *Id.* at 491.  Here, the same "common sense" approach applies.  For example, the subject misrepresentations and omissions are contained in marketing brochures that are clearly uniform and have hit their intended target market. Exs. B, L–P.  *In re Nat'l West.*, 268 F.R.D at 666 ("since an inference of reliance is logical from Plaintiffs' evidence, this Court finds that Plaintiffs have shown that reliance is a common question").

### b.    California Securities Law Claims

Plaintiff seeks a declaratory judgment from this Court that the Secure Index FIAs that pay premium bonuses are "securities" under California law.  FAC ¶187.  Such a judicial declaration will have an effect on other common claims and relief sought by Plaintiff and the California Class.  FAC ¶¶187-88.  For example, ING's sale of unregistered securities would be an unlawful business practice affecting Plaintiff and each member of the California Class.  *Id.*  Plaintiff also seeks relief under Cal. Corp. Code §§ 25501 and 25501.5 for ING's violations of Cal. Corp. Code § 25401.  FAC ¶¶196-198.  Plaintiff's § 25401 claims are premised upon ING's fraudulent scheme to dupe Californians into purchasing unregistered securities with false and misleading uniform sales materials and "options" contracts.  FAC ¶¶191-192.

Since filing the FAC, discovery has revealed that the California Securities law claims should apply to all Secure Index FIAs sold to Plaintiff and the Class primarily because ████████████████████████████████████████████
████████████████████████████████████████████ Ex. I, ¶33. This issue predominates over any individual issues raised by the California Securities Law Claims.  For example, ING states internally that ING's internal documents have confirmed, ████████████████████████████████████

21

1 ████████████████████████████████████████████ Ex. F, p. 8205.

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ███████████████████████████ Ex. F, p. 8203.  ING internal presentations make

6 clear that ████████████████████████████████████████

7 ████████████████████████████████████████ Ex. G, p. 8291.

8 ING's uniform sales materials, used to sell these unregistered "options" contracts,

9 are false and misleading because they omit material facts concerning the existence

10 of the "options" or "derivatives" and the securities' true values.  Exs. L–P.

11      These facts raise questions common to Plaintiff and all members of the

12 California Class that predominate over any individual issues concerning the sales of

13 these "options" contracts.

14                **c.      California Financial Elder Abuse Claims**

15      Plaintiff alleges that ING took and/or assisted in the "wrongful use" taking of

16 retirement savings from Plaintiff and the members of the California Seniors

17 Subclass in violation of Cal. Welf. & Inst. Code § 15610.30.  FAC ¶¶10, 146.

18 Plaintiff alleges that ING's "wrongful" taking includes the sale of unregistered

19 securities (FAC ¶152) that ING had priced to pocket – not protect – Class members'

20 savings (FAC ¶80).

21      As discussed above, questions surrounding the existence of "derivatives" or

22 "options" in the Secure Index FIAs, as well as their valuations, are questions that

23 predominate over any individual issues pertaining to these claims.   Moreover,

24 Plaintiff's claims stem from the same predicate acts that support his UCL and FAL

25 claims.  *See In re Nat'l West.*, 268 F.R.D at 669 ("since the elder abuse claims are

26 premised on the same [UCL and FAL] acts, the court again finds that common

27 questions predominate").  Likewise, financial elder abuse claim is subject to class-

28 wide proof through ING's records that can identify which Class members were age

1    65 or older on the transaction date.  Exs. B, I.

2              **4.    Superiority**

3         Federal Rules of Civil Procedure 23(b)(3) requires the Court to find "that a

4    class action is superior to other available methods for the fair and efficient

5    adjudication of the controversy."   Rule 23(b)(3).   "Typically, a class action is

6    superior if the case presents a large volume of individual claims that could strain

7    judicial resources if tried separately and if each potential plaintiffs recovery may

8    not justify the cost of individual litigation."  *Alba v. Papa John's USA*, 2007 U.S.

9    Dist. LEXIS 28079, *44 (C.D. Cal. 2007) (citing *Amchem Prods. v. Windsor*, 521

10   U.S. 591, 616-617 (1997)).   Specifically, there are four factors courts consider in

11   determining whether a class action is the superior method.

12        The first factor is "the interest of members of the class in individually

13   controlling the prosecution or defense of separate actions."   Rule 23(b)(3)(A).

14   "Where damages suffered by each putative class member are not large, this factor

15   weighs in favor of certifying a class action."  *Zinser*, 253 F.3d at 1190. Here, the

16   individual damages suffered by each class member, while not insignificant, are

17   trivial when compared to the costs of litigation against a global powerhouse like

18   ING.  *See Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las*

19   *Vegas Sands, Inc*., 244 F.3d 1152, 1163 (9th Cir. 2001) ("If plaintiffs cannot

20   proceed as a class, some – perhaps most – will be unable to proceed as individuals

21   because of the disparity between their litigation costs and what they hope to

22   recover.")

23        The second factor is "the extent and nature of any litigation concerning the

24   controversy already commenced by or against members of the class."   Rule

25   23(b)(3)(B).  Plaintiff and his counsel are not aware of such litigation.

26        The third factor is "the desirability or undesirability of concentrating the

27   litigation of the claims in the particular forum."  Rule 23(b)(3)(C).  Here, ING does

28   a substantial amount of Secure Index business in California and Plaintiff resides in

                                    23

1   the greater San Diego area.  Furthermore, all remaining claims are brought under

2   California law.  Thus, concentrating litigation in this judicial district is desirable.

3   *Cartwright v. Viking Industries*, 2009 U.S. Dist. LEXIS 83286, *43 (E.D. Cal.

4   2009) ("[I]t is desirable to litigate the claims in California, where the named

5   plaintiffs and class members reside or resided. Further all claims are brought

6   pursuant to California law.").

7       The fourth factor is "the difficulties likely to be encountered in the

8   management of a class action."  Rule 23(b)(3)(D).  This case presents a relatively

9   discrete set of circumstances.  Class members' claims are aligned and cohesive

10  because they all flow from defendants' abusive design, pricing and execution of the

11  Secure Index FIAs.  The FIAs at issue are rooted in standardized pricing,

12  standardized (non-negotiable) contract forms, uniform calculations of values, the

13  uniform marketing materials prepared by ING, and the investment parameters set

14  by ING on a group-wide basis.  Moreover, the key witnesses will be able to discuss

15  issues that affect Class FIAs generally and the core valuation issues will largely be

16  driven by expert analysis and spreadsheet presentations.  Finally, ING's actuary

17  testified that ING's FIA contract data systems have the demonstrated capacity to

18  correct account values for Class members.  Ex. E, p. 15:19-25 ("we entirely make

19  the customer whole, as if the error never existed").  Plaintiff does not anticipate any

20  unusual difficulties in managing this class action.

21  **V.   CONCLUSION**

22      For all the foregoing reasons, this Court should grant Plaintiff's motion for

23  class certification in its entirety.  If this Court determines, however, that there is any

24  deficiency in Plaintiff's motion, Plaintiff respectfully requests the opportunity to

25  cure that deficiency with a renewed motion for class certification or other procedure

26  acceptable to this Court.

27  ///

28  ///

DATED:  March 27, 2014

**HUTTON LAW GROUP**

By: */s/ Andrew W. Hutton*
ANDREW W. HUTTON
12671 High Bluff Drive, Suite 130
San Diego, CA  92130
Telephone:  (858) 793-3500
Facsimile:   (858) 793-3501
   drew@law-hutton.com

**TATRO & ZAMOYSKI, LLP**

By: */s/ Timothy J. Tatro*
TIMOTHY J. TATRO
PETER A. ZAMOYSKI
12760 High Bluff Drive, Suite 210
San Diego, CA 92130
Telephone:  (858) 244-5032
Facsimile:   (858) 847-0032
   tim@tatrozamoyski.com
   peter@tatrozamoyski.com

Attorneys for Plaintiff

25