# Exhibit S

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  SOUTHERN  DISTRICT  OF  CALIFORNIA

```
ERNEST O. ABBIT, on behalf of      )
himself and all other persons      )
similarly situated,                )
                                   )
                    Plaintiff,     )  Case No.
                                   )  13cv2310 GPC WVG
-vs-                               )
                                   )
ING USA Annuity and Life Insurance )
Company and ING U.S., Inc.         )
                                   )
                    Defendants.    )
_____)
```

DEPOSITION OF MATTHEW COPLEY

NOVEMBER 18, 2014

Reported by:  Tricia Rosate, RDR, CRR, CSR No. 10891

Page 2

1          I N D E X
2  WITNESS:  MATTHEW COPLEY
3  EXAMINATION                          PAGE
4  BY MR. JOHNSON                         5
5  BY MR. HUTTON                         53
6  BY MR. TATRO                          84
7
8          E X H I B I T S
9  DEPOSITION EXHIBIT:                  PAGE

10  Exhibit 1  California Department of Insurance    16
11            Check License Status, Continuing
              Education Detail, Matthew David Copely
12  Exhibit 2  Response Sheet                        22
13            (HTFS 00075)
14  Exhibit 3  Heritage Tax and Insurance Services,  26
              Inc. 5 Step - Questionnaire
15            Check-List
              (HTFS 00079 - HTFS 00082)
16  Exhibit 4  Handwritten notation                  29
              (HTFS 00099)
18  Exhibit 5  RiverSource Rate Bonus Series         33
19            (HTFS 00077, HTFS 00078)
            Exhibit 6  ING Application, Fixed Annuities    35
20            (HTFS 00123 - 00128)
21  Exhibit 7  ING USA Annuity and Life Insurance    38
            Company, Secure Index Opportunities
22          Plus Disclosure
            (HTFS 00129 - HTFS 00135)
23  Exhibit 8  ING Suitability Profile               40
24            (Deferred Annuities Only)
              (HTFS 00138, HTFS 00139)
25

Page 3

1          E X H I B I T S  (Continued)
2  DEPOSITION EXHIBIT:                  PAGE

3  Exhibit 9  Heritage Tax And Insurance Services,  41
            Inc. Tax cover sheet and Fixed
4          Annuity Needs Analysis
5          (HTFS 00101 - HTFS 00103)
6  Exhibit 10  American Express Global Prepaid      44
            letter dated November 13, 2010,
7          to Brian White
            (HTFS 00023)
8  Exhibit 11  Heritage Tax And Insurance Services, 45
            Inc. document dated November 17, 2010,
9          signed by Ernie Abbit, re: receipt of
10          American Express gift cards
            (HTFS 00024)
11  Exhibit 12  Transmission Report, ING Strategy    49
            Change Request
12          (HTFS 00007)
13  Exhibit 13  Transmission Report, Transfer of     50
            Value The Retirement Gold Annuity
14  Exhibit 14  Accusation, In the Matter of the     58
            Licenses and Licensing Rights of
15          Matthew David Copley, Respondent
16  Exhibit 15  ING Fixed Annuities Application      61
            For Agent Appointment
17          (ING-USA-0003750)
18  Exhibit 16  ING packet entitled Mapping Your     69
            Retirement Destination
19          (AB0061 - AB0072)
20  Exhibit 17  Property Detail Report,              77
            2727 DeAnza Road
21          (HTFS 00029)
22  Exhibit 18  ING Fixed Annuities, Fixed           78
            Annuity Application
23          (HTFS 00120 - 00139)
24
25

Page 4

1          APPEARANCES
2
3  FOR THE PLAINTIFF:
4  HUTTON LAW GROUP
   BY:  ANDREW W. HUTTON, ESQ.
5  12671 High Bluff Drive, Suite 130
   San Diego, California  92130
6  (858) 793-3500
   drew@law-hutton.com
7          - and -
8  TATRO & ZAMOYSKI, LLP
   BY:  TIMOTHY J. TATRO, ESQ.
9  12760 High Bluff Drive, Suite 210
   San Diego, California  92130
10  (858) 244-6584
11
12
13  FOR THE DEFENDANTS:
14  STITES & HARBISON, PLLC
   BY:  CLARK C. JOHNSON, ESQ.
15  400 West Market Street, Suite 1800
   Louisville, Kentucky  40202-3352
16  (502) 681-0349
   cjohnson@stites.com
17
18
19
20
21          DEPOSITION OF MATTHEW COPLEY,
22  taken at 350 Tenth Avenue, Suite 1300, San Diego,
23  California, on Tuesday, November 18, 2014, commencing at
24  8:55 a.m., before Tricia Rosate, RDR, CRR, Certified
25  Shorthand Reporter No. 10891.

Page 5

1          MATTHEW COPLEY,
2  having been first duly sworn, testified as follows:
3
4          EXAMINATION
5  BY MR. JOHNSON:
6      Q  Mr. Copley, would you state your full name.
7      A  Matthew David Copely.
8      Q  Have you given a deposition before?
9      A  No.
10      Q  Well, let me cover some of the process here so
11  that we can be as efficient as we can.  As you can see,
12  there's a court reporter here taking down what everyone
13  says, so if you'd let me finish my question before you
14  start answering, that would be helpful to everyone.
15          If you don't understand one of my questions, let
16  me know, and I'll try and rephrase it for you.
17          If you need to take a break at any time, just
18  let me know that, as well, and we're happy to accommodate
19  it.
20          If you can, answer my questions orally so the
21  court reporter can pick up the answer.  She can't get
22  gestures or shakes of the head or use of your hands to
23  answer a question.
24          Mr. Copely, what do you do for a living?
25      A  Financial advisor.

Deposition of Matthew Copley                                                                ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 6

1   Q   And how long have you been in that line of work?
2   A   Well, 15 years I've been doing some type of
3   financial advising, but early on, it was primarily fixed
4   annuity, just regular fixed annuities.  And then I got
5   into the reverse mortgage business, and it wasn't until
6   about 2009 that I started really focusing more on
7   financial advice for retirees.
8   Q   Okay.  And so starting around 2009, you focused
9   on financial advice for retirees?
10  A   Correct.
11  Q   And do you have any licenses or certifications?
12  A   Yes.
13  Q   And can you tell me what they are?
14  A   I have a life insurance license that allows me
15  to do insured products like fixed annuities.  That, I got
16  in 2001.  I have a Series 65 financial advisor license
17  which is a fee-based financial advisor license.  I got
18  that in November of last year.
19  Q   So you got your Series 65 license about a year
20  ago?
21  A   Last year.  Uh-huh.
22  Q   And you've had a California insurance license
23  since about 2001?
24  A   Yes.
25  Q   Okay.

Page 7

1   A   And then I also have -- it's called an NMLS
2   which is a national mortgage license for doing
3   mortgages.
4   Q   And approximately when did you receive the
5   mortgage license?
6   A   Well, the mortgage license didn't exist until
7   right around 2009, so as soon as the state and the
8   government set those up, I got my license immediately.
9   But I've been doing mortgages all the way back since
10  2003.
11  Q   What's the process or what was the process in
12  2001 to obtain a license from the California Department
13  of Insurance to sell life insurance or annuities?
14  A   You had to take a week-long course.  I think it
15  was 50 hours or something.  It was a classroom course,
16  and then take a test.
17  Q   Okay.  And I take it you passed the test?
18  A   Yes.
19  Q   Did your license ever have any restriction or
20  probationary status on it?
21  A   Yeah.  Early on when I first got my license, the
22  State of California said I'd made a misstatement on my
23  application.  I'd had a misdemeanor when I was in college
24  in 1998, and so they had actually revoked my license
25  because the first attorney that represented me had

Page 8

1   misfiled paperwork.  And I got another attorney.  I was
2   later compensated.  I actually sued the other attorney
3   for misrepresenting me, and I got a substantial
4   settlement.
5       The second attorney took me to an arbitration
6   hearing, and the judge ruled in my favor, that I had not
7   made any misstatements on my application; that I had been
8   forthright with the Department of Insurance.  So they
9   granted my license, and they made it a restricted license
10  for a period of time when I first got my license.
11  Q   Okay.  And those restrictions have long expired?
12  A   I believe so.
13  Q   Okay.  What is Heritage Tax And Insurance
14  Services?
15  A   It's a corporation that is co-owned by myself
16  and Brian White.  And Brian founded a company,
17  White Security Services, back in 1990, and I went to work
18  for him in 2001.  And in 200-- I believe 2003 or 2004,
19  we set up a 50/50 partnership arrangement, and we set up
20  the Heritage Tax And Insurance Services as an
21  S corporation, that we were 50/50 partners.
22  Q   How about Senior American Funding?  What's that
23  entity?
24  A   That's the mortgage company that still focuses
25  on mortgages, primarily reverse mortgages.  That's

Page 9

1   another company that Brian and I founded -- same thing,
2   50/50 -- to do the mortgage business.
3   Q   How about HighTechLending?  What's that?
4   A   HighTechLending is a bank out of Orange County,
5   out of Irvine, and when they changed some of the rules
6   with the Frank-Dodd Act a few years ago, it made it more
7   advantageous to be a branch manager rather than a broker.
8   So I set up a branch arrangement with First National Bank
9   of Utah, and then later with HighTechLending to do
10  reverse mortgages under the banking license versus a
11  broker license.
12  Q   Now, you mentioned you started focusing on
13  financial advice for retirees and indexed annuities
14  around 2009?
15  A   Yeah.  We had done it prior to that off and on.
16  But I did quite a bit in 2004 and 2005 for a short period
17  of time, but the reverse mortgage business was really
18  successful when the housing boom was going on in
19  2006/2007.  And if wasn't until the crash of 2008 that
20  the reverse mortgage business really fell off a cliff,
21  and when that happened, we were looking to really kind of
22  change our business because we were losing quite a bit of
23  money.
24      And that's when I got in touch with
25  The Revolution which was a field marketing organization

Deposition of Matthew Copley                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 10

1   that a gentleman by the name of Mark Lindsey ran.  And he
2   had a whole turnkey seminar system to present fixed-index
3   annuities and do retirement planning for retirees, and so
4   that's who I signed up with, and that was around 2009.
5       Q   Okay.  So around 2009, you signed up with
6   The Revolution --
7       A   Uh-huh.
8       Q   -- which was a field marketing organization.
9   Can you explain briefly what a field marketing
10  organization is?
11      A   Generally the insurance companies don't like to
12  do business with a small guy like me who does a little
13  bit of business here and there.  They want millions and
14  millions of dollars in production.  So what a field
15  marketing organization is is it's a marketing company
16  that brings hundreds and thousands of agents from all
17  over to work through them, and they're able to generate
18  enough production for the insurance company to want to
19  work with them, and they usually produce all kinds of
20  marketing materials.  In this case, the seminar that I
21  did was through their organization, but some of the
22  companies have direct mail, they have website design,
23  they have different marketing things that allows to, you
24  know, go out and advertise and things like that.
25      Q   So the field marketing organization, this was to

Page 11

1   support your marketing efforts?
2       A   Correct.
3       Q   And you still have to be approved or appointed
4   by a company in order to sell its products; right?
5       A   Right.
6       Q   And approximately how many companies had
7   authorized you to sell annuities in the 2009/2010
8   time frame?
9       A   I'd be guessing.  Maybe around ten.
10      Q   Okay.  Now, was Mr. White, Mr. Brian White, also
11  focusing on financial advice for retirees and annuities
12  in the 2009/2010 --
13      A   Yes.  Yes.
14      Q   And was he also appointed or authorized to sell
15  for a variety of different companies?
16      A   Yes.
17      Q   And in order to be authorized or approved to
18  sell a company's products, are you required to undergo
19  training by those companies?
20      A   Yes.
21      Q   Okay.  And focusing on ING in particular, were
22  you required to complete a training course relating to
23  ING annuities?
24      A   Yes.
25      Q   And did you do that?

Page 12

1       A   Yes.
2       Q   Was there any updating or periodic renewal of
3   that training?
4       A   From time to time.  It's not anything that's
5   ongoing, but they do have updates that they require you
6   to do before you can do business when they change things
7   or update a product.
8       Q   And you completed that training, to the best of
9   your knowledge?
10      A   Yes.
11      Q   And is that true of other companies, too, that
12  you were approved to sell for?
13      A   Yes.
14      Q   So you've had to complete training to be
15  approved in the first instance?
16      A   Uh-huh.
17      Q   And also get ongoing or updated training over
18  time?
19      A   Yes.
20      Q   Okay.  Now, you said you were appointed by
21  approximately ten companies.
22      A   I'm guessing.  But, yeah, it's around that
23  number.
24      Q   Was ING one of the top companies that you sold
25  for in that time frame?

Page 13

1       A   I wouldn't say it was one of the --
2           Well, top five.  Yeah.
3       Q   Okay.  So it was in the top five --
4       A   Yes.
5       Q   -- but not number one?
6       A   Correct.
7           MR. TATRO:  Can you clarify?  I'm sorry to
8   interrupt.
9           MR. JOHNSON:  Sure.
10          MR. TATRO:  Do you mean in terms of production
11  or size, or what are you talking about?
12          THE WITNESS:  Production.
13          MR. TATRO:  Okay.
14  BY MR. JOHNSON:
15      Q   What were some of the other companies in the top
16  five?
17      A   In 2009, north American.  We were doing a lot of
18  North American Life.  I believe we were doing a lot of
19  Allianz.  What other companies back then?
20  American National, Great American.  I think around 2009,
21  that would have been -- oh.  American Equity.  We did a
22  little bit of be with American Equity; not as much as the
23  others.  But, yeah, of course ING.
24      Q   Okay.  Now, are you still affiliated with
25  The Revolution?

Page 14

1  A  No.
2  Q  Are you affiliated with any other field
3  marketing organization at this point?
4  A  Yeah.  I changed to Gradient Advisors.  They're
5  back in Topeka, Kansas, and Minneapolis.  They had
6  offices in Topeka, Kansas.
7  Q  When did you make that change?
8  A  That would have been about three years ago.  I
9  wasn't with Revolution that long.  Maybe a year and a
10 half, two years.
11      And then I bounced around between different
12 field marketing organizations to find one that kind of
13 fit what we wanted to do, and I'd say probably around
14 2011/2012 is when I first contacted Gradient and started
15 working with them.
16 Q  Okay.  When you say Gradient fit what you wanted
17 to do, can you explain that?
18 A  Well, prior to Gradient, a lot of companies were
19 really focused on fixed-index annuities, and they were
20 just -- the idea was to find clients that fit the
21 fixed-index annuity profile that were looking for -- you
22 know, principal protection with maybe better than bank
23 account returns -- and that was the real focus of the
24 business.  And Gradient has a much broader -- broader
25 array of products and services, and so I was able to get

Page 15

1  my Series 65 and start offering all kinds of stuff from
2  stocks, bonds, mutual funds, ETFs and really do
3  comprehensive retirement planning, where before it was
4  really more product-oriented.
5  Q  Now, we talked about ongoing training required
6  by the companies.  Does the State of California have any
7  ongoing training or educational requirements?
8  A  Yeah.  Every two years, you have to do
9  continuing education.  That's usually done online,
10 though.  That's pretty easy to do.
11 Q  And you've completed all of your California --
12 A  Yes.
13 Q  -- annuity training?
14 A  Yes.
15 Q  When you say it's pretty easy to do, what are
16 the subjects that are covered in the California
17 continuing legal education?
18 A  They just cover, you know, the basics as far as
19 annuities.  You have to do obviously continuing education
20 specifically for annuities.  So there's a specific
21 annuity training, that they have requirements on an
22 ongoing basis.  But there's other things that you have to
23 choose from as far as you've got code and ethics
24 trainings, you've got various trainings on
25 life insurance, long-term care, estate planning.  You

Page 16

1  know, different subjects.  And you have to compile a
2  certain amount of continuing education credits every two
3  years to maintain your license.
4      MR. JOHNSON:  Let me mark a document here.
5      (Exhibit 1 was marked for identification.)
6  BY MR. JOHNSON:
7  Q  Mr. Copley, Exhibit 1 is a printout of the
8  California Department of Insurance website as of
9  November 11th, 2014, for your continuing education on
10 annuities.  Do you see that?
11 A  Yes.
12 Q  Does that appear to be an accurate statement of
13 the continuing education that you completed for the
14 State of California on annuities?
15 A  It looks like it.
16 Q  And so there was an eight-hour training course
17 that you took, completed in early 2005?
18 A  Uh-huh.  Yes.
19 Q  And then four-hour courses every other year?
20 A  Right.
21 Q  In any of those continuing education courses,
22 are you cautioned not to sell indexed annuities to senior
23 citizens?
24 A  Well, you're cautioned against selling them to
25 senior citizens that are maybe facing nursing home care

Page 17

1  and things like that where they might need a considerable
2  amount of liquidity.  But, yes, you're absolutely
3  cautioned to sell under specific circumstances that are
4  appropriate.
5  Q  So there's a focus on suitability?
6  A  Correct.
7  Q  In any of the California continuing legal
8  education courses, are you cautioned not to sell
9  annuities that offer bonuses?
10 A  Well, no.  No.  The annuities with bonuses
11 typically have lower cap rates and maybe aren't as --
12      In some areas where they offer a bonus, there's
13 a benefit on one side, and there's a takeaway on the
14 other.  So no.  There's bonus products that are
15 definitely appropriate in certain circumstances.
16 Q  Okay.  Now I want to focus on again the
17 2009/2010 time frame.  Can you tell me what your process
18 was for finding clients?
19 A  Well, when I joined The Revolution, they had a
20 whole turnkey system, and I just followed it to a T.  I
21 actually went to a training in Los Angeles.  That
22 training was sponsored by all the insurance companies.  I
23 believe ING was one of the sponsors for the training I
24 went to.  And it was two days where they went through and
25 presented the seminar, exactly how to present it.  They

Page 18

1  gave us a video that we could watch so we could duplicate
2  exactly what Mark Lindsey was doing in Los Angeles, and
3  then we saw a live seminar.  After going through the
4  training, we saw a live seminar after the first night.
5       And then the whole second day of the training
6  was a real thorough presentation for -- presentation with
7  a client, one on one, and so I just followed exactly what
8  Mark Lindsey had laid out.  I did the seminar exactly
9  like he presented it, and then I went through the -- they
10 had a little sales guide that they had you go through
11 on -- when you met with a client.
12      Q  So you took the -- you went to Los Angeles and
13 took the training from The Revolution?
14      A  Correct.
15      Q  And can you describe the process that you were
16 trained in?  In other words, again, the question I
17 started on was:  How did you go about meeting new
18 potential clients?
19      A  Well, they had it all -- it was just a turnkey
20 setup.  They went through the whole training, and what it
21 consisted of is you mailed a mailer out that they had
22 designed, and you just, you know, put all your name and
23 information on it, and you put a mailer out to have
24 people come to a seminar.  Generally you do, like, a
25 dinner seminar.  And so we just picked various places in

Page 19

1  town that had enough of a capacity, like a banquet room
2  that was popular that people liked to go to, and then you
3  would invite everyone to the seminar to learn about
4  fixed-index annuities and, you know, how to get
5  potentially better market returns and banks and CDs, you
6  know, but without the risk of the stock market.
7       And then people would come to the seminar, and
8  we would put on about a 90-minute seminar on, you know,
9  how fixed-index annuities work and why they're
10 appropriate for, you know, people's retirement if they're
11 interested in investments that have no risk -- well, no
12 principal risk, market risk.
13      And then you meet with the clients.  You try to
14 set an appointment at the seminar.  I had an assistant
15 there, just even at the time, and she would set an
16 appointment with a client.  She had my calendar at the
17 back of the seminar.  Then these people would come into
18 my office a week or two later, and I'd present the
19 fixed-index annuities, and some of the people would think
20 it was a good fit, and other people didn't, and so that's
21 what we did.
22      Q  How did you go about determining whether a
23 fixed-index annuity was a good fit for an interested
24 client?
25      A  Well, you know, you do a risk tolerance.  You

Page 20

1  get an idea of kind of how they feel about market risk.
2  Of course in 2009, everyone was really concerned about
3  market risk, so we had people literally flooding into
4  these seminars to -- wondering about how to kind of
5  protect their retirement assets.  And so you know, we'd
6  go over and tell them that, you know, the investment that
7  we put them in would be -- you know, it wouldn't be in
8  something that was a market risk investment and could
9  potentially earn a higher return.
10      So there was a whole presentation.  I think
11 there's a copy of it in the file that you guys both got
12 on exactly what I went through, step by step, when I
13 presented it.
14      Q  Okay.  I think we'll go through that here in a
15 bit this morning.
16      A  Okay.
17      Q  And again, focusing on generating new clients or
18 new business, are referrals from existing clients an
19 important source of new business for you?
20      A  Absolutely.
21      Q  Okay.
22      A  Yeah.
23      Q  So you want your existing clients to be happy
24 with their decisions?
25      A  Absolutely.

Page 21

1       Q  And, in fact, clients can be repeat customers so
2  to speak, can't they?
3       A  Sure.  We get a lot of clients that invite their
4  friends to a future seminar, and that's some of the best
5  clients because they're a referral from someone who we're
6  already working with.
7       Q  So you would certainly never sell anyone
8  anything that was worth less than they paid for it.
9       A  No.
10      Q  Let's talk a little bit about Mr. Abbit's
11 purchase.  You mentioned that you would hold these
12 seminars at restaurants around town?
13      A  Uh-huh.
14      Q  Was Phil's BBQ one of those?
15      A  Yeah.  That's one of my favorite places to do a
16 seminar.
17      Q  And Mr. Abbit attended a seminar in August 2010?
18      A  Yes.
19      Q  Did you know Mr. Abbit prior to that time?
20      A  No.
21      Q  Was he mailed an invitation for this seminar?
22      A  Yes.
23      Q  Do you know how it came to be that he was mailed
24 an invitation?
25      A  Well, we used a company -- I'm trying to think

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 22

1  of the company that we used at the time.  I could
2  probably go back through and look at my records and see
3  which company it was, but they're direct mail companies
4  that mail out for you the invitation pieces.  It's the
5  one that Revolution recommended to us.  And that direct
6  mail piece was mailed out to his house, and then they
7  call in on a reservation line.  And it's like an 800
8  number where people answer the phone, and they set him up
9  to go to the seminar.
10     MR. JOHNSON:  Let's mark this as Exhibit 2.
11     (Exhibit 2 was marked for identification.)
12  BY MR. JOHNSON:
13     Q  Mr. Copely, can you tell us what Exhibit 2 is?
14     A  These are the sheets that we ask people to fill
15  out and turn in at the back of the room after the seminar
16  is over.  That basically says if they're interested or
17  not in a meeting about fixed-index annuities.
18     Q  Did you meet with Mr. Abbit or Miss Lange, his
19  spouse, beyond an introduction on August 3rd, 2010?
20     A  No.  I might have said hello and shook their
21  hands, but I don't think I talked to them a whole lot at
22  the meeting.  They came into the office after the fact.
23     Q  Okay.  And do you review these responsibilities
24  sheets in advance of meeting in person with your --
25     A  Yes.

Page 23

1     Q  -- with folks who are coming into your office?
2     A  Yes.
3     Q  Okay.  Did you ask Mr. Abbit why he scratched
4  out at the bottom the five-year and seven-year options?
5     MR. HUTTON:  Objection to the form.
6  BY MR. JOHNSON:
7     Q  You can answer the question if you understand
8  it.
9     A  I never asked him that.  I don't remember if I
10  asked him that.
11     Q  Okay.  Okay.  And so Mr. Abbit then came into
12  your office to discuss the seminar in more detail?
13     A  Yes.
14     Q  Do you remember approximately when that
15  happened?
16     A  It was probably a few weeks after the seminar.
17  I think he was one that took a while to come in for an
18  appointment.  The whole process with him took a little
19  while.  He came in a couple times for appointments in the
20  office to go over the product, and then he came back in
21  to go over it again and answer questions.  And then it
22  was -- quite a bit of time passed before he called me and
23  said he had researched the product and that he wanted to
24  do it, except that he wanted a rebate.
25     Q  Okay.  Did his wife come with him on each of

Page 24

1  those visits?
2     A  Yes.
3     Q  And was Mr. White with you in those meetings, or
4  was that on your own or --
5     A  I don't remember.
6     Q  Okay.  When you first met with Mr. Abbit in your
7  office, did you go over his financial background?
8     A  Yes.
9     Q  And as you sit here today -- and we'll look at
10  some documents in a little bit -- but just as you sit
11  here, do you remember anything about his situation?
12     A  From what I remember, he had close to
13  1.4 million.  I believe Ameriprise was the company he was
14  with.  He was not happy with them.  He lost a lot of
15  money in the 2008 drop in the market, and, you know, he,
16  I believe, had a lot money in, like, money-market type
17  accounts inside of his account where he was earning less
18  than a tenth of 1 percent.  And so he came in really
19  looking for some way to earn better interest, but he
20  didn't want to put his principal at risk because he had
21  just had a big loss in the market.
22     Q  And so the basis of that, what did you recommend
23  to him?
24     A  I told him that -- you know, he wanted to keep
25  some of the money out for liquidity purposes in case he

Page 25

1  needed it.  And, you know, it was really up to him how
2  much he wanted to invest in the annuity.  I presented the
3  whole thing to him.  I suggested a million dollars as,
4  you know, a percentage of his IRA.  And one of the things
5  that I like to do is address all the negative aspects,
6  and of course liquidity is a big negative aspect with
7  annuities as you can't get all of the money once you set
8  up the account.  You can only get up to 10 percent a
9  year.  So I addressed that with the idea that this was
10  IRA money, and it would be tax suicide to pull it all out
11  in a lump sum, anyway, and you probably wouldn't want to
12  take out more than 10 percent in one year; otherwise, you
13  would be in a much higher tax bracket.  So it made a lot
14  of sense to him.  Liquidity was not as big of an
15  interest.
16     And of course he had requirement of
17  distributions because he was over age 70 and a half that
18  he had to take every year, so it seemed like a good fit
19  to have a portion of the money in liquid assets and then
20  the million dollars in the annuity.
21     Q  Okay.  You mentioned a form that The Revolution
22  provided that you had used as part of your meetings with
23  potential clients.  Let's see if I can put that in front
24  of you.
25     MR. JOHNSON:  This will be Exhibit 3.

Deposition of Matthew Copley                                 ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 26

1    (Exhibit 3 was marked for identification.)
2   BY MR. JOHNSON:
3       Q   Mr. Copely, is this the form that you were
4   referring to earlier?
5       A   Yes.  This is what The Revolution developed to
6   have us go through with each client.
7       Q   Okay.  Did you use this document in connection
8   with your meetings with Mr. Abbit?
9       A   Yeah.  Uh-huh.
10      Q   Now, on the first page of Exhibit 3, towards the
11  middle of the document, under No. 5, there's -- I guess
12  just past that, it says, "The following three items are
13  what my clients want, what I believe in, what we need to
14  agree on in order for us to work together."  Do you see
15  that?
16      A   Yes.
17      Q   Number 2 is assumed rate of return, 5 to
18  8 percent.  Do you see that?
19      A   Uh-huh.
20      Q   Do you know where those numbers came from?
21      A   Mark Lindsey developed that with The Revolution.
22  This is their form.  We just took our name and put it on
23  top instead of their name.  It's an absolute duplicate of
24  what they designed.
25      Q   So The Revolution -- that was in the form that

Page 27

1   The Revolution provided to you?
2       A   Yeah.  Yeah.  Everything that we have, the
3   response sheet, this was everything that the field
4   marketing organization designed, and we were told to put
5   our name on it and just use exactly what they did.
6       Q   Okay.
7       A   Which is what we did.
8       Q   Do you know where The Revolution came up with
9   the assumed rate of return of 5 to 8 percent?
10      A   I do not.
11      Q   The next item there says, "Keeping It Simple."
12  Can you explain what that is, as something that you're
13  clients want and that you believe in?
14      A   Well, they -- you know, The Revolution, the idea
15  was if you have your money in one spot and it's simple,
16  to be able to look at, you know, performance, S&P 500,
17  subject to monthly caps or monthly averages or annual
18  point-to-point or whatever the, you know, index is.  And
19  it's not a lot of guesswork as far as you don't have to
20  do market analysis and invest in oil companies or
21  energy companies or whatever.  You know, it's real
22  simple.  It's just a real simple type of approach to --
23      Q   Not constant tinkering?
24      A   Correct.
25      Q   Continuing on on the same page there, there's a

Page 28

1   paragraph that says, "Most people have question marks
2   about their finances.  They don't want these question
3   marks."  What question marks did Mr. Abbit have about his
4   finances?
5       A   He was really concerned about market risk.  And
6   I was actually under the impression that he wasn't going
7   to work with me, because I presented an annuity, and his
8   current company, Ameriprise, had also presented an
9   annuity to him, but the annuity that Ameriprise presented
10  was a variable annuity.  Obviously variable annuities
11  have market risk versus fixed-index.  So when I was going
12  over my annuity with him, I focused heavily on the fact
13  that there was no stock market risk in this annuity as
14  far as the account can't drop because the market drops,
15  and that was something that seemed to be a hot button for
16  him.  And so --
17      Q   Is that the safety first and safe money choices
18  concept here?
19      A   Right.  That's the big thing.  He didn't want to
20  lose any more money, and he felt like he had enough money
21  to be comfortable the rest of his life.  He just didn't
22  want to lose any of it.  And his wife is quite a bit
23  younger, and he wanted to make sure she had something if
24  he was gone.
25      Q   Okay.  Now, to jump ahead in Exhibit 3 to the

Page 29

1   third page of the document, No. 3 there, it says, "It
2   looks like too good to be true; right?  There has to be a
3   catch; right?  You are right.  There are two catches.
4   One, time; and two, cap."  Do you see that?
5       A   Rights.
6       Q   Did you discuss those catches with Mr. Abbit?
7       A   Yeah.  I do it in detail.  In fact, I most
8   likely did it on a separate piece of paper where I write,
9   "Catch 1" and "Catch 2" on it.  That's what I used to do
10  when I was doing The Revolution.
11          MR. JOHNSON:  This will be Exhibit 4.
12          (Exhibit 4 was marked for identification.)
13  BY MR. JOHNSON:
14      Q   Mr. Copely, I'll represent to you that this
15  document we've marked as Exhibit 4 was produced from your
16  files for Mr. Abbit.
17      A   Correct.
18      Q   Can you tell us what it is?
19      A   This was the -- when I went over this section,
20  No. 3, this is the piece of paper that I produced to him.
21  We talked about the money is tied up for a period of
22  time, and I presented three different annuities to
23  Mr. Abbit.  ING had a five-year, a seven-year, and a
24  ten-year available.  The bonus was larger on the
25  longer-term ones, and so he wanted to go with that one

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 30

1  versus the five or the seven.  And I talk about how he
2  can only get at 10 percent of the money per year during
3  that time frame.
4          And then the catch number two is that the amount
5  of money that he can earn is capped, you know.  Obviously
6  if you don't have any downside risk because of the
7  market, your upside is, you know, limited.  And so I went
8  over the different indexes with him, and we talked about
9  you've got the annual point-to-point, the monthly
10 average, and then the monthly cap which was -- the
11 presentation that Mark Lindsey really pushed back in 2009
12 was that the monthly cap had the highest potential, and
13 the idea was that your principal is protected, so we
14 should try for the highest potential gain.
15         So I went over each of the indexes with
16 Mr. Abbit, and you know, with his input, we selected
17 which indexes he wanted.  And I actually went out and saw
18 him, I believe, twice after the first renewal and the
19 second renewal to go over the indexes with him again so
20 he could pick which ones he wanted.
21     Q   Looking again at Exhibit 4, towards the bottom,
22 there's a parenthetical, and it says, "0 percent -
23 20 percent."  Do you see that?
24     A   Uh-huh.  Uh-huh.
25     Q   What's that about?

Page 31

1      A   Well, zero is the worst you can do, and then if
2  you're in the monthly cap strategy, the monthly cap, if
3  you look at the max cap available monthly, it came out
4  to, like, 20 percent max -- max gain that you could earn.
5  Obviously the market would have to go up to the cap every
6  month for a 12-month period, so that's the high -- the
7  maximum you could possibly earn, and zero is the worst
8  you can do.  And, you know, Mark Lindsey's presentation
9  was that you should assume that you're going to get
10 somewhere between 5 and 8 percent annually over the
11 length of the contract.
12     Q   Okay.  Did you discuss with Mr. Abbit the
13 possibility that in a given year, he might not have any
14 increase?
15     A   That's why I put the zero percent on there.
16 Yeah.  Absolutely.
17     Q   All right.  You said earlier today that you met
18 with Mr. Abbit and then didn't hear from him for a while?
19     A   Yeah.  I didn't think that he was interested in
20 the product because he -- Ameriprise had presented a
21 variable annuity.  I believe the company was RiverSource
22 if I remember right.  And he seemed to act like he was
23 going to go with that company.
24         And he had called me a few times and asked
25 questions.  He asked me how much I was going to make in

Page 32

1  commissions on the annuity.  And, you know, I -- I
2  disclosed it to him, but I was -- I didn't want to tell
3  him the complete amount that I was getting in a lump sum,
4  so I said, "7,000 for every year that you have the
5  contract," because I thought that that would, you know,
6  scare him away as far as getting the product.  And I was
7  also concerned that he seemed like the kind of person
8  that was trying to get something for nothing.  And sure
9  enough, he called me a few weeks later and said he had
10 researched it, and he looked at all the different annuity
11 products, and he liked this ING one, but he knew I was
12 going to get a big commission, and he said he wanted a
13 $5,000 rebate.  And you know, I'd never given a rebate
14 before, and I never have since.  It was the one and only
15 client I've ever worked for that asked for a rebate.
16         So I called The Revolution who was the marketing
17 organization, and I said, "Is this legal?  Can I do a
18 rebate?"
19         And they said, yeah, it was legal; that the
20 insurance companies frown about it, but it was legal to
21 do it.  And I was looking at a pretty substantial
22 commission, and a $5,000 rebate made sense.  So I agreed
23 to give him 5,000 in American Express gift cards in order
24 to -- if he did the annuity, and that's what he did.
25     Q   We'll look at some of those rebate documents in

Page 33

1  a second.
2          You mentioned RiverSource as a product that
3  Mr. Abbit was considering?
4      A   Yeah.  He brought in a bunch of paperwork on a
5  variable annuity that another advisor had presented him.
6  I believe it was his Ameriprise advisor.  And he was
7  hammering me with all kinds of questions, things that I
8  couldn't even answer as far as why this fixed-index
9  annuity versus the RiverSource.  And I just made it real
10 simple, and I said, "The RiverSource annuity has market
11 risk which is -- your primary objective, your goal, you
12 told me you don't want to risk your principal; you don't
13 want to see your account drop like it did in 2008.  And
14 the ING product doesn't have market risk as a potential
15 for account value loss, where the RiverSource was a
16 variable annuity that did have account value loss."
17         And I think that's why he ultimately decided to
18 go with ING.
19     Q   There was one RiverSource document in your file,
20 and let's look at that.
21         MR. JOHNSON:  This will be 5.
22         (Exhibit 5 was marked for identification.)
23 BY MR. JOHNSON:
24     Q   So Mr. Copely, I'll represent this was in the
25 file that you've produced --

Page 34

A   Correct.

Q   -- under subpoena.

A   Uh-huh.

Q   So it's your testimony that you were not offering a RiverSource annuity to Mr. Abbit.

A   No.

Q   Okay.  On this particular sheet, if you look in the lower right, it looks like it was printed September 20, 2010.  Do you see that?

A   Uh-huh.

Q   And this is not for variable annuities but fixed annuity?

A   This is a fixed-index annuity.  What happened is he initially -- we were comparing variable annuities, and he came back to see me another time with this document and said, "Well, RiverSource has fixed-index annuities as well.  Not just variable annuities.  And so I'm taking a look at their fixed-index annuity versus the ING."

    And so he brought this in and wanted me to go over it with him.  So I told him that the products were very, very similar as far as, you know, what they accomplished, principal protection with the potential for better market gains than bank CDs and savings accounts and things like that.  And so I don't remember exactly what the differences were between the two, but I know we

Page 35

discussed in detail the RiverSource product versus the ING.  But this one, there wasn't a whole lot of difference between the ING product as far as what it did.  They were both fixed-index annuities that kind of did the same thing, and I think ultimately he decided he'd rather work with me than his current guy at Ameriprise.

Q   So he ended up applying for an ING annuity?

A   Correct.

    MR. JOHNSON:  This is number 6.

    (Exhibit 6 was marked for identification.)

BY MR. JOHNSON:

Q   Mr. Copely, can you tell us what Exhibit 6 is?

A   This is the ING application for Mr. Abbit's annuity.

Q   And it's dated September 21, 2010?

A   Yes.

Q   So that's about six and a half weeks after the Phil's BBQ meeting?

A   Correct.

Q   What's your best estimate on the number of times you met with Mr. Abbit before he signed this application?

A   At least two times, but I think it was three.

Q   Okay.  And physically, where was Mr. Abbit when he signed this document?

A   I believe it was at my office.  I know I visited

Page 36

his home after the annuity had been in place for a year.  I don't think I went out there prior to that, but I may have gone to his house.  I can't remember.

Q   Okay.

A   I know I've been there, to his house, but I think it was after I had him in place for a year.

Q   Okay.  If you look at the first page of Exhibit 6, it indicates that Mr. Abbit was electing to put 100 percent of his premium in the monthly cap index strategy.  Do you see that?

A   Yes.

Q   You touched on this a little bit, but did you and Mr. Abbit talk about that decision?

A   Yeah.  I went through each -- each different one and told him what the different -- you know, how each one worked; that one was the participation, one was the point-to-point and the monthly average and the monthly cap.  The monthly cap had the highest potential gain if the market went up every month for 12 months, and I think that was, you know, his -- you know, what he wanted to do.  He wanted to try to go for the highest gain to have his principal protected, because I think the thought was that it was currently in a lot of money-market type investments, and he was trying to get the best return he can without the principal risk, so that's what he

Page 37

ultimately chose.  And I think after the first year, that strategy had not done very well, and we had changed it to mix up different percentages with the different strategies after the first year.

Q   Now, you sold other ING indexed annuities -- right? -- to others?

A   Correct.  Uh-huh.

Q   And do all of your clients elect 100 percent to the monthly cap index strategy?

A   No.

Q   Is that the most popular strategy?

A   No.  What I usually like to do is kind of switch the percentage up between the different ones, and you know, maybe 25 percent and 25 percent in the different ones, because, you know, who knows which ones -- I don't have a crystal ball.  I don't know how the market's going to -- the indexes are going to perform.  But I just kind of go over each one.  And some clients that want to have kind of more  -- "I want my principal protected, but I want the most aggressive potential gain," obviously the monthly cap has that ability to have it in a good year.

Q   Now, at the time of application, there are other documents that you present to your client and review with them?

A   The brochure, the ING company brochure on the

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 38

1  actual product.
2      Q  You complete a suitability profile, also?
3      A  I do, but I'm not sure back then there was a lot
4  of a suitability profile.  I definitely went through
5  whatever ING had as far as their paperwork.  I'm sure you
6  have a copy of it.
7      Q  Yeah.  And again, these are documents from your
8  file.
9          MR. JOHNSON:  This is No. 7, I believe.
10         (Exhibit 7 was marked for identification.)
11         THE WITNESS:  Yeah.  This is it.
12  BY MR. JOHNSON:
13     Q  So you can flip through this, Mr. Copely.  I'm
14  going to focus principally on page 3.
15     A  Okay.
16     Q  Again, this is entitled "ING USA Annuity &
17  Life Insurance Company, Secure Index And Opportunities
18  Plus Disclosure."  Do you see that on the top of page 1?
19     A  Page 3?
20        Oh.  Page 1.
21     Q  Yeah.
22     A  Oh, yeah.
23     Q  And at the bottom of page 3, your signature
24  appears.  Do you see that?
25     A  Yes.

Page 39

1      Q  And above your signature is a certification that
2  you reviewed this document with Mr. Abbit; right?
3      A  Yes.
4      Q  And that was a correct certification?
5      A  Yeah.  I go through the whole document.  In
6  fact, The Revolution recommended that we have them
7  initial next to the surrender charges, which obviously
8  isn't required by ING.  But you can see on the second
9  page where I had him initial, because as I go through
10  this, the fees, expenses, and other charges, I had him
11  initial there.  And we just go through all of the
12  whole -- each paragraph here, and then when we get to the
13  end, we sign it.
14     Q  And at the top of page 3, there's a provision on
15  how the agent's compensated.  Do you see that?
16     A  Yes.
17     Q  And you went over that with him?
18     A  Yeah.  He asked me, "Well, how much --
19        Before we even went through this page, he had
20  asked me prior to this, you know, what I was being
21  compensated, and I told him "$7,000 for each year that
22  you're in the contract."
23     Q  Which is $70,000?
24     A  Correct.
25     Q  And did you provide Mr. Abbit with a copy of the

Page 40

1  California Annuity Buyers Guide?
2      A  Yes.
3      Q  Did he have any questions for you as you went
4  through this document?
5      A  I can't remember.  We went through, you know,
6  the different indexes, I know, behind this, after he
7  signed, and what was available, and we decided to pick
8  which indexes to go with.  It's pretty self-explanatory
9  when you go through it.  It talks about different
10  strategies and what some of the fees and expenses are.
11     Q  We talked about a suitability profile as well.
12         MR. JOHNSON:  Let's mark this as Exhibit 8.
13         (Exhibit 8 was marked for identification.)
14  BY MR. JOHNSON:
15     Q  Mr. Copely, can you tell us what Exhibit 8 is?
16     A  This is the form that I fill out with the
17  client.  I go over their monthly household income and
18  expenses and all of the considerations before purchasing
19  the annuity.
20     Q  And your signature's at the bottom of the second
21  page of Exhibit 8?
22     A  Yes.
23     Q  And in signing, you certified, quote, that "I
24  believe that the annuity for which the owners is applying
25  is suitable to the financial needs and objectives of the

Page 41

1  owner"?
2      A  Yes.
3      Q  Was that a correct statement?
4      A  Well, yeah.  I mean, a third of his money was
5  still liquid in other assets, and we were just putting a
6  million dollars in the annuity.  So I thought it was
7  appropriate for what he was trying to accomplish.
8      Q  Now, after you submitted the application and
9  related paperwork, did ING ask for additional information
10  about suitability?
11     A  I don't believe so.  I don't remember.
12     Q  Let me refresh your memory.
13         MR. JOHNSON:  This will be No. 9.
14         (Exhibit 9 was marked for identification.)
15         THE WITNESS:  Yeah.  So they obviously asked for
16  additional information, see this is all the additional
17  information I provided.
18  BY MR. JOHNSON:
19     Q  So Exhibit 9 is some additional information that
20  you provided to ING in the form of a Needs Analysis?
21     A  Yeah.  The company, after I submitted this, they
22  must have asked for this Needs Analysis, so this is what
23  I put together.
24     Q  Okay.  And this information was based on your
25  discussions with Mr. Abbit?

Case 3:13-cv-02310-GPC-WVG   Document 39-21   Filed 03/27/15   PageID.1146   Page 13 of 27
Deposition of Matthew Copley
ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 42

1  A  Yes.
2  Q  Obviously ING ended up issuing an annuity to
3  Mr. Abbit?
4  A  Yes.
5  Q  Did you deliver that contract to him?
6  A  Yes.  I think that's -- the first time I went to
7  his house is when I delivered the contract.
8  Q  Okay.  Did you just shake his hand and drop it
9  off?
10  A  No.  I went over it.  I showed him the contract,
11  and I kind of went over all the details, and he signed
12  the delivery receipt that he had received it.
13      And then about a year later, I went back out
14  there because he was unhappy that the monthly cap
15  strategy hadn't performed, and so that's when we changed
16  the percentages and the indexes.
17  Q  Okay.  We'll get to that in a second.  You
18  mentioned a couple times this rebate issue.  Was it
19  Mr. Abbit's requested that he get a rebate or some kind
20  of discount?
21  A  Yes.  It was kind of strange.  I've never had a
22  client before or since ask for that, but he had done a
23  lot of research, I guess, on annuities and came up with,
24  you know, articles or whatever that said annuities were
25  highly compensated and that brokers made a lot of money,

Page 43

1  agents made a lot of money selling annuities, and I think
2  that was what he was fishing for when he asked me how
3  much I was going to make on the product.  And so he said
4  that he was willing to go with my annuity versus the
5  RiverSource annuity if I gave him a $5,000 rebate, and I
6  told him I didn't think I could do that, but I'd call him
7  back and let him know.
8      And I ended up calling The Revolution, and I
9  asked them if it was legal, and they said, "Well, the
10  insurance companies frown upon it, but it is legal."
11      And I was staring at probably the single largest
12  commission on an annuity that I had ever sold at that
13  point in time, and if it was legal, I said, "Okay.  I'll
14  do it."
15      So I called him back and said I was willing to
16  give him $5,000, and I wanted to give it to him in the
17  form of an American Express gift card so I can account
18  for it on all my taxes and accounting and everything.
19  So --
20  Q  So it was your idea to give him the discount in
21  the form of gift cards?
22  A  Yeah.  I didn't want to give him just cash.  I
23  don't know why.  There was some reason behind it at the
24  time, that I wanted to have some kind of an accounting
25  where it was a gift card instead of cash.

Page 44

1  MR. JOHNSON:  This is No. 9, I guess.
2  MR. HUTTON:  10.
3  (Exhibit 10 was marked for identification.)
4  BY MR. JOHNSON:
5  Q  Mr. Copley, I'll represent to you that this was
6  produced out of your file in this matter.  Can you tell
7  us what Exhibit 10 is?
8  A  Exhibit 10, this is the receipt that my business
9  partner got when he purchased the American Express gift
10  cards we gave Mr. Abbit.
11  Q  Do you know whose handwriting that is that says,
12  "Delivered to Ernie Abbit"?
13  A  That's mine.  That's my initials.
14  Q  Your initials underneath it?  Okay.
15      And this letter is dated November 13, 2010?
16  A  Yes.  I wanted to wait until 30 days, and I told
17  Mr. Abbit that; that, you know, if he canceled the
18  contract in the 30 days, that I wouldn't, you know, get
19  compensated, so I wasn't going to give him the gift cards
20  until after the 30 days was up.
21  Q  Okay.  Did you deliver these gift cards in
22  person?
23  A  Yes.
24  Q  Did he come into your office, or did you go out
25  to his house?

Page 45

1  A  I can't remember.
2  Q  And you had him sign an acknowledgement when he
3  received them?
4  A  Yes.  I believe there is something that I had
5  him sign.  I think it's in the file.
6  MR. JOHNSON:  This will be 11.
7  (Exhibit 11 was marked for identification.)
8  BY MR. JOHNSON:
9  Q  Mr. Copely, can you tell us what Exhibit 11 is?
10  A  This is what I had Ernie sign when I gave him
11  the gift cards just acknowledging that he had received
12  them and that we weren't making any representations as
13  far as the legal or tax implications of such rebate.
14  Q  The second sentence says, "This rebate will be
15  accounted as a rebate/incentive for annuity purchase and
16  will not be disclosed unless required by law or audit."
17  What's the purpose of that sentence?
18  A  Ernie didn't want any disclosure.  He didn't
19  want any tax document showing that he had received it,
20  and so I just accounted for it as an expense because
21  that's what he had requested.
22  Q  In other words, you weren't going to issue him a
23  1099 or anything like that.
24  A  Correct.  He said he didn't want a 1099.
25  Q  And at the same time or around the same time

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 46

1 that Mr. Abbit was purchasing an ING annuity, his spouse
2 also purchased an indexed annuity?
3    A   Yeah.  After we talked over this, he said that
4 his wife had an a IRA that he wanted to do the same thing
5 with, so I researched fixed-index annuities for her.  And
6 because she was younger, she was able to get into a
7 product that a little better cap rates than what he could
8 get at his age, and so we went with an American Equity
9 fixed-index annuity for her.
10   Q   Was she actively involved in that process?
11   A   Yeah.  Uh-huh.
12   Q   And --
13   A   Yeah.  He was upset because the first year, his
14 contract didn't do very well because of the index he
15 chose, and then his wife's contract had done pretty well
16 the first year.  I think she got 8 percent or something.
17 So I think that's kind of what soured him on the whole
18 thing, is that his wife's contract made money and that
19 his didn't.  And I remember a statement he made.  He
20 said, "Everyone's making money except Ernie Abbit."
21       So we changed up the indexes after that first
22 year to try to balance more -- you know, to try to get a
23 return from somewhere depending on how the indexes did.
24       MR. TATRO:  I'm going to interpose a belated
25 objection that it calls for speculation, lacks

Page 47

1 foundation.
2       To the extent this is getting into any personal
3 financial information or product purchases by
4 Nadine Lange, that is not relevant nor really calculated
5 to lead to the discovery of relevant evidence.  She
6 didn't buy an ING product, she's not a class member, and
7 it doesn't negate her third-party privacy rights.  And
8 I'd move to strike the response as nonresponsive.
9 BY MR. JOHNSON:
10   Q   Mr. Copely, to you knowledge, has Mrs. Lange
11 ever complained about the performance of her annuity?
12   A   No.
13   Q   Now, Mr. White, your colleague is listed as the
14 agent who sold that policy.  Do you know why that is?
15   A   I think he was contracted with American Equity
16 where I was not, so I think Brian is the one that I
17 brought in for her, to present that product, because I
18 don't think I was contracted with American Equity at that
19 time.
20   Q   And did you go through a separate or additional
21 process of the -- walking through The Revolution form in
22 connection with selling the American Equity contract?
23   A   No.  Not with her.  We just went through the
24 company information because we had already gone through
25 all the suitability stuff.  She was there when I

Page 48

1 presented his, so when I did hers, it was kind of just an
2 additional product.  We had already gone through all the
3 different steps, and he knew what he was looking for,
4 so --
5       MR. TATRO:  Can we agree to a running objection
6 as to any questions related to Miss Lange's financial
7 products or background information?
8       MR. JOHNSON:  Sure.  That's fine.
9       MR. TATRO:  Okay.
10 BY MR. JOHNSON:
11   Q   Now, Mr. Copley, you mentioned a couple times
12 that you met with Mr. Abbit on or around his contract
13 anniversary to talk about how the product was doing.
14   A   Uh-huh.
15   Q   Is that a custom you have with most of your
16 clients?
17   A   Yes.
18   Q   And tell me why you do that.
19   A   Well, I like to make sure that, you know,
20 everything makes sense for what their goals are.
21 Sometimes, you know, you have a big market drop, and you
22 might say, "Look.  Here's the different indexes, and this
23 is how they perform if the market recovered or dropped
24 further."  And so I try to let them kind of know what the
25 different options are, and I kind of talk about how I

Page 49

1 feel about the overall economy, and I discuss with them
2 how they feel about the overall economy.  And it gives me
3 an opportunity to talk to them about, you know,
4 potentially other business that I could work with them,
5 and it also gives me an opportunity to talk about, you
6 know, referrals and things like that.
7   Q   Sure.  You mentioned that Mr. Abbit ended up
8 changing his election strategy at some point in time.
9   A   Uh-huh.  I think we changed it -- I think we
10 changed it twice.  After the first year, he wasn't happy.
11 He thought the indexes were --
12       You know, I think it was after the first year.
13 I went out to see him at his house, and we changed the
14 indexes at some point.
15   Q   Well, let's see if I can give you a document
16 that will refresh your memory on when that happened.
17       MR. JOHNSON:  This is 12.
18       (Exhibit 12 was marked for identification.)
19 BY MR. JOHNSON:
20   Q   Mr. Copely, can you tell us what Exhibit 12
21 is?
22   A   This is the change in strategy request where we
23 decided to go 40 percent monthly -- 40 percent monthly
24 average, 30 percent monthly cap, and 30 percent
25 point-to-point.  We tried to split it up a little bit.

Page 50

1  We went over all the indexes, and that's what he wanted
2  to do.
3      Q  And this is dated October of 2012?
4      A  Yes.
5      Q  So that's about two years after --
6      A  Okay.  Two years.  Yeah.
7      Q  You mentioned he may have changed his elections
8  more than once?
9      A  I thought for some reason that we had changed
10 them more than once.  I can't remember.  I know that
11 every year at the anniversary, that my assistant calls
12 all my clients and tried to set an appointment to come
13 out and see them to change the strategies.  So I'm not
14 sure if I had met with him after the first year, but
15 obviously from this paperwork, I certainly did after the
16 second year.
17     Q  Did Mrs. Lange -- Miss Lange change her
18 elections as well?
19     A  Yes.
20     Q  Okay.
21     A  But her elections were different.  Ernie was
22 really adamant about what he wanted to do, so I think
23 Miss Lange took my advice more than what he did.
24        MR. JOHNSON:  Well, let's this is 13.
25        (Exhibit 13 was marked for identification.)

Page 51

1  BY MR. JOHNSON:
2      Q  Mr. Copely, can you tell us what Exhibit 13 is?
3      A  This is the selections that Miss Lange -- we did
4  on her transfer of strategies.  She had done fairly well
5  in her contract, and she wanted to have 50 percent of it
6  in the fixed interest.  I can't remember what it was, one
7  half percent or something at the time.  So she was
8  guaranteed a certain amount of a return, and then the
9  other 50 percent we split between the average value and
10 the monthly point-to-point.
11     Q  This document, Exhibit 13, is dated
12 September 25th, 2012.  Do you see that?
13     A  Uh-huh.
14     Q  That's about three weeks prior to Exhibit 12 --
15     A  Yeah.  American Equity has a strange way they do
16 it.  Almost every company after 12 months, they give a
17 30-day window to change strategies, but
18 American Equity has an 11-month change, so you have to go
19 out and see the client after 11 months, between the
20 eleventh and twelfth month, to change their strategies.
21 So I had to go out and see her to change hers, and then I
22 had to go back to do -- to change his.
23     Q  Okay.
24     A  And I know I went to their house to do this.  I
25 remember going to their house to do these changes.

Page 52

1      Q  And again, Miss Lange hasn't complained about
2  her contract in any way?
3      A  No.
4      Q  Mr. Abbit, has he complained about his contract?
5      A  Yes.
6      Q  What has he said about the contract?
7      A  Well, he wished he was still in the stock market
8  because the stock market had taken off after we set up
9  this contract.  He, you know, like I said, made the
10 comment that "Everyone's making money except
11 Ernie Abbit."  And he had a brother-in-law, I think -- I
12 think it was his brother-in-law that was also with
13 Ameriprise and that I had spoke with.  He referred him,
14 and his brother-in-law had decided to stay in the market,
15 and I think that he was really upset that his
16 brother-in-law had done real well when the market had
17 recovered, and that his contract wasn't earning as much
18 as it could have been if it had stayed in the
19 stock market.
20     Q  Has he ever complained about the surrender
21 changes?
22     A  No.
23     Q  Has he ever complained about the bonus?
24     A  No.
25     Q  Has he ever complained about your commission?

Page 53

1      A  No.
2      Q  Has he ever complained about embedded
3  derivatives?
4      A  No.
5      Q  Now, you and I, Mr. Copely, we've met once
6  before today?
7      A  Uh-huh.
8      Q  When was that?
9      A  I don't know.  About a month or so ago in my
10 office.  You came by and talked about, you know,
11 everything that went on here.
12     Q  Okay.  Do you remember anything else about that
13 meeting?
14     A  No.  Nothing specific.
15        MR. JOHNSON:  Okay.  No further questions.
16        MR. TATRO:  Off the record?
17        MR. JOHNSON:  Sure.  Let's take a break.  We've
18 been on for an hour.
19        (Break taken.)
20
21             EXAMINATION
22 BY MR. HUTTON:
23     Q  Mr. Copely --
24     A  Yes.
25     Q  I have a few questions for you when you're

Deposition of Matthew Copley                                      ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 54

1  ready.  Mr. Copely, my name is Drew Hutton.  I'm one of
2  the counsel for Mr. Abbit in this litigation.  I'll have
3  some questions for you.
4      Are you represented by counsel in connection
5  with this litigation?
6      A  No.
7      Q  You testified earlier that Mr. Johnson came to
8  your office about a month ago.
9      A  Yes.
10     Q  How long did you meet with Mr. Johnson?
11     A  Maybe 15, 20 minutes.
12     Q  What did you discuss?
13     A  He went over the file, some of the same
14  paperwork that we discussed this morning, but more
15  generally.  We didn't go over any specifics.  It was kind
16  of, you know, just generally what happened with the
17  presentation and the whole bit.  So I went over that with
18  him.
19     And he informed me that he was going to send me
20  paperwork to get a copy of the whole file, so I --
21  shortly thereafter, I got a request for a copy of the
22  file, and then shortly after that, I got a request from
23  you.  So --
24     Q  So you met with Mr. Johnson before you received
25  a subpoena from him?

Page 55

1      A  Yes.
2      Q  Did Mr. Johnson tell you which documents he'd
3  be -- the types of documents that he would be requesting?
4      A  Well, he said he wanted the whole file.
5      Q  And you had that file available at the time?
6      A  Yes.
7      Q  Did he make a copy of it at that time?
8      A  No.
9      Q  Did you take any notes at that meeting?
10     A  No.
11     Q  After that meeting, did you have occasion to
12  speak to Mr. Johnson?
13     A  I think he may have called me one time just to
14  let me know that he was sending a request for a copy of
15  the file.  I believe he called me to let me know that.  I
16  don't remember if I spoke to him or if it was a message.
17     Q  Any other conversations?
18     A  I think I spoke to him one time on the phone
19  between sending the file and receiving this request for a
20  deposition.
21     Q  What did you discuss in that call?
22     A  Just that I'd be happy to come take a
23  deposition.
24     And I think there was some discussion regarding
25  the types of annuities that Mr. Abbit purchased, and I

Page 56

1  know I remember -- I remember Mr. Johnson saying that
2  he -- Mr. Abbit had done really well in his account --
3  his annuity in the last year.  I can't remember -- I
4  can't recall much of what else was discussed.
5      Q  Do you receive copies of the statements that
6  Mr. Abbit receives?
7      A  Usually the insurance companies send me a notice
8  saying that the client's renewal's coming up, and yes,
9  usually I get copies of the statements every year.  I
10  believe on Mr. Abbit, anything I got would have been in
11  the file, so if there's any year that's missing, it's one
12  that I didn't receive or I for some reason didn't make a
13  copy of it.
14     Q  You mentioned a gentleman by the name of
15  Mark Lindsey.
16     A  Uh-huh.
17     Q  He's in charge of The Revolution?
18     A  Yes.
19     Q  Have you spoken to him in connection with this
20  litigation?
21     A  Not at all.
22     Q  And in connection with the subpoena?
23     A  Not at all.
24     Q  You testified earlier about a misstatement that
25  was contained on an application, and this was the

Page 57

1  insurance license application for the State of
2  California.  Do you recall that testimony?
3      A  Yes.  Yes.
4      Q  And you mentioned that there were a couple
5  lawyers involved who represented you.  The first layer
6  you said had the --
7      A  He failed to file documents that -- for some
8  kind of a hearing, so the Department of Insurance had
9  revoked my license that they had just issued me.  And I
10  ended up getting a different attorney, because this guy,
11  you know, was a disaster.  And the new attorney got me a
12  request for some kind of a hearing.  And so then that's
13  when the Department of Insurance, the judge ruled that I
14  hadn't made a misstatement on my application, and I was
15  able to keep my license with some kind of restriction on
16  there that says I have to abide by all -- which I would
17  have done, anyway.  There was no real restriction.  It
18  was just classified a restricted license.
19     And then later, I got another attorney and sued
20  the first attorney for -- because I had all these e-mails
21  and everything saying that he had filed everything that
22  he hadn't filed, so I got a pretty substantial
23  settlement.
24     Q  The first attorney, what is his name?
25     A  It was Pinker -- Pinkerton & Doppelt.  I can't

Page 58

1  remember the actual attorney.  I think he was kind of a
2  guy under the main attorney.  The main attorney was a guy
3  by the name of -- I think it was Pinkerton or -- I don't
4  remember.  He said he had to take a mortgage out on his
5  house to settle.  That's all I remember.
6      Q  What was the name of your second lawyer that you
7  used in connection with this insurance matter?
8      A  What was his name?  I'd have to -- I'd have to
9  see if I can look through some records.  I'm not sure
10 what his name was.  He specialized in arbitration and
11 hearings like this.
12         MR. HUTTON:  This is going to be Exhibit 14.
13         (Exhibit 14 was marked for identification.)
14 BY MR. HUTTON:
15     Q  Mr. Copely, you've been handed what's been
16 marked as Exhibit 14, and this is -- the first three
17 pages are a document called "Accusation" from -- with a
18 caption before the Insurance Commissioner of the State of
19 California, and then following that document is an
20 eight-page proposed decision from the
21 Insurance Commissioner of the State of California.  Do
22 you see that document?
23     A  Right.
24     Q  Have you seen any of these documents before
25 today?

Page 59

1      A  Yes.
2      Q  The first document, you've seen this accusation
3  before today?
4      A  Yes.
5      Q  And the proposed decision, you've seen that
6  document before today?
7      A  Yes.
8      Q  The proposed decision, is this something that
9  you sued your first lawyer in connection with?
10     A  Yeah.  Well, the first attorney that represented
11 me, my license had been revoked, so I sued that first
12 attorney because he misrepresented and he didn't file a
13 bunch of forms in time.
14        This is -- the second attorney was representing
15 me for this, and this was when I went before this
16 administrative hearing, and that's when they were -- they
17 re-issued my license under what's called a suspended
18 license.  Or not suspended.  Restricted.  Excuse me.
19 Restricted.
20     Q  So it's this proposed decision that's the second
21 document that resulted in the restricted licensing?
22     A  Correct.
23     Q  And how long were you issued -- over what period
24 was this license restricted?
25     A  I'm not sure.  From whenever this was originally

Page 60

1  put into place, for a number of years.  I'm not sure.
2      Q  Have the restrictions ever been lifted off your
3  license?
4      A  I believe it was for a period of time, but I've
5  never gone back and looked.
6      Q  So you're not sure whether or not you have a
7  restricted license today?
8      A  No.  I'm not sure.  I don't believe so, because
9  when you go on the Department of Insurance website, it
10 doesn't say, "restricted license," so -- I think it used
11 to say that years ago.
12     Q  There are a number of factual findings in the
13 proposed decision.  Do you see those?
14     A  Uh-huh.
15     Q  Do you disagree with any of those factual
16 findings?
17     A  There are several parts I disagreed with at the
18 time, but it was what it was.  The judge that went
19 through everything got information from, you know, the
20 original case, and there was a lot of misstatements that
21 the detectives had made.
22        But all in all, I was a juvenile delinquent when
23 I was a child.  When I was 18, 19 years old, I made a lot
24 of really foolish decisions, and I hung out with the
25 wrong crowd.  And it wasn't until I really met my wife

Page 61

1  that my life actually -- she kind of was the person that
2  kind of got me on the straight and narrow, and then of
3  course now that I have four children, I'm, you know, the
4  model of responsibility.  But no.  When I was a teenager,
5  I -- I didn't come from a lot of money, and -- you know,
6  I my parents worked very hard.  My mom was a waitress, my
7  dad was a crew chief in a grocery store.  When I was a
8  teenager, I thought it was cool to run the neighborhood
9  and hang out with the bad kids, so it took me a while to
10 grow up.
11        MR. HUTTON:  This will be Exhibit 15, I believe.
12        (Exhibit 15 was marked for identification.)
13 BY MR. HUTTON:
14     Q  Mr. Copley, the document that's been marked
15 Exhibit 15 has a document range on it, GUSA 3750 to 3752.
16     A  Uh-huh.
17     Q  It indicates that it's the fixed-index annuity
18 application for agent appointment from ING.  Do you see
19 that?
20     A  Yes.
21     Q  Do you recognize this document?
22     A  This looks like the agent appointment that ING
23 had me fill out when I signed up with the company.
24     Q  So on the second page is your signature?
25     A  Yes.

Page 62

1  Q  Next to the day, January 15, 2009?
2  A  Yes.
3  Q  And so this would be about the time frame that
4  you were requesting agent appointment with ING?
5  A  Correct.
6  Q  For the purposes of selling fixed annuities?
7  A  Correct.
8  Q  And would this include for the purpose of
9  selling fixed-index annuities?
10  A  Yes.
11  Q  The questionnaire on page 1, Question No. 6 --
12  A  Yes.
13  Q  "With the exception of routine traffic
14  violation, have you ever been convicted or pled guilty or
15  nolo contendere (no contest) in a court to a misdemeanor
16  or felony?"
17  A  Uh-huh.
18  Q  Did you answer "No" to that question?
19  A  Yes.
20  Q  Is that correct?
21  A  Yes.  We had my case -- I went back to court in
22  2004, and a not guilty plea was entered, and I had an
23  attorney to go back through the case.  So the original
24  1998 misdemeanor was changed to a not guilty plea.
25  Q  Did the court ever enter a not guilty -- expunge

Page 63

1  your misdemeanor?
2  A  Yes.  Everything has been taken off my record in
3  2004.  The original 1998 case, there was a lot of
4  problems with it.  I didn't have the money to defend
5  myself, so I took the plea bargain that the court offered
6  me.  And, unfortunately, you know, there was a lot of
7  things wrong with taking that plea bargain.  So I went
8  back to court in 2004 and went before a judge, and we
9  went back through the case, and they put in a not guilty
10  plea.  I was advised at that point by my attorney that I
11  could answer "No" to any questions because the not guilty
12  plea had been entered.
13  Q  What's the name of that attorney?
14  A  David Gutierrez.
15  Q  Is he in San Diego?
16  A  Yes.
17  Q  On the same page, Question 10, it reads, "Have
18  you ever been convicted of or pled guilty or
19  nolo contendere (no contest) to violating state insurance
20  department or federal or state securities or
21  investment-related regulations or statutes, or have you
22  ever had your insurance license or securities
23  registration suspended, revoked, investigated, audited,
24  or had a license denied?"  Do you see that?
25  A  Yes.

Page 64

1  Q  And you answered "No" to that question?
2  A  Yes.
3  Q  Is that a true statement?
4  A  I don't know.  I was advised to answer, "No"
5  because the Department of Insurance in the hearing,
6  administrative hearing, had ruled that I had not made a
7  misstatement and that the revocation of my license for
8  that period of time was in error.  So I've been -- I was
9  advised that it should never have been revoked in the
10  first place, so that's what I've always checked going
11  forward upon advice of my attorney.
12  Q  So this was your attorney advising you to say,
13  "No" to this particular question?
14  A  Yeah.
15  Q  And this is David Gutierrez?
16  A  Yes.
17  Q  Well, at some point, you submitted this
18  application to ING; correct?
19  A  Uh-huh.
20  Q  After that point --
21      And that's a "Yes" to that question?
22  A  To what question?
23  Q  I'm sorry.  I just want to make sure that the
24  record's clear.  After you sent this application in to
25  ING -- I'm sorry.  Strike that.

Page 65

1      At some point, you submitted this application to
2  ING; correct?
3  A  Yes.
4  Q  Okay.  After that point, did ING ever contact
5  you regarding the insurance matter that was the subject
6  of the previous exhibit that we looked at?
7  A  Yes.  Every insurance company always has a
8  question about that, and I have to send documentation
9  regarding the case.  I don't think I've ever contracted
10  with an insurance company without having to explain that.
11  Q  Did you send them the paperwork from the -- for
12  the insurance matter that ended up restricting your
13  license?
14  A  Yes.
15  Q  And that was sent to ING?
16  A  Every single insurance company that I think I've
17  ever contracted with has asked me that question, because
18  I check "No" on these, and then it comes up on the
19  Department of Insurance website that I had a suspended
20  license, so I have to explain myself.  Every single
21  contract I think I've ever sold, the insurance company
22  comes --
23      I don't know specifically whether ING asked for
24  it, but I'm 99 percent sure that they did, because I
25  don't remember ever having an insurance company not

Case 3:13-cv-02310-GPC-WVG   Document 39-21   Filed 03/27/15   PageID.1152   Page 19 of 27

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 66

1  question me.
2      Q  You testified earlier today about ING training.
3      A  Uh-huh.
4      Q  Do you recall that testimony?
5      A  Uh-huh.
6      Q  Can you describe for me how you received that
7  training?
8      A  Product training is done generally online.  You
9  go on, and they have an online course that they have you
10  go through.  You have to read through sections and answer
11  questions and certify that you understand what you read.
12  And it's -- you know, a little course that they design
13  for the product, and that's separate from the courses you
14  have to take through the State of California for the
15  insurance license.  That's just the product training,
16  which is usually done on the Internet.
17      Q  Do you keep a copy of that training?
18      A  I do not.
19      Q  Do you keep a copy of the certification
20  indicating that you've taken the training?
21      A  No.  No.  I have to get certified on many, many,
22  many products, and it would be a mountain of paperwork to
23  keep track, to make copies of all those.  I let the
24  insurance companies handle any copies.
25      Q  When do you know that it's time to update

Page 67

1  training with respect to ING products?
2      A  Two ways.  One, they notify you by e-mail that
3  you have to do specific training, new training on various
4  products.  And then the other time that you have to go
5  through training is if you're going to discuss a new
6  product with a client that you've never written before.
7  Then generally you have to do a product training for the
8  new piece of business.  So generally I call up and say,
9  "I want to offer this particular product, you know.  Is
10  there a training that is required?"
11      And they usually say, "Yes."
12      And so I say, "Well, how I do complete that
13  training?"
14      And they usually send me an e-mail or tell me
15  where to go on the website in order to complete that
16  training.
17      Q  The notifications that you receive for the
18  updated training, do you keep copies of those e-mails?
19      A  No.  I don't keep copies.  It's possible to go
20  back and search some e-mail archive, but I don't have
21  copies.  I delete all that stuff.
22      Q  Before the Secure Index Opportunities Plus
23  Annuity product from ING was sold to Ernie Abbit, had you
24  sold that product previously to anyone?
25      A  Yes.  I believe so.

Page 68

1      Q  How many people had you sold that product to?
2  Do you know?
3      A  I would be guessing.  I would say prior to
4  Ernie Abbit, maybe anywhere from two to ten people.
5      Q  And did you receive specific training for that
6  product before selling the product?
7      A  Yes.
8      Q  And do you recall what that training -- was it
9  online?
10      A  Online.  Everything ING pretty much does is
11  online on their trainings.
12      Q  That was also -- that particular online
13  training -- something you have had to provide
14  certification for?
15      A  I believe so.  You know, you're going back
16  five years, and I know there's a certain point in time
17  where they started really specifying product training.
18  And it was sometime around that time, maybe a little
19  before or a little after, that the companies really
20  started getting specific on product training.  So I'm not
21  100 percent sure, but I believe I did product training
22  for that product.
23      Q  Did the product training include the sales
24  brochure that would be used for the product?
25      A  I don't remember.

Page 69

1      MR. HUTTON:  This will be 16.
2      (Exhibit 16 was marked for identification.)
3  BY MR. JOHNSON:
4      Q  Mr. Copely, you've been handed what's been
5  marked as Exhibit 16.
6      A  Yes.
7      Q  It has a document range, AB 61 through AB 72.
8      A  Yes.
9      Q  Do you recognize this document?
10      A  Yes.
11      Q  And is that the sales brochure that you used in
12  connection with selling Ernie Abbit the ING annuity?
13      A  Yes.
14      Q  Can you tell me how you came into possession of
15  the ING sales materials?
16      A  They were originally given to me at
17  The Revolution training as a product that they
18  recommended, and when I got back to my office, I ordered
19  multiple copies of the five-year, the seven-year, and the
20  ten-year ING product.  And so they sent me a box of -- I
21  don't know -- a dozen or more of these brochures that I
22  used to present to clients.
23      Q  You said they sent a box of these --
24      A  ING.
25      Q  ING sent these?

Deposition of Matthew Copley                                ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 70

1    A  Yes.
2    Q  Okay.  Do you recall whether that was before or
3  after your training?
4    A  It was after, because I didn't start working
5  with these products until after I went to The Revolution
6  training, which I believes was sometime in 2009.
7    Q  Did anyone at the company -- after you received
8  the box of sales brochures, did anyone at the company,
9  ING, contact you regarding these brochures?
10   A  Yes.  There was a rep at ING that contacted me
11  on a regular basis asking me if I needed new brochures.
12  And I can't remember what that rep's name is, but that
13  rep's changed.  There's serveral people who have been in
14  that position.  But they always call and ask if I need
15  any help with anything or if I need any more marketing
16  material, things like that.  That's about it.
17   Q  In terms of marketing for this particular
18  product, did ING offer you anything else for sale of this
19  product?
20   A  There was another generic brochure on
21  fixed-index annuities that wasn't specific to this
22  product, but ING had another brochure that talked about
23  fixed-index annuities and just generally how they worked.
24  That was another brochure they gave every client.  That
25  one, plus this one.  And I -- obviously, depending on

Page 71

1  whether someone wanted the five-year, the seven-or the
2  ten-, depending on which product brochure, I would use.
3  But there was another brochure that ING had that was just
4  a general brochure on fixed-index annuities.
5    Q  Did ING ever explain to you either in training
6  or conversation surrounding the sales materials that the
7  product contained derivatives that were embedded in the
8  contract?
9    A  No.
10   Q  In connection with either the training or the
11  sales materials that were provided to you by ING, did
12  anyone ever explain to you what the economic value of the
13  contract was in and around the purchase date?
14       MR. JOHNSON:  Object to form.
15       THE WITNESS:  I don't understand the question as
16  far as economic value.
17  BY MR. HUTTON:
18   Q  Well, did anyone ever explain to you that there
19  were components of the contracts that had separate value
20  different than, let's say, death benefits and other
21  features?
22   A  No.
23   Q  Did anyone ever explain to you how the product
24  could be valued on an economic basis?
25   A  No.

Page 72

1       MR. JOHNSON:  Object to form.
2  BY MR. HUTTON:
3    Q  In connection with the training or the
4  sales brochure that ING provided you, did anyone ever
5  explain to you that the 5 percent bonus was subject to
6  market risk?
7    A  No.
8    Q  Had you been told that the ING annuity that you
9  sold to Mr. Abbit for a million dollars was worth really
10  $730,000, would you have sold him that product?
11       MR. JOHNSON:  Object to form and foundation.
12       THE WITNESS:  I don't know.  I've never -- I
13  never told him it was only worth that, so -- I don't
14  know.  I don't think so.
15  BY MR. HUTTON:
16   Q  Would that be consistent with your understanding
17  of principal protection?
18   A  No.  If a contract was only worth $700,000, it
19  certainly wouldn't be principal -- it wouldn't be a
20  principal-protected product.
21   Q  Did anyone at The Revolution ever explain to you
22  that the ING fixed-index annuity providing the bonus
23  contained derivatives embedded in the contract?
24   A  No.
25   Q  Do you have any experience in your financial

Page 73

1  advisor role selling derivatives?
2    A  Not at all.
3    Q  Are you trained to sell derivatives?
4    A  No.
5    Q  Have you ever received any classes or continuing
6  education that cover the topic of derivative instruments?
7    A  No.
8    Q  I think before you, you will find Exhibit 3 that
9  was introduced earlier today.  It's this questionnaire
10  checklist.
11   A  Yes.
12   Q  It has a document range, HTFS 79 through
13  HTFS 82.
14   A  Correct.
15   Q  Do you see that?
16   A  Yes.
17   Q  You testified earlier that this was a form that
18  was prepared by Revolution.
19   A  Yes.
20   Q  And I think you testified earlier that you had
21  used this document in your meeting with Ernie Abbit.
22   A  Correct.
23   Q  Is there any reason why the form's not filled
24  out?
25   A  I felt it was a little clumsy to fill a form out

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 74

1  when I was meeting with a client, so I liked to kind of
2  go over each question and have the client answer it,
3  so I had in my mind that they'd answered how they were
4  supposed to answer throughout the document. And when I
5  did the training with The Revolution, some of the other
6  advisors, you know, filled this out specifically with the
7  client, but I felt it looked a little unsophisticated to
8  be filling out this form.
9      Q   So there's nowhere on here that Mr. Abbit's
10 attesting to any of these representations in terms of
11 initials or anything like that?
12     A   No.
13     Q   On the first page, you testified earlier that
14 regarding the feature of Keeping It Simple --
15         Do you see that?
16     A   Uh-huh.
17     Q   -- that the S&P 500 index is a simple approach
18 to the investment. Do you recall that?
19     A   Uh-huh.
20     Q   Is that "Yes"?
21     A   Yes.
22     Q   Okay. If you had an understanding that the
23 contract was embedded with derivatives, would you
24 continue to feel that that was a simple approach to the
25 investment?

Page 75

1      A   I don't know the internal workings inside the
2  investment. I simply presented what the end result was.
3  So anything involving derivatives is really above my
4  level of expertise. You know, I understood it to be a
5  product where the principal was protected against
6  market risk and that the client could potentially earn a
7  greater return than they could from money market or CDs
8  or savings accounts. And for a client that was looking
9  for principal protection, but, you know, wanted a little
10 better return than maybe a bank would offer, that was
11 kind of the idea behind the product. I really don't have
12 any experience with the derivatives or anything that's
13 involved with it.
14     Q   There's a document we looked at earlier today.
15 It was marked as Exhibit 8. Suitability Profile, two
16 pages.
17     A   Yes.
18     Q   It has a document range HTFS 138 through 139.
19     A   Yes.
20     Q   The second page, we looked at your signature at
21 the bottom of the page. Do you recall that?
22     A   Yes. That's my signature.
23     Q   And this was an acknowledgement regarding
24 suitability?
25     A   Yes.

Page 76

1      Q   And had you understood the product to not
2  protect principal, would you have deemed it suitable for
3  Mr. Abbit?
4      A   No, I would not.
5      Q   If you had concluded that the product did not
6  provide income benefits that were better than simple bank
7  investments like a savings account or a CD, would you
8  consider that suitable for Mr. Abbit?
9      A   No.
10     Q   If you had known there were derivatives embedded
11 in the contract, would you have considered that
12 investment suitable for Mr. Abbit?
13     A   I really have a really limited knowledge of
14 derivatives, so I can't really answer that question
15 because I don't understand whether it would be suitable
16 or not, because I'm not familiar with how derivatives
17 work.
18     Q   We looked earlier at Exhibit 9. This was
19 follow-up from ING on suitability analysis called a
20 Needs Analysis.
21     A   Yes.
22     Q   The first page is a fax cover sheet?
23     A   Yes.
24     Q   That's your signature at the bottom of the page?
25     A   Yes.

Page 77

1      Q   And the narrative on that page is a document
2  that you prepared?
3      A   Yes.
4      Q   In the bottom paragraph, you mention -- you make
5  a statement, "Additionally, his home, which is not
6  usually considered, is a multi-million Mission Bay
7  beachfront property which he stated is owned free and
8  clear." Do you see that?
9      A   Yes.
10     Q   What property is that referring to?
11     A   Mr. Abbit's home. He stated that he owned it
12 free and clear and that it was worth, you know, well over
13 a million dollars.
14     Q   Had you been to Mr. Abbit's home?
15     A   Yes.
16     Q   And is it a mobile home?
17     A   It is a mobile home, manufactured mobile home,
18 but it's on the sand.
19         (Exhibit 17 was marked for identification.)
20 BY MR. HUTTON:
21     Q   Mr. Copely, you've been handed what's been
22 marked as Exhibit 17. This is a document with a number,
23 HTFS 29.
24     A   Uh-huh.
25     Q   I think this is a document produced from your

Deposition of Matthew Copley

ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 78

files.

A  Yes.

Q  Is that correct?

A  Yes.

Q  Is this a document that you generated off the Internet?

A  Yeah.  Mr. and Mrs. Abbit wanted to get a living trust prepared, and I have an attorney that works with our company that does trusts for our clients, and so this document was generated so we could get the information needed to put his property in his living trust and to file it with the County Recorder's office.

Q  Was that ever done?

A  I believe so.  After all the annuity stuff was done, he mentioned that he wanted a trust, so I believe they came back in shortly after completing all the annuities to complete a living trust with the attorney that we have there, maybe a month or two later.  I'm not sure.

MR. HUTTON:  18, I think.

(Exhibit 18 was marked for identification.)

BY MR. HUTTON:

Q  Mr. Copley, this document labeled Exhibit 18 has a document range HTFS 120 through 139.  This is a document produced from your files; correct?

Page 79

A  Yes.

Q  Does this constitute the fixed annuity application that you prepared for Mr. Abbit's annuity purchase?

A  Yes.

Q  And is this a document that you submitted to ING?

A  Yes.

Q  Referring you to page 124 --

A  124, okay.

Q  Is that your handwriting there?

A  Yes.

Q  And on the following page as well?

A  Yes.

Q  The page ending 128 --

A  Yes.

Q  -- you identify the marketing organization there as The Revolution, FMO.

A  Correct.

Q  Is The Revolution compensated in any way in connection with the sale of an annuity like this?

A  Yes.  I believe so.

Q  How are they paid?

A  I think they get an override on the business that we generate.  I'm not sure what it is.  My

Page 80

understanding is it's probably somewhere between 1 and 2 basis points.  So somewhere between 1 and 2 percent on whatever the sale is.

Q  Who pays them?

A  ING, the insurance company.

Q  You mentioned 1 to 2 percent.  1 to 2 percent of what?

A  The total value -- I'm not sure what they get paid.  It's just -- you know, my understanding from being in the business is that they get some kind of an override from the insurance company.  I don't know if it's based on production or if it's just a flat percentage on what is sold, but I would imagine that they would get somewhere between 1 and 2 percent of whatever the premium was that went into the contract.

Q  It's not a percentage of what you make?

A  No.

Q  In other words, you don't write a check to The Revolution?

A  No.  I have no -- I really don't know what they make.  ING, Revolution, that's between them.

Can I take a break?

A  Absolutely.

MR. JOHNSON:  Sure.

(Break taken.)

Page 81

BY MR. HUTTON:

Q  Mr. Copely, I want to talk to you about Exhibit 11 that was shown to you earlier today.

A  11, yes.

Q  The heading on this document says, "Heritage Tax And Insurance Services, Inc."  Do you see that?

A  Yes.

Q  Is that your company?

A  Brian and I are the two owners of that company.

Q  All right.  So this is the 50/50 S Corp?

A  Correct.

Q  And underneath that, it says, Law Office of Marvin Errickson, Esq.

A  Uh-huh.

Q  Does he have any ownership interest in this company?

A  No.

Q  Why is he referred to at the top of that page?

A  He did trusts and estate planning work for our clients, and he worked through our office sometimes with his clients, and you know, obviously with our clients doing estate planning work.  And I don't know why it was set up that way.  I think Brian and Marvin had put that together.

Q  The name of your company, do you provide tax

Deposition of Matthew Copley                                    ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 82

1  services in connection with your work?
2     A  Yeah.  We have -- well, first we were with
3  USA Tax, but now we're with Gradient Tax which is
4  Stovall & Associates.  It's a CPA firm that whenever
5  people want their taxes done, we gather all their
6  information and send it to the CPA, and they do all the
7  work.
8     Q  Does your firm prepare tax returns?
9     A  No.  We don't prepare the tax returns, but we
10  basically gather all the information and send it to
11  Stovall & Associates that does all the tax work and sends
12  it back to us.  And we -- I don't know how it's
13  classified, but we collect money to do tax returns, and
14  we have to pay Stovall & Associates for their work.  They
15  don't pay Stovall directly.  We actually are the company
16  providing the tax work, but we have Stovall & Associates
17  do the work.
18     Q  So your company invoices clients for the
19  preparation of tax returns?
20     A  Yes.
21     Q  What kind of tax returns does the company issue
22  invoices for?
23     A  Whatever Stovall & Associates -- we don't make
24  any money on it.  We just turn around, and whatever we're
25  charged from the CPA firm is what we charge the client,

Page 83

1  whatever tax returns they need.  Generally just
2  individual tax returns for your clients.
3     Q  So 1040?
4     A  Uh-huh.
5     Q  How about 1099s?
6     A  I'm not sure what the difference is between a
7  1040 and a 1099.  I'm really not a tax person.  I let the
8  tax CPAs handle all of that.
9     Q  Did Stovall & Associates review this letter
10  before it was --
11     A  No.  I didn't use Stovall & Associates until I
12  went to Gradient.  I was with Usa Tax at the time.  And,
13  no, they did not review this document.  I believe this
14  document was actually typed up by Brian White, and I
15  don't know if it was connected to Marvin at all.  But we
16  just wanted to type something up that basically said that
17  he had received the gift cards, and, you know, what it
18  was in reference to.
19     Q  Did you have an understanding that a 1099 is
20  required by law to be issued?
21     A  No.  I'm not aware of anything.  I just know
22  that Ernie Abbit's very shrewd, and he was very specific
23  that he didn't want to disclose the 5,000 he got.  I
24  don't know.
25     MR. HUTTON:  I'll move to strike that answer as

Page 84

1  not responsive.
2     Okay.  Tim, do you want to take a few questions?
3     MR. JOHNSON:  Let me --
4     Can I put on the record what we talked about?
5     MR. TATRO:  Sure.
6     MR. JOHNSON:  At Plaintiff's request, Defendants
7  are going to allow multiple attorneys on behalf of
8  Plaintiff to question Mr. Copely.  Off the record, I
9  noted that I typically object to that approach, but for
10  the purposes of this deposition only, I will agree to it.
11     MR. TATRO:  Thank you, Counsel.
12
13     EXAMINATION
14  BY MR. TATRO:
15     Q  Mr. Copely, my name is Tim Tatro.  I'm
16  co-counsel for Mr. Abbit.
17     You've been a financial advisor for about
18  15 years?
19     A  No.  I've been a financial advisor for a year,
20  but I've been doing, you know, fixed-index annuities
21  since 2001, so about 14 years, I guess.
22     Q  Okay.  And in the roughly 14 years that you've
23  been selling fixed-index annuities, can you estimate for
24  me, just ballpark, the number of clients or potential
25  clients that you met with --

Page 85

1     A  Let me clarify.  Fixed-index annuities, I don't
2  think I did any of them until 2004/2005.  Early on in
3  2001, '02, '03, they were just regular fixed annuities
4  that had a fixed interest rate.  I think the first
5  indexed fixed annuity hit our radar around 2004/2005.
6     The number of clients would be a complete guess.
7  I did, I think, about $5 million, so maybe 50 clients
8  roughly in around 2004/'05 range.  And since 2009, I've
9  done quite a bit more business.  I don't know.  Several
10  hundred clients I've done fixed-index annuities for.
11     Q  All right.  Since 2004, you're estimating
12  several hundred clients?
13     A  Yeah.
14     Q  Specifically involving fixed-index annuities?
15     A  Correct.
16     Q  Okay.  Can you narrow that down just a little
17  bit?  Do you think it's more than 500?
18     A  I don't think it's that many.  No.  It's not
19  more than 500.  I would say the range is probably between
20  200 and 400.
21     Q  Okay.
22     A  That's a guess.  I'd have to go and actually do
23  some research.
24     Q  That's fine.  The second attorney that -- whose
25  name you couldn't remember related to the licensure issue

Deposition of Matthew Copley

ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 86

1  that you had, you had mentioned that you'd have to go
2  back and look to get his name.
3      A  Uh-huh.
4      Q  Is there something that you have at home or at
5  the office readily available to you that might have his
6  name on it?
7      A  No.  I would really -- in fact, I don't even
8  know if I could find it.  He specialized in
9  administrative --
10       I think his name was Mark, but you know, I mean,
11  that's really a guess.  He specialized in
12  administrative-type hearings.  When I got the complaint,
13  I guess these guys research public record or whatever to
14  find out if there's some kind of a complaint with the
15  Department of Insurance, and he sent me some letters
16  saying he specialized in administrative hearings.  And I
17  ended up calling him, and he said he specialized in it,
18  so he represented me.  That was the second attorney.
19       The first attorney that completely screwed up
20  everything, that was actually a referral from a company
21  called Prepaid Legal which was some scam multilevel
22  marketing thing that I was involved in when I was a
23  teenager.  And I had recruited a bunch of people to sell
24  this multilevel marketing Prepaid Legal thing, and I had
25  held onto it because I thought it was a good service.

Page 87

1  And the one time I needed to use it, they gave me an
2  attorney that completely mismanaged my case.  So --
3      Q  The second attorney whose name you think might
4  be Mark, was he in San Diego?
5      A  Yes.
6      Q  Okay.
7      A  He was in Southern California.  He may have been
8  in -- I think he was in Orange County.  I can't remember,
9  but -- he was definitely in Southern California, but he
10  may have been Orange County the more I think about it.
11       Is it on there?
12      Q  Charles Benninghoff?
13      A  There you go.  Charles.  It wasn't Mark.  I
14  don't know where I got Mark from.
15      Q  We talked briefly about the online product
16  training you did for the ING products.
17      A  Yes.
18      Q  Do you happen to recall what the website was
19  that you went to for that?
20      A  ING's website.
21      Q  Is there any special access that you need to be
22  able to do that?  Do you need a passcode?
23      A  Yeah.  There's usually a user name and passcode
24  that you have to type in to be able do that.
25      Q  Were there any course materials or anything that

Page 88

1  you download or were sent by ING?
2      A  No.  They're all online.  When you do the
3  training, there's course material that you bring up right
4  there on the screen, go through it, and it's all part of
5  the training.
6      Q  Did you as part of that training receive any
7  feedback from ING?
8      A  I can't remember.  I don't remember any
9  feedback.
10      Q  Did anyone from ING contact you regarding the
11  results of any quizzes or forms you filled out --
12      A  No.
13      Q  -- in relation to that training?
14      A  No.
15      Q  As far as you know, did anyone --
16       Well, do you take a series of tests at the end
17  of the training online?
18      A  It's not a series of tests.  It's a real --
19  small little questions.  You know, there's not -- on
20  product training, there's minimal questions, 10 to 25
21  kind of questions.  It's just on a specific product
22  training.
23      Q  Okay.  Okay.  Related to the Revolution, you
24  said that they had a turnkey system that you found very
25  appealing; is that right?

Page 89

1      A  Yes.
2      Q  Did any of their turnkey systems apply
3  specifically to ING products?
4      A  No.  They really had a system to sell
5  fixed-index annuities.  That's really what Revolution was
6  all about.  And one of the reasons I left them shortly
7  after joining them is really that's all they were.  They
8  were an organization designed to find clients that
9  were -- that fit the fixed-index annuity profile and to
10  sell fixed-index annuities.  That's what The Revolution
11  was all about.  It really wasn't a comprehensive
12  financial planning operation like Gradient that I use
13  now.
14      Q  You've talked about Exhibit 3 which was your
15  questionnaire checklist.
16      A  Yes.
17      Q  And this was developed by Mr. Lindsey at
18  The Revolution?
19      A  I believe so.  He's the one that ran
20  The Revolution.  He was the one that put on the training.
21  There's other people that worked with him.  He had a
22  dozen employees or more, and I'm sure that they helped
23  him develop this.  But he actually did this presentation.
24  I watched him do a live seminar with clients actually in
25  the -- it was like at Morton's steakhouse or something up

Deposition of Matthew Copley                                ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 90

1 there in Los Angeles.  So that's where I learned how do
2 all this stuff.  They gave us a whole system.  They said,
3 "Here's the mailer.  Here's the seminar.  Here's the
4 questionnaire that you go over with the client."  And,
5 you know, the focus was to sell fixed-index annuity.
6 That's all it was about.
7     Q   So you took his questionnaire and put "Heritage"
8 at the top?
9     A   Yeah.  That's what they told us to do.
10     Q   Do you change any substantive --
11     A   Not at all.  It's 100 percent what
12 The Revolution designed.
13     Q   As far as you know, do you know if
14 The Revolution took any steps to show what's been marked
15 as Exhibit 3 to ING?
16     A   I have no idea what Revolution and ING --
17         I'm not 100 percent sure, but I'm pretty sure
18 there was an ING rep at the training.  All the big
19 insurance companies had a rep there at this training I
20 went to.  It was a training with several hundred agents
21 from all over the company, and there were reps from ING,
22 Allianz, all the major insurance companies, all the major
23 insurance companies The Revolution was telling us to use.
24     Q   Was this the event at Morton's steakhouse you
25 were talking about?

Page 91

1     A   Well, it was a two-day training.  I believe it
2 was at a hotel next to Mark Lindsey's office, and then
3 after the first full day of training, that evening we sat
4 and watched the seminar, and then after that evening, the
5 next day, we went through a whole training on this, on
6 how to present to a client and how to take them from --
7 you know, through the whole fixed-index annuity process
8 so they would buy one.
9     Q   And by "this," you're referring to Exhibit 3?
10     A   Correct.
11     Q   What year was that seminar that you're talking
12 about?
13     A   It would have been around 2009, because that's
14 when I got back into doing fixed-index annuities.
15 Because prior to that from really 2005 to really 2008, I
16 was all about reverse mortgages, because the mortgage
17 business was really booming.  That was all of our focus.
18 I flew all over the country recruiting reverse mortgage
19 loan officers.  That was my primary business.  It wasn't
20 until I joined The Revolution.  I think it was sometime
21 around 2009 -- well, you can see when I contracted with
22 ING.  That's around the time that I did everything.  So
23 where is the ING contract?  There's a copy here
24 somewhere.
25         Here it is.  Fixed application for agent

Page 92

1 appointment.  So I went there and got going right around
2 there, January 2009.  So it was right around that time.
3 It was probably late 2008.  I'm going to guess it was
4 probably somewhere between September and December in 2008
5 that I went to that training at The Revolution, and I
6 contracted with the companies.
7     Q   And as far as you recall, did any ING
8 representatives make any presentations at that seminar?
9     A   A lot of the insurance companies made
10 presentations at those seminars.  I can't remember if
11 they did or not.
12     Q   Okay.
13     A   It wouldn't surprise me at all that an ING
14 representative made a presentation.  Most of the
15 insurance companies at least got up and said a piece --
16 the rep at least got up and said, "Here's our product and
17 why you should use us" and so on and so forth.
18     Q   You mentioned that The Revolution had developed
19 a client profile that they encouraged you to use for
20 these fixed-index annuity products.
21     A   Right.
22     Q   What was that client profile?
23     A   It was people that were risk adverse that were
24 concerned about market risk, generally pre-retirees,
25 retiree, people that want to get a return that's maybe

Page 93

1 better than bank interest rates, but they're really
2 concerned about principal risk, market risk.  So that's
3 the client that you try to go after.  I think the mailer
4 that went out, they recommended mailing to people that
5 were, like, 55 to 75 kind of range, somewhere in there,
6 and that was kind of the target market, homeowners in
7 that range.
8     Q   Okay.  And is that the profile that you followed
9 in sending out your mailer?
10     A   Yes.  It's not perfect.  The direct mail
11 companies usually stretch both sides of -- they want to
12 mail out as many mailers as possible so they can make as
13 much money as possible, so they usually stretch it.  So
14 when we do a mailer that's 55 to 75, we get a few
15 40-year-olds in there and a few 80-year-olds too.  It's
16 not perfect.
17     Q   When you had your first individual meeting with
18 Mr. Abbit at your office, did you present any non-ING
19 products to him?
20     A   Yes.  I believe so.  There were several
21 different fixed-index annuities that we discussed.  I
22 didn't really present the actual brochures.  We just kind
23 of talked in general terms about fixed-index annuities
24 The problem with Mr. Abbit is he was quite a bit older
25 than most of the clients we were working with, and most

Deposition of Matthew Copley                                      ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 94

1  of the companies have an age cap of 75 or, you know, some
2  age where they won't allow you to sell a fixed-index
3  annuity -- their particular product -- to someone of a
4  certain age.  And in this case, I had to find a product
5  that he was looking for which was a bonus fixed-index
6  annuity, which is what he wanted.  And, unfortunately,
7  the American Equity I think stopped at a certain age, the
8  North American stopped at a certain age, and ING was one
9  of the only ones that offered to age 80.  And I believe
10  he was close to that, if not 80 at the time that he did
11  this, and so -- I don't know.  He was in his late 70s,
12  maybe.  I can't remember.  But I remember the ING product
13  was one that we could present to him because of his age.
14      And I remember his wife, we did the
15  American Equity product because I liked the product
16  better as far as the cap rate and everything that were
17  available, but he didn't qualify because of his age for
18  that product.
19      Q   And what you just explained, is that something
20  that you explained to Mr. Abbit at that time?
21      A   Yes.  Yeah.
22      Q   Exhibit 4 is what described the two catches you
23  talked about.
24      A   Yes.
25      Q   And at the bottom, where it says, "0 percent to

Page 95

1  20 percent," that's the potential annual return of the
2  product?
3      A   Yes.  Yeah.  When I went to the --
4      Q   I'm sorry.  That's just a yes-or-no question.
5      A   Yes.  Uh-huh.
6      Q   So my next question is:  In the roughly
7  ten years you've been selling fixed-index annuity
8  products, have you seen any of your clients experience a
9  20 percent annual return on an ING fixed-index annuity?
10      A   Not ING, no.
11      Q   What's the highest return you remember seeing
12  for any client with the fixed ING, fixed-index annuity,
13  specific to the ING product line?
14      A   I'm not sure.  It's definitely less than
15  10 percent.
16      Q   Okay.  Almost done.  In talking about the $5,000
17  rebate that you gave Mr. Abbit, is it your testimony that
18  in your entire career, he's the only client you've ever
19  given a rebate to?
20      A   Yes.
21      Q   And you determined that The Revolution had no
22  issue with the legality of that rebate?
23      A   Correct.  Yeah.  I called them beforehand --
24  because I had originally told Mr. Abbit that I didn't
25  think I could give him any rebate.  But I called

Page 96

1  The Revolution who was the field marketing organization
2  at the time and asked them, you know, is it legal to give
3  a rebate, and their response was yes, it was perfectly
4  legal.  Insurance companies frowned upon it, but in this
5  case, they encouraged me to sell the product because it
6  was a pretty substantial case, and $5,000 wasn't a big
7  rebate considering the compensation we were going to
8  receive selling the product.
9      Q   After you were assured by The Revolution that it
10  was okay, did you assume that ING was okay with it as
11  well?
12      A   Not necessarily.  Revolution told me that
13  insurance companies frowned upon it, so my guess was that
14  ING probably frowned upon giving rebates as well.  So I
15  don't believe that ING, you know, was even notified of
16  it.  There was an attorney that The Revolution had that
17  we worked with, and it was a gal, and I can't remember
18  her name, but there was a specific attorney that works
19  with Mark Lindsey, and I know that the rebate was
20  discussed with her.
21      Q   Okay.  Did ING ever pay you or Heritage any
22  compensation beyond the commission?
23      A   No.
24      Q   Was there ever any type of performance bonus?
25      A   No.

Page 97

1      Q   Did you ever speak with anyone at ING regarding
2  Mr. Abbit's policy?
3      A   No.
4      Q   All your contact with ING was in writing?
5      A   Yeah.  I believe so.  They requested obviously
6  the additional suitability needs analysis at some point,
7  so I'm not sure how they requested that, but I believe it
8  was in writing.  Most likely they e-mailed us.
9      Q   I'm almost there.  Just give me a moment to
10  review.
11      MR. TATRO:  Okay.  That will do it.
12      MR. JOHNSON:  No further questions.
13  We're off the record.
14      (Discussion off the record.)
15      MR. JOHNSON:  So I think the witness is saying
16  he wants to read and sign.
17      (Deposition proceedings concluded at 11:30 a.m.)
18
19
20
21
22
23            Matthew Copley
24
25

Deposition of Matthew Copley

ABBIT vs. ING USA ANNUITY AND LIFE INSURANCE CO., et al.

Page 98

1    I, Tricia A. Rosate, Certified Shorthand
2  Reporter licensed in the State of California, License
3  No. 10891, hereby certify that the deponent was by me
4  first duly sworn, and the foregoing testimony was
5  reported by me and was thereafter transcribed with
6  computer-aided transcription; that the foregoing is a
7  full, complete, and true record of said proceedings.
8    I further certify that I am not of counsel or
9  attorney for any of the parties in the foregoing
10 proceeding and caption named or in any way interested in
11 the outcome of the cause in said caption.
12   The dismantling, unsealing, or unbinding of the
13 original transcript will render the reporter's
14 certificates null and void.
15   In witness whereof, I have hereunto set my hand
16 this day:  December 1, 2014
17
18   ___X___ Reading and Signing was requested.
19
20   _____ Reading and Signing was waived.
21   _____ Reading and signing was not requested.
22
23
24   _____
25   Tricia Rosate, RDR, CRR
     CSR No. 10891