UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST O. ABBIT, on behalf of himself and on behalf of all persons similarly situated,<br><br>                   Plaintiff,<br><br>v.<br><br>ING USA ANNUITY AND LIFE INSURANCE COMPANY, and ING U.S., INC.,<br><br>                   Defendants. | Case No.: 3:13-cv-02310-GPC-WVG<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S REMAINING CLAIMS**<br><br>**[ECF No. 130.]** |

Before the Court is Defendants ING USA Annuity and Life Insurance Company and ING U.S., Inc.'s (collectively, "Defendants" or "ING") Motion for Summary Judgment on the Remaining Claims. (Dkt. No. 130.)[1] Plaintiff Ernest O. Abbit ("Plaintiff" or "Abbit") opposed the motion, (Dkt. No. 141), and Defendants filed a reply, (Dkt. No. 149).

A motion hearing was conducted on April 6, 2017. (Dkt. No. 163.) Andrew

---

[1] Citations to the record are based upon the pagination generated by the CM/ECF system. Citations to sealed documents will refer both to the numbering system imprinted by the parties (*e.g.*, "Oppo. 0101") as well as to the pagination generated by the CM/ECF system.

Hutton and Timothy Tatro appeared on behalf of Plaintiff. (*Id.*) Clark Johnson, Michael Leigh, and David Noonan appeared on behalf of Defendants. (*Id.*)

After the hearing, the Court granted Plaintiff leave to file supplemental evidence, consisting of the deposition testimony of William Bainbridge and an additional expert report by Dr. McCann, and a supplemental brief explaining the relevance of the evidence to the instant motion. (Dkt. No. 164.) The Court also granted Defendants leave to respond to Plaintiff's supplemental briefing. (*Id.*) Plaintiff filed the supplemental briefing and evidence, and Defendants responded. (Dkt. Nos. 171, 174, 176, 178.)

Upon consideration of the moving papers, supplemental briefing, oral argument, and the applicable law, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's individual claims.

## BACKGROUND

Having previously recited the facts of this case at length, the Court declines to repeat them here. (*See, e.g.*, Dkt. Nos. 59, 117.) While the operative facts are few, the parties' presentations of the facts are substantively enmeshed with their legal theories. A brief review of relevant background suffices.

An annuity is a contract between an insured individual and an insurance company in which the insured pays premiums to the insurance company in exchange for the insurance company's promise to return the deposit via periodic payments. (Dkt. No. 59 at 2.) Annuity contracts typically undergo two primary periods: the "full accumulation period," during which the investor deposits funds with the insurance company, and the "annuitization period," during which the investor withdraws funds in the form of periodic payments. (*Id.*) Fixed index annuities ("FIAs") are annuities that generally earn interest linked to or derivative of the price movements of an equity index or other index, such as the S&P 500® Index. (*Id.*) Indexed annuities can also guarantee interest. (*Id.*) The policy parameters (such as "caps," "participation rates," and "spreads") are periodically declared by the insurance company. (*Id.*)

Defendants designed the Secure Index Opportunities Plus FIA and submitted the annuity product, Form IU-IA-3050(CA) ("Form 3050"), to the California Department of Insurance ("CDI") for review and approval in 2007. (Dkt. No. 144-1, Plaintiff's Separate Statement of Undisputed Facts ("Pl.'s SSUF") ¶¶ 2–3.) In its submission to the CDI, Defendants represented that the FIA provides for equity-indexed benefits, and that "[t]he Cap, Participation Rate, and Spread will be set such that the annualized option cost for this strategy will be at least 100 bps." (Declaration of Andrew W. Hutton in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Hutton Decl.") Ex. B at Oppo. 0075, 0103, Dkt. No. 144-3 at 38, 66.) The CDI approved Defendants' application to sell Form 3050 to California consumers. (Pl.'s SSUF ¶ 9.)

Plaintiff, a retired senior citizen, purchased an ING "Secure Index Opportunities Plus" FIA with a $1,000,000 premium payment on September 28, 2010. (Dkt. No. 117 at 2.) Defendants contributed a 5% bonus of $50,000 to Plaintiff's contract. (Dkt. No. 144-1, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Resp. to Defs.' SSUF") ¶ 1.) Plaintiff currently still holds his contract. (Dkt. No. 130-2, Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment on the Remaining Claims ("Defs.' SSUF") ¶ 2; Pl.'s Resp. to Defs.' SSUF ¶ 2.) At the time of his purchase, and on each of his six contract anniversaries, Plaintiff has elected one or more of the interest-crediting strategies offered pursuant to his FIA. (Declaration of Michael T. Leigh ("Leigh Decl.") Ex. 1 at § 6, Dkt. No. 130-4 at 16–20; Leigh Decl. Exs. 5–11, Dkt. Nos. 130-8–130-14.) Plaintiff's FIA has been credited with $84,863.86 in interest. (Defs.' SSUF ¶ 6; Pl.'s Resp. to Defs.' SSUF ¶ 6.)

Section 5.8 of Plaintiff's FIA contract guarantees that "[t]he reserves and guaranteed values will at no time be less than the minimum required by the laws of the state in which this Contract is issued." (Leigh Decl. Ex. 1, Dkt. No. 130-4 at 16.) Section 6.5 provides definitions applicable to the Monthly Cap Index Strategy, specifies that the "Index Credit" amount "is based on the performance of the applicable Index as

measured over the Contract Year," and provides the formula with which index credits under the Monthly Cap strategy are calculated. (Leigh Decl. Ex. 1, Dkt. No. 130-4 at 20.) The contract confers upon Defendants discretion to add interest-crediting strategies as approved by the CDI, and to change the terms and conditions governing the interest-crediting strategies within contract parameters and state law. (Leigh Decl. Ex. 1 § 6, Dkt. No. 130-4 at 16.)

In applying for his FIA, Plaintiff acknowledged that "[a]ny values shown, other than guaranteed minimum values, are not guarantees, promises or warranties." (Hutton Decl. Ex. E at Oppo. 0210, Dkt. No. 144-6 at 9.) Hypothetical interest credit illustrations provided in Plaintiff's FIA application show the possibility of him earning 0% in index credits. (Hutton Decl. Ex. E at Oppo. 0215–18, Dkt. No. 144-6 at 14–17.) Plaintiff also acknowledged the following statement: "You should discuss your retirement planning objectives, anticipated financial needs and risk tolerance with your agent to make sure this annuity meets your current financial needs and objectives." (Hutton Decl. Ex. E at Oppo. 0214, Dkt. No. 144-6 at 13.)

The ING USA sales brochure stated: "Neither your premium, the 5% bonus, nor any previously credited interest can be diminished due to movements in the S&P 500 Index." (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 4.) It also stated: "Since the interest credit is related, in part, to movements in the S&P 500 Index, the amount of interest your annuity will be credited at the end of the contract year cannot be known or predicted prior to the end of the contract year." (*Id.*) It further stated that "[t]he contract does not directly participate in any stock or equity products." (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 13.) Finally, the brochure provided illustrations showing that a contract holder might not earn any interest in a contract year, (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 5–10), and stated that ING USA promised no specific rate of return, that ING USA could change the pricing parameters of the strategies each contract year, and that the bonus might be recouped over time with, *inter alia*, lower credited interest rates, participation rates, index caps, and monthly caps, (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 3, 13).

Plaintiff did not communicate with Defendants before or after purchasing his contract. (Leigh Decl. Ex. 3, Abbit Depo. at 43:17–46:7, 65:21–22, Dkt. No. 130-6 at 13–14, 18.) Defendants used independent, third-party marketing organizations to distribute their insurance-based products and annuities; Defendants do not have "company-owned field wholesalers." (Leigh Decl. Ex. 4, Tope Depo. 17:1–18, Dkt. No. 130-7 at 7.) Matthew Copley, who sold Plaintiff his FIA contract, was an "independent" agent. (Dkt. No. 152 at 5.) Copley testified that in the 2009 and 2010 time frame, he sold annuity products from "around ten" different companies. (Leigh Decl. Ex. 14, Copley Depo. 11:6–9, Dkt. No. 130-17 at 5.) While Defendants required Copley to adhere to ING's Business Guidelines and General Advertising Rules, (*see, e.g.*, Hutton Decl. Ex. P at Oppo. 0929–34, Dkt. No. 144-15 at 50–55), Defendants were free to accept or reject Plaintiff's FIA application after Copley submitted it, (Dkt. No. 130-1 at 31 (citing Leigh Decl. Ex. 15, Dkt. No. 130-18)).

Plaintiff filed a First Amended Complaint ("FAC") on March 27, 2014. (Dkt. No. 20.) On November 16, 2015, the Court granted in part and denied in part Plaintiff's motion for class certification. (Dkt. No. 59 at 26.) Specifically, the Court certified the following five claims: (1) a breach of contract claim based on "ING setting the prices of the undisclosed derivatives structure so low that the true values of the contracts were below the minimum values guaranteed," (*id.* at 15); (2) a UCL claim, flowing from the breach of contract claim, based on "Plaintiff's theory under the Insurance Code . . . that ING failed to maintain guaranteed values of the Secure Index FIAs as required by Cal. Ins. Code § 10168.25," (*id.* at 20); (3) a financial elder abuse claim, also flowing from the breach of contract claim, based on "Plaintiff's theory regarding the failure to maintain guaranteed values of the Secure Index FIAs," (*id.* at 22); and (4) two securities law claims under California law, based on Plaintiff's "novel theory which would extend the reach of securities law to FIAs" on the basis that "FIAs are securities because ING's internal execution of the 'derivatives' and 'options' transfers market risks from ING to Plaintiff and the California Subclass," (*id.* at 23). The Court declined to certify Plaintiff's

remaining claims, including, *inter alia*, claims for breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, false advertising under Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and failure to supervise. (Dkt. Nos. 20, 59.) The remaining claims are at issue in the instant motion.

On February 1, 2016, Defendants filed a motion for summary judgment on the certified class claims. (Dkt. No. 70.) The Court directed dissemination of the class notice on April 26, 2016. (Dkt. No. 91.) On June 24, 2016, the Court held a hearing on Defendants' motion for summary judgment. (Dkt. No. 111.) The class opt-out period expired on July 20, 2016. (Dkt. No. 91 at 1.) On August 30, 2016, the Court granted Defendants' motion for summary judgment on all certified class claims. (Dkt. No. 117.)

Plaintiff filed a motion for reconsideration of the Court's August 30, 2016 Order granting Defendants' motion for summary judgment on all certified class claims. (Dkt. No. 121.) The Court denied Plaintiff's motion for reconsideration on December 12, 2016. (Dkt. No. 129.) On December 23, 2016, Plaintiff filed a motion for certification of partial final judgment of the class claims under Federal Rule of Civil Procedure 54(b). (Dkt. No. 134.) The Court denied Plaintiff's motion for partial final judgment on February 2, 2017. (Dkt. No. 145.)

On December 15, 2016, Defendants filed a motion for summary judgment on Plaintiff's remaining individual claims. (Dkt. No. 130.) The motion has been fully briefed, (Dkt. Nos. 141, 149), complete with supplemental briefing and evidence, (Dkt. Nos. 171, 174, 176, 178).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

## DISCUSSION

Defendants move for summary judgment on Plaintiff's remaining individual claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, violations of the California Unfair Competition Law

("UCL") and False Advertising Law ("FAL"), and failure to supervise.  (Dkt. No. 130-1 at 7.)  The Court examines each of Plaintiff's remaining claims in turn.

## I.      Breach of Contract

The elements of a breach of contract claim are: (1) the existence of a valid contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.  *Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (Cal. 1968).

Defendants first argue that Plaintiff's three breach of contract claims fail for lack of a breach and for lack of damages.[2]  (Dkt. No. 130-1 at 12–14.)  In his FAC, Plaintiff asserts three theories for his breach of contract claims: (1) Defendants failed to credit and compound interest daily; (2) Defendants charged expenses and/or reduced interest credits; and (3) Defendants issued false and misleading periodic statements to Plaintiff. (Dkt. No. 20, FAC ¶¶ 113–22.)

Plaintiff did not respond directly to Defendants' motion for summary judgment on the remaining breach of contract claims, and he abandoned the "interest compounded daily" theory.  (Dkt. No. 149 at 5; Dkt. No. 141 at 28 n.11.)  Defendants are entitled to summary judgment on Plaintiff's remaining breach of contract claims on this basis alone. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (holding that a plaintiff abandons claims by not raising them in opposition to a defendant's motion for summary judgment); *Vasserman v. Henry Mayo Newhall Mem'l Hosp.*, 65 F. Supp. 3d 932, 963 (C.D. Cal. 2014) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is on the Parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.")); *Ramirez v. City of Buena*

---

[2] Because the Court concludes that Plaintiff has not shown any breach of contract, the Court does not continue on to discuss the issue of damages.

*Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) ("It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment. A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case." (internal citations and quotation marks omitted)).

## A. First Breach of Contract Claim

In any event, Plaintiff fails to show that Defendants breached the contract under any of the three theories enumerated above. The contract belies Plaintiff's allegation that Defendants were required to credit and compound interest daily. (Leigh Decl. Ex. 1, Dkt. No. 130-4 at 10.) The contract specifies that the Minimum Guaranteed Strategy Value of each Strategy is the sum of: "(a) 87.5% of the portion of the Single Premium elected to the Strategy, less Premium Taxes; adjusted for (b) Any Re-elections or Surrenders of Accumulation Value; plus (c) *Interest credited daily* at the applicable Minimum Guaranteed Strategy Value Rate." (*Id.* (emphasis added).) The contract does not require Defendants to credit and compound interest daily.

## B. Second Breach of Contract Claim

Plaintiff has not identified any expenses that Defendants have charged him or any interest credits that have been reduced in violation of any express contract term. (*See* Leigh Decl. Ex. 1 § 6, Dkt. No. 130-4 at 16–20.) Rather, Defendants have proffered evidence showing that Plaintiff's contract was credited with the interest credits prescribed under contract terms. (*See* Dkt. No. 130-1 (citing Leigh Decl. Exs. 5–11, Dkt. Nos. 130-8–130-14).)[3]

---

[3] Plaintiff objects to evidence Defendants submitted in support of their motion for summary judgment. (Dkt. No. 141-4.) Specifically, Plaintiff objects to fifteen of Defendants' annotations on the basis that the annotations are inadmissible hearsay, impermissible legal conclusions, and improper lay opinion testimony. (*Id.*) At the summary judgment stage, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be

While Plaintiff does not respond directly to Defendants' motion for summary judgment on his breach of contract claims, Plaintiff nonetheless maintains throughout his opposition brief that Defendants have imposed "extra-contractual charges" on Plaintiff's investment by failing to ensure "substantive participation" in the equity-indexed benefits. (*See* Dkt. No. 141-2 at 3–4, Pl.'s Resp. to Defs.' SSUF ¶ 3; *see also* Dkt. No. 141 at 8, 11, 13, 21, 25.) Plaintiff identifies two relevant contract terms: § 5.8 and § 6.5. (Dkt. No. 141 at 9.) Section 5.8 guarantees that "[t]he reserves and guaranteed values will at no time be less than the minimum required by the laws of the state in which this Contract is issued." (Hutton Decl. Ex. G, Dkt. No. 141-11 at 17.) Section 6.5 provides definitions applicable to the Monthly Cap Index Strategy, and specifies that the "Index Credit" amount "is based on the performance of the applicable Index as measured over the Contract Year." (*Id.* at 21.)

Plaintiff has not shown a genuine dispute of material fact regarding whether Defendants have breached § 5.8. Plaintiff's "substantive participation" argument fails for the reasons articulated below, *infra* Part II.B. The Court determined in a prior Order that there was no genuine dispute of material fact as to whether Defendants ever breached the Minimum Guaranteed Strategy Value terms of the contract by failing to guarantee the minimum nonforfeiture amounts prescribed by California's nonforfeiture law. (Dkt. No. 117 at 5–9.) Nor has Plaintiff shown a breach of § 6.5. Plaintiff's "based on" argument fails for the reasons articulated below, *infra* Part II.C.

////

---

admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.")); *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.") (internal quotation marks and citation omitted)). Here, it is uncontested that the underlying evidence is admissible. Defendants' annotations may also be admissible at trial via live testimony. In any event, as the Court's adjudication of the instant motion does not turn in any way on Defendants' annotations, the Court will accordingly consider Defendants' evidence without referring to the annotations.

**C. Third Breach of Contract Claim**

Plaintiff has not identified any falsity in his periodic statements. The contract requires Defendants to provide an "Annual Statement of Values" showing "the following values as of the statement date: (a) the amount of Single Premium paid; (b) the amount and dates of any partial Surrenders; (c) the Accumulation Value; and (d) the Cash Surrender Value." (Leigh Decl. Ex. 1 § 8.4, Dkt. No. 130-4 at 23.) Defendants provided Plaintiff with statements annually, as required by the contract. (*See* Leigh Decl. Exs. 5–11, Dkt. Nos. 130-8–130-14.) While Plaintiff does not respond directly to Defendants' motion for summary judgment on his breach of contract claims, Plaintiff reiterates his "substantive participation" argument. (Pl.'s Resp. to Defs.' SSUF ¶¶ 15–16.) Plaintiff's "substantive participation" argument fails for the reasons explained below, *infra* Part II.B. Plaintiff has not proffered any evidence showing a breach of the contract term governing Defendants' obligations to provide periodic statements.

The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's three breach of contract claims.

**II. Breach of the Implied Covenant of Good Faith and Fair Dealing**

A breach of the implied covenant of good faith and fair dealing does not require a breach of a specific provision of a contract. *See Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 373 (Cal. 1992). Rather, "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349–50 (Cal. 2000) (emphasis in original). The implied covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* It does not exist "'to protect some general public policy interest not directly tied to the contract's purposes.'" *Carma Developers*, 2 Cal. 4th at 373 (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 690 (Cal. 1988)). To impose an implied covenant of good faith and fair dealing, the

following requirements must be satisfied:

> (1) The implication must arise from the language used or it must be indispensible to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract.

*Lippman v. Sears Roebuck & Co.*, 44 Cal. 2d 136, 142 (Cal. 1955) (internal citation and quotation marks omitted).

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Carma Developers*, 2 Cal. 4th at 372. Here, Section 6 of the FIA contract provides:

> You select the Strategy(ies) to which any portion of the Single Premium and Re-elections are elected, subject to the terms of this Contract. We reserve the right to add Strategies as approved by the Insurance Department of the state in which the Contract is issued. We may cease to offer a specific Strategy or cease to accept Re-elections to a specific Strategy at any time. Any new Re-elections accepted are subject to the terms and conditions in existence for any Strategy(ies) available at that time, including the then existing rates, caps, spreads, and credits, which may differ from the rates, caps, spreads, and credits applicable to previous elections or Re-elections.

(Leigh Decl. Ex. 1 § 6, Dkt. No. 130-4 at 16.) This is not an express grant of "unfettered discretion." *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1121 (Cal. Ct. App. 2008), *as modified on denial of reh'g* (June 4, 2008); *see also Baymiller v. Guarantee Mut. Life Co.*, No. SA CV 99-1566 DOC AN, 2000 WL 1026565, at *2 (C.D. Cal. May 3, 2000) (holding that the covenant of good faith and fair dealing did not apply to defendants' discretionary authority where "nothing in the express language of Defendants' life insurance policies requires the use of a specific formula to calculate interest rates and cost of insurance charges"). Rather, the contract affords Defendants

discretion within bounds.  Defendants reserve the right to add interest-crediting strategies, as approved by the CDI, and to change the terms and conditions governing the interest-crediting strategies, within contract parameters and state law.  Defendants must accordingly exercise their discretionary authority in good faith.

### A. The Parties' Positions

Defendants argue that Plaintiff's claim fails primarily on two grounds.  (Dkt. No. 130-1 at 15–16.)  First, Defendants argue that Plaintiff seeks to impose substantive duties beyond the express terms of the agreement he made with Defendants.  (*Id.*)  Second, Defendants argue that Plaintiff has not shown how Defendants have failed to exercise their discretion to adjust certain features of the interest-crediting strategies in good faith. (*Id.*)

Plaintiff's response is threefold.  First, Plaintiff cites Defendants' January 4, 2007 submission to the CDI, in which Defendants represented that the FIA provides for equity-indexed benefits, and that "[t]he Cap, Participation Rate, and Spread will be set such that the annualized option cost for this strategy will be at least 100 bps."  (Hutton Decl. Ex. B at Oppo. 0075, 0103, Dkt. No. 144-3 at 38, 66.)  Plaintiff also cites an internal memorandum in which Defendants observed that "[w]hile it may be possible to credit less on FIA Products, there are [a] number of risks in doing so.  The first may be a reputation risk, as we do not wish to be unfair to customers."  (Hutton Decl. Ex. I at Oppo. 0375, Dkt. No. 144-9 at 12.)

Second, Plaintiff contends that Defendants deprived Plaintiff of equity-indexed benefits by setting caps and rates "so low that their values do not substantively participate in the S&P 500 Index, and are not based on the performance of the Index," in violation of Cal. Ins. Code § 10168.25(e).  (Dkt. No. 141 at 24.)  Plaintiff cites to Dr. Craig J. McCann's calculation of what Dr. McCann calls the "equivalent value of S&P 500 Index

call options" for Plaintiff's Monthly Cap Index Strategy.[4] (Declaration of Craig J. McCann ("McCann Decl.") Ex. 1 at Oppo. 0606; Dkt. No. 144-12 at 6.) According to Dr. McCann, the "equivalent bps value" for Plaintiff's Monthly Cap Strategy was less than 100 bps on the investment date and on each subsequent contract anniversary. (*Id.*)

Finally, Plaintiff contends that the contract does not confer upon Defendants unfettered discretion, but rather requires Defendants to calculate equity-indexed benefits "based on" the performance of the S&P 500. (Dkt. No. 141 at 23–24.) Plaintiff maintains that "based on" can have but one meaning: "based only on." (*Id.* at 24.)

In response, Defendants proffer a table from their verified discovery responses showing that the annualized option cost associated with each strategy in which Plaintiff allocated funds exceeded 100 bps each year. (Leigh Decl. Ex. 16, Dkt. No. 149-2 at 5.) Defendants maintain that unlike Dr. McCann's numbers, their figures are not hypothetical measurements of "equivalent value," but rather are measurements of the annualized option cost associated with each interest-crediting strategy. (Dkt. No. 149 at 7.)

### B. Plaintiff's "Substantive Participation" Argument

The implied covenant of good faith and fair dealing "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz*, 24 Cal. 4th at 349–50. Here, Plaintiff's "substantive participation" argument has a basis in the agreement actually made. In their 2007 submission to the CDI, Defendants represented that "[t]he Cap, Participation Rate, and Spread will be set such that the annualized option cost for this strategy will be at least 100 bps." Section 6 of Plaintiff's contract provides a nexus between the contract and Defendants' 2007 submission to the CDI. (Leigh Decl. Ex. 1 § 6, Dkt. No. 130-4 at 16

---

[4] In his initial declaration provided in support of Plaintiff's opposition brief, Dr. McCann did not describe what "equivalent value" measures or how it squares with the "annualized option cost" described in Defendants' 2007 submission to the CDI. (McCann Decl. Ex. 1 at Oppo. 0606; Dkt. No. 144-12 at 6.)

("We reserve the right to add Strategies as approved by the Insurance Department of the state in which the Contract is issued.").) Furthermore, William Bainbridge, the Head of Annuity Product Development for Defendants, testified that "[o]ur contracts, through the actuarial memorandums file, indicated we would spend 100 basis points on an annualized basis" for contracts purchased before January 3, 2011, including Plaintiff's contract. (Dkt. No. 174-1 at 10, Bainbridge Depo. 151:18–152:08.) Given the above, the Court concludes that the implied covenant of good faith and fair dealing requires Defendants to maintain an annualized option cost of at least 100 bps for each of Plaintiff's interest-crediting strategies.

### 1. The Statutory and Regulatory Framework Regarding "Substantive Participation"

Contrary to Plaintiff's argument, Cal. Ins. Code § 10168.25(e) and its implementing regulations do not support Plaintiff's implied covenant of good faith and fair dealing claim. Defendants' 2007 submission to the CDI, rather than Cal. Ins. Code § 10168.25(e) or its implementing regulations, comprises the sole basis for Plaintiff's argument that Defendants were required to spend 100 bps on options on an annualized basis. Cal. Ins. Code § 10168.25(e) and 10 C.C.R. § 2523.5(b)(2) do not define "substantive participation" as requiring an annualized option cost exceeding 100 bps.

At the hearing, the Court asked Plaintiff to point out specific language in the statute that requires the annualized option cost for the equity-indexed benefit to total or exceed 100 bps. Plaintiff did not and cannot do so, as nothing in Cal. Ins. Code § 10168.25(e) mandates 100 bps in annualized option cost as the minimum floor for "substantive participation."

California's nonforfeiture statute provides, in pertinent part, that "[d]uring the period or term that a contract provides substantive participation in an equity indexed benefit, it may increase the reduction described in paragraph (1) of subdivision (d) by up to an additional 100 basis points to reflect the value of the equity index benefit." Cal. Ins. Code § 10168.25(e). Subparagraph (1) of subdivision (d) in turn specifies the calculation

to determine "[t]he interest rate used in determining minimum nonforfeiture amounts."[5] Cal. Ins. Code § 10168.25(d)(1). Defendants take the additional reduction permitted in Cal. Ins. Code § 10168.25(e) with respect to Plaintiff's FIA and accordingly have to provide "substantive participation." (*C.f.* Dkt. No. 174-1 at 12, Bainbridge Depo. 157:01–05.) However, the statute does not define "substantive participation." All Cal. Ins. Code § 10168.25(e) provides for is this: if the contract provides substantive participation in an equity-indexed benefit during a period or term, Defendants are permitted to increase the reduction described in Cal. Ins. Code § 10168.25(d)(1) by a maximum of an additional 100 bps to reflect the value of the equity-indexed benefit.

10 C.C.R. § 2523.5, Cal. Ins. Code § 10168.25(e)'s implementing regulation, defines "substantive participation" as requiring an annualized option cost of at least 25 bps, not 100 bps. The regulation provides that "[i]f a company chooses to take the additional reduction for an equity-indexed benefit as provided under Subsection 10168.25(e) of the Insurance Code, the company shall prepare a demonstration showing compliance with the requirements in Subsection 10168.25(e)." Cal. Code Regs. tit. 10, § 2523.5(a). 10 C.C.R. § 2523.5(b)(2) then outlines one of the steps used to demonstrate compliance with Cal. Ins. Code § 10168.25(e):

> If the annualized option cost for the equity-indexed benefit is *twenty-five* . . . basis points or more, then the equity-indexed benefit provides substantive participation under Subsection 10168.25(e) of the Insurance Code and the company may take a reduction equal to the lesser of 100 basis points and the annual cost basis value.

---

[5] This interest rate

shall be an annual rate of interest determined as the lesser of 3 percent per annum and . . . [t]he five-year Constant Maturity Treasury Rate reported by the Federal Reserve as of a date, or averaged over a period, rounded to the nearest one-twentieth of 1 percent, specified in the contract no longer than 15 months prior to the contract issue date or redetermination date under paragraph (2), reduced by 125 basis points, where the resulting rate is not less than 1 percent.

Cal. Ins. Code § 10168.25(d)(1).

Cal. Code Regs. tit. 10, § 2523.5(b)(2) (emphasis added). California law uses an annualized option cost of 25 bps, not 100 bps, as the benchmark for substantive participation.

As Plaintiff pointed out at the hearing, 10 C.C.R. § 2523.5 did not take effect until December 19, 2012, well after Plaintiff's contract was issued in 2010. It thus appears that when Plaintiff purchased his FIA contract, the statute and implementing regulations did not specify *any* minimum annualized option cost for substantive participation. Defendants' commitment to maintaining an annualized option cost of 100 bps for Plaintiff's contract was not based upon a statutory or regulatory minimum, but upon Defendants' statements in its 2007 submission to the CDI.

Plaintiff also cites to Defendants' internal statements which reference the Indexed Standard Nonforfeiture Law ("SNFL"). (Hutton Decl. Ex. A at Oppo. 0005, Dkt. No. 144-2 at 5 ("SNFL allows for an additional reduction in the nonforfeiture rate of up to 1% . . . for strategies which provide for substantial participation in an equity index. Substantial participation is defined as providing for a market value of benefit (i.e. 1% option cost) to justify reduction."); Hutton Decl. Ex. C at Oppo. 0124; Dkt. No. 144-3 at 12 ("The initial option budget is from stat pricing model. After the initial guaranteed period, the renewal option budget is set to the greater of the one year risk free rate less the pricing spread or a 1% option budget (required by the Indexed Standard Nonforfeiture Law).").) The National Association of Insurance Commissioners ("NAIC") SNFL is a model regulation. It appears that California has not adopted the SNFL's definition of substantive participation, as neither Cal. Ins. Code §10168.25(e) nor 10 C.C.R. § 2523.5(b)(2) requires the annualized option cost to exceed 100 bps. What these internal statements show is that Defendants designed Plaintiff's contract to contain a guaranteed annualized option cost of 100 bps for each interest-crediting strategy, even though state law did not specify a minimum threshold of 100 bps.

Accordingly, Plaintiff's "100 bps" theory for his implied covenant of good faith and fair dealing claim rests upon Defendants' 2007 submission to the CDI, rather than Cal. Ins. Code § 10168.25(e) or its implementing regulations.

### 2. Whether Defendants Complied with the Implied Covenant of Good Faith and Fair Dealing

Defendants represented the following to the CDI in 2007:

For the Monthly Cap Index Strategy, on each Contract Anniversary, the Index Credit equals the sum of twelve Monthly Index Changes during the Contract Year. The Index Credit will never be less than zero.

The Monthly Index Change is the lesser of the Monthly Cap or the result of (i) / (ii) − 1, where
(i) Is the Index Number on each Monthly Anniversary, and
(ii) Is the Index Number on the prior Monthly Anniversary.

The Monthly Cap is declared, for each Premium/Re-election, *in advance*, and is guaranteed for one year. It may change annually. *The Monthly Cap will be set such that the annualized option cost for this strategy will be at least 100 bps. Annualized option cost will be calculated based on the current Accumulation Value and Monthly Cap. The method and parameters will be calibrated to capital markets based option pricing at the then current market conditions.*

(Dkt. No. 144-3 at 38, Hutton Decl. Ex. B at Oppo. 0075 (emphases added).)

Defendants proffer a table from their verified discovery responses showing that the annualized option cost associated with each strategy in which Plaintiff allocated funds exceeded 100 bps each year. (Leigh Decl. Ex. 16, Dkt. No. 149-2 at 5.) Plaintiff proffers no evidence contradicting Defendants' numbers. Plaintiff instead proffers Dr. McCann's measurement of a different, theoretical value to support his argument that Defendants did not meet their target of 100 bps. (Dkt. No. 176-18 at 6, McCann Supp. Report ¶ 10.)

However, Plaintiff's evidence concerns a fundamentally different value, begging the question: 100 bps of *what*? Plaintiff's expert calculates "equivalent value" based upon the measurement of a theoretical "EIB leg." (*See id.*) As Defendants observe, Plaintiff's theories of "equivalent value" and "EIB legs" have arisen for the first time in

supplemental briefing after nearly four years of litigation.  (Dkt. No. 178 at 2.)  Setting aside the fact that these novel theories are recent offerings, Plaintiff's evidence does not create a genuine dispute of material fact for the following reasons.

First, Plaintiff's expert calculates a different value altogether.  In an internal document, Defendants described their "FIA Static Hedging Methodology."  (Dkt. No. 176-16 at 22, Supp. Ex. T at 8211.)

> Static hedging is fairly simple conceptually.  When ING sells a policyholder a FIA, ING is *implicitly* selling them an option.  ING then turns around and purchases the same option from an investment bank (*in theory*); thus ING is perfectly hedged (*in theory*).  As new policies are sold, and as existing policies begin a new indexing period, new options need to be purchased to hedge ING's equity risk exposures.

(*Id.* (emphases added).)  Plaintiff's expert terms the option "implicitly" sold to Abbit as the "EIB leg" and terms the option Defendants actually purchase as the "Hedge leg." (Dkt. No. 176-18 at 9–10, McCann Supp. Report ¶ 21.)  Characterizing these two "legs" as fundamentally different, Plaintiff's expert estimates the theoretical value of the "EIB leg," incorporating liquidity discounts proposed by academic studies, (Dkt. No. 176-18 at 6–7, McCann Supp. Report ¶¶ 10–11), whereas Defendants measure the "Hedge leg," based on actual data, (Leigh Decl. Ex. 16, Dkt. No. 149-2 at 5).  It is clear that the numbers Plaintiff proffers, all of which fall below 100 bps, reflect measurements of a fundamentally different value.

Not only are Plaintiff's numbers premised on a different calculation, they are theoretical, not factual.  ING did not and has not actually sold Abbit an option—rather, ING, *in theory*, "implicitly" sells an option when it sells policyholders FIAs.  (Dkt. No. 176-16 at 22, Supp. Ex. T at 8211.)  The only options purchased are those Defendants purchase to hedge risk, (*id.*), and those are the options upon which Defendants' calculations of annualized option cost are based, (*see* Dkt. No. 178 at 2–6).  Indeed, in accordance with Defendants' 2007 representation to the CDI, the numbers Defendants produce are "based on then current market prices for options supporting each of Mr. Abbit's selected Index Strategies as of each Contract Anniversary Date."  (Leigh Decl.

Ex. 16, Dkt. No. 149-2 at 5.)

Moreover, nothing in Defendants' 2007 submission to the CDI suggests that Defendants had to measure annualized option cost by valuing an "implicit," theoretical "EIB leg." Defendants simply stated:

> The Monthly Cap will be set such that the annualized option cost for this strategy will be at least 100 bps. Annualized option cost will be calculated based on the current Accumulation Value and Monthly Cap. The method and parameters will be calibrated to capital markets based option pricing at the then current market conditions.

(Dkt. No. 144-3 at 38, Hutton Decl. Ex. B at Oppo. 0075 (emphases added).) Nowhere does the term "equivalent value" or "EIB leg" appear in the above language.

Plaintiff argues that Defendants' numbers do not reflect discounts for the "EIB leg's" lack of marketability and non-transferability, and do not reflect potential mismatches between the payoffs of the "EIB leg" and the "Hedge leg." (Dkt. No. 176-18 at 13–14, McCann Supp. Report ¶¶ 28–29.) However, these objections are premised upon Plaintiff's legally deficient "EIB leg" theory. Setting aside the fact that these objections are relevant only insofar as Plaintiff's "EIB leg" theory is viable, Plaintiff's arguments are insufficient to defeat summary judgment. Plaintiff's expert incorporates theoretical discounts proposed by academic studies from the employee stock option context. (Dkt. No. 176-18 at 5, 13, McCann Supp. Report ¶¶ 10 n.1, 28 n.5.) Moreover, Plaintiff's expert's opinion is speculative. (Dkt. No. 176-18 at 13–14, McCann Supp. Report ¶ 29 (observing that the "mismatches *sometimes* result in payoffs to Defendants that are not transmitted to contract holders" and that "the hedging option in that case *may* have been far more valuable than the EIB" (emphasis added))); *c.f. Getz v. Boeing Co.*, 654 F.3d 852, 865 (9th Cir. 2011) (speculation and conjecture insufficient to defeat summary judgment); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C. Cir. 1977) ("To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than [the expert's] theoretical speculations would seriously undermine the policies

of Rule 56.").

Finally, Plaintiff complains that Defendants use "stale" options quotes from investment banks, rather than quotes on the actual day of Plaintiff's contract purchase and subsequent anniversaries (September 28 from the year 2010 onward), and that the quotes are not "firm" quotes, but "indicative" quotes. (Dkt. No. 171 at 9–10.) Plaintiff's first objection is unavailing. Defendants' submission to the CDI makes clear that "[t]he Monthly Cap is declared, for each Premium/Re-election, *in advance*, and is guaranteed for one year." (Dkt. No. 144-3 at 38, Hutton Decl. Ex. B at Oppo. 0075 (emphasis added).) In order to declare the Monthly Cap in advance of each strategy selection period and allow Plaintiff the chance to elect interest-crediting strategies during the thirty-day period after his contract anniversary, the annualized option cost necessarily relies upon option quotes from dates preceding Plaintiff's contract anniversary. (*See* Dkt. No. 178 at 7 n.4; Dkt. No. 130-4 at 14, Leigh Decl. Ex. 1 § 3.1 ("You elect the Strategies for your Single Premium from among those described in the Contract and offered by us. At any time during the 30-day period following a Contract Anniversary, you may re-elect all or a portion of the Accumulation Value in any Strategy to any other Strategy.").)

Plaintiff's second objection is similarly unavailing. No distinction between "indicative" and "firm" quotes appears in Defendants' 2007 submission to the CDI. Defendants simply represented to the CDI that it would calculate annualized option costs using methods and parameters "calibrated to capital markets based option pricing at the then current market conditions." (Dkt. No. 144-3 at 38, Hutton Decl. Ex. B at Oppo. 0075.) No evidence in the record indicates that Defendants did not do so. Rather, the only evidence in the record shows that Defendants calculated the annualized option cost "based on then current market prices for options supporting each of Mr. Abbit's selected Index Strategies as of each Contract Anniversary Date." (Leigh Decl. Ex. 16, Dkt. No. 149-2 at 5.)

Furthermore, the record contains no evidence of capital market options costs, other than the data Defendants used to calculate the annualized option cost associated with

each interest-crediting strategy in which Plaintiff allocated funds. (Dkt. No. 178 at 5–6.) Beyond Plaintiff's expert's quantification of theoretical "EIB leg" values, which are inapposite for the reasons detailed above, Plaintiff has no evidence that he would have benefited from later option quotes or "firm" option quotes. *C.f. Getz*, 654 F.3d at 865; *Merit Motors, Inc.*, 569 F.2d at 673.

In sum, there is no genuine dispute of material fact as to whether Defendants have breached the implied covenant of good faith and fair dealing by failing to maintain an annualized option cost of 100 bps for each interest-crediting strategy. The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing on the "substantive participation" theory.

### 3. Second Request for Reconsideration of the Court's Order Granting Defendants' Motion for Summary Judgment on the Class Claims

At the hearing, and in his supplemental briefing, Plaintiff suggested that the Court, on its own motion, once again reconsider its conclusions regarding the breach of contract class claims. (Dkt. No. 171 at 11–12.) The Court declines to reconsider its prior ruling and instead reaffirms its conclusions in its prior Order denying Plaintiff's first motion for reconsideration. (Dkt. No. 129.)

As was true at the last motion for summary judgment, and as is still true now, Plaintiff has not pointed to a specific contract term in which Defendants expressly guaranteed 100 bps (or any other amount) in annualized option cost to Plaintiff and the rest of the class members. Even taking at face value Plaintiff's assertion that this theory of "substantive participation" could not have arisen earlier, Plaintiff's failure to identify a salient contract term is fatal to the breach of contract class claims. The closest term Plaintiff points to is § 5.8 of the FIA contract, which guarantees that "[t]he reserves and guaranteed values will at no time be less than the minimum required by the laws of the state in which this Contract is issued." (Leigh Decl. Ex. 1, Dkt. No. 130-4 at 16.) However, as explained above, *supra* Part II.B.1, Cal. Ins. Code § 10168.25(e) does not

specify a minimum floor for "substantive participation." To the extent Plaintiff argues that Defendants failed to provide the minimum nonforfeiture amounts prescribed by Cal. Ins. Code § 10168.25(e), the Court previously found that Defendants did not breach their obligation to maintain the minimum nonforfeiture amounts guaranteed under the contract and California law. (*See* Dkt. No. 117 at 5–9.)

Moreover, Plaintiff's attempt to retroactively amend his arguments regarding the certified class claims fails for the additional reason that the "substantive participation" argument is not common to the certified class. Contracts issued before January 3, 2011 are treated differently than contracts issued after January 3, 2011, because Defendants stopped taking the additional reduction in the nonforfeiture rate after January 3, 2011. (Dkt. No. 174-1 at 10–11, Bainbridge Depo. 150:17–154:22.) As Plaintiff's contract was purchased before January 3, 2011, Defendants did not treat Plaintiff's contract any differently. (*Id.*) While Defendants' commitment to maintaining an annualized option cost of at least 100 bps for Plaintiff's contract remained unchanged, contracts issued after January 3, 2011 did not contain a "substantive participation" requirement under Cal. Ins. Code § 10168.25(e). (*See id.*; *see also* Dkt. No. 178 at 3 n.2.) And 10 C.C.R. § 2523.5, which applies, at the very least, to contracts issued after December 19, 2012, provides for a minimum floor of 25 bps in annualized option cost, rather than 100 bps.

For the foregoing reasons, the Court **DENIES** Plaintiff's renewed request for reconsideration of the Court's Order granting Defendants' motion for summary judgment on the certified class claims.

### C. Plaintiff's "Based On" Argument

Plaintiff's "based on" argument has a basis in the agreement actually made. *See Guz*, 24 Cal. 4th at 349–50. Section 6.5 of the contract provides definitions applicable to the Monthly Cap Index Strategy, and specifies that the "Index Credit" amount "is based on the performance of the applicable Index as measured over the Contract Year." (*Id.* at 21.) However, as explained below, *infra* Part II.C, Plaintiff's unfounded interpretation of "based on" lacks merit, and Plaintiff has not shown how Defendants have breached any

express or implied obligation flowing therefrom.

As a threshold observation, Plaintiff's argument that Defendants failed to ensure that index credits were "based on" the performance of the S&P 500 appears to be coextensive with his argument about "substantive participation." (*See, e.g.*, Dkt. No. 141 at 8–9, 13–14, 23–24, 26.) To the extent Plaintiff's "based on" argument depends upon his "substantive participation" argument, the "based on" argument fails for the same reasons articulated above, *supra* Part II.B.

Even if Plaintiff's "based on" argument stands alone, it, too, fails as a matter of law. First, the contract does not support Plaintiff's assertion. Section 6.5 of the contract indeed defines "Index Credit" as "the amount credited to the portion of the Single Premium, Bonus or Re-elections elected to this Strategy and is based on the performance of the applicable Index as measured over the Contract Year." (Hutton Decl. Ex. G at Oppo. 0305, Dkt. No. 141-11 at 17; *see also* Hutton Decl. Ex. E at Oppo. 0212, Dkt. No. 144-6 at 11 ("The value of this annuity may also grow through index credits that depend on the performance of the S&P 500 index.").) Plaintiff omits mention of the definitions that break down how the index credits are calculated. The definitions flesh out in technical detail how the amounts credited are "based on" the performance of the S&P 500. Specifically, "[t]he Index Credit equals the sum of the twelve Monthly Index Changes during the Contract Year," with "Monthly Index Change" defined as "the lesser of the Monthly Cap or the result of (i)/(ii) − 1, where (i) is the Index Number on each Monthly Anniversary; (ii) is the Index Number on the prior Monthly Anniversary." (Hutton Decl. Ex. G at Oppo. 0305, Dkt. No. 141-11 at 17.) "Monthly Cap" is in turn defined as "the maximum Monthly Index Change that may be applied in calculating the Index Credit at the end of each Contract Year. It is declared annually in advance and is guaranteed for one year. The initial Monthly Cap is shown on the Contract Data Page." (*Id.*) "Index Number" is defined as "the published value of the [S&P 500] Index." (Hutton Decl. Ex. at Oppo. 0296, Dkt. No. 141-11 at 12.) And "[t]he Index Credit will never be less than zero." (Hutton Decl. Ex. G at Oppo. 0305, Dkt. No. 141-11 at 17.)

Plaintiff has not shown how Defendants have failed to abide by the transparent calculation outlined in the definitions.

In addition, neither the contract nor state law supports Plaintiff's assertion that the phrase "based on" means "based solely on," such that all factors apart from the performance of the S&P 500 are excluded from consideration. *See* Cal. Code Regs. tit. 10, § 2523.1(b) (defining "equity-indexed benefit" as "a benefit in an annuity contract in which the value of the benefit is determined using an interest crediting rate based on the performance of an equity-based index *and* contract parameters" (emphasis added)); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) ("In the context of statutory interpretation, courts have held that the plain meaning of 'based on' is synonymous with 'arising from' and ordinarily refers to a '*starting point*' or a '*foundation*.'" (emphasis added)). Nor does "based on" require a linear relationship between the S&P 500 and the index credits.[6]

Finally, the internal memorandum and presentation Plaintiff cites do not show that Defendants failed to determine index credits based on the performance of the S&P 500. In the memorandum, Defendants acknowledged that "[w]hile it may be possible to credit less on FIA Products, there are [a] number of risks in doing so," including "a reputation risk, as we do not wish to be unfair to customers." (Hutton Decl. Ex. I at Oppo. 0375, Dkt. No. 144-9 at 12.) In the presentation, Defendants discussed how to meet their

---

[6] Other public documents associated with the FIAs indicate that "based on" does not mean "based solely on." Defendants' Form 10-K, filed in 2011 with the Securities and Exchange Commission ("SEC"), states,

> Under fixed annuity contracts, the principal amount is guaranteed, and, for a specified time period, the Company credits interest to the contract owner accounts at a fixed interest rate, or, for an FIA, the greater of a fixed interest rate or a return based upon performance of the Standard & Poor's ("S&P") 500 index *and participation rates set by the Company*.

(Hutton Decl. Ex. M at Oppo. 0619, Dkt. No. 141-17 at 7 (emphasis added).) The ING USA sales brochure states: "Since the interest credit is related, *in part*, to movements in the S&P 500 Index, the amount of interest your annuity will be credited at the end of the contract year cannot be known or predicted prior to the end of the contract year." (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 4 (emphasis added).)

internal return-on-investment ("ROI") targets. (Hutton Decl. Ex. N at Oppo. 0858, Dkt. No. 144-13 at 15.) Plaintiff's evidence shows Defendants' internal discussions regarding how to optimize ROI while balancing reputational risks; it does not create a genuine dispute of material fact regarding whether Defendants failed to credit interest based on the performance of the S&P 500.

In light of the foregoing, the Court concludes that there is no genuine dispute of material fact regarding whether Defendants breached the implied covenant of good faith and fair dealing on the "based on" theory. The Court **GRANTS** Defendants' motion for summary judgment on this claim.

### III. Breach of Fiduciary Duty

A breach of fiduciary duty claim under California law requires "the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (Cal. Ct. App. 1991). With respect to insurers and insureds, the California Supreme Court has observed,

> [T]he insurer-insured relationship . . . is not a true "fiduciary relationship" in the same sense as the relationship between trustee and beneficiary, or attorney and client. It is, rather, a relationship often characterized by unequal bargaining power in which the insured must depend on the good faith and performance of the insurer. This characteristic has led the courts to impose "special and heightened" duties, but "[w]hile these 'special' duties are akin to, and often resemble, duties which are also owed by fiduciaries, the fiduciary-like duties arise because of the unique nature of the insurance contract, *not* because the insurer *is* a fiduciary."

*Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal. 4th 1142, 1150–51 (Cal. 2001) (internal citations omitted). Under this view, "California courts have refrained from characterizing the insurer-insured relationship as a fiduciary one." *Tran v. Farmers Grp., Inc.*, 104 Cal. App. 4th 1202, 1211 (Cal. Ct. App. 2002), *as modified on denial of reh'g* (Jan. 27, 2003). Rather, California decisions have "suggest[ed] that an insurer's breach of its "fiduciary-like duties" is adequately redressed by a claim for breach of the covenant of good faith and fair dealing implied in the insurance contract." *Id.* at 1212. "[A]s a matter of California law, no true fiduciary duty arises from the insurer-insured relationship and an

insured therefore cannot maintain a claim for breach of fiduciary duty based solely on the insurer-insured relationship."[7] *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices*

---

[7] Plaintiff cites to inapposite cases in support of his argument that a fiduciary duty exists in this case. (Dkt. No. 141 at 17–18.) Plaintiff's breach of fiduciary duty claim is brought under California law, not ERISA. *Parker v. Bain*, 68 F.3d 1131 (9th Cir. 1995), discussed the definition of "fiduciary" under the ERISA statute and federal common law, not California law. 68 F.3d at 1139–40. *Carter v. San Pasqual Fiduciary Trust Co.*, No. SACV1501507JVSJCGX, 2016 WL 6803768 (C.D. Cal. Apr. 18, 2016), too, involved a claim for breach of fiduciary duty under ERISA; in fact, the court dismissed with prejudice plaintiffs' state law claims for breach of fiduciary duty, finding such claims to be preempted by ERISA. 2016 WL 6803768, at *7. The fiduciary duty claims in *Santomenno v. Transamerica Life Ins. Co.*, No. CV 12-02782 DDP MANX, 2013 WL 603901 (C.D. Cal. Feb. 19, 2013), are also ERISA, not state law, claims. 2013 WL 603901, at *7.

Nor are Plaintiff's citations from the stockbroker context availing, given the "long settled" rule in California that stockbrokers owe fiduciary duties to their customers. *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 245–46 (Cal. Ct. App. 2007); *see also Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605, 607 (9th Cir. 1983) (recognizing that California law imposes fiduciary obligations on stockbrokers who control the account "for all practical purposes"). Furthermore, Plaintiff conflates the factors used to determine the *scope* of a stockbroker's fiduciary duty with the question of whether a fiduciary duty *exists*. In *Apollo Capital Fund*, the court observed that while it is undisputed that a stockbroker owes fiduciary a fiduciary duty to his or her customer, "the scope of the duty depends on the nature of the broker/customer relationship" and "specific facts and circumstances presented in a given case." 158 Cal. App. 4th at 245–46.

Plaintiff's supplemental legal authority, supplied in an *ex parte* motion, (Dkt. No. 152), also does not avail his claim. Both *Chamber of Commerce of the United States of Am. v. Hugler*, No. 3:16-CV-1476-M, 2017 WL 514424 (N.D. Tex. Feb. 8, 2017), and *Mkt. Synergy Grp., Inc. v. United States Dep't of Labor*, No. 16-CV-4083-DDC-KGS, 2017 WL 661592 (D. Kan. Feb. 17, 2017), involved administrative law challenges to the Department of Labor's ("DOL's") final rules, issued pursuant to its authority to enforce ERISA and published on April 8, 2016, 81 Fed. Reg. 20946. The DOL rules effected the following changes, as summarized by the court in *Chamber of Commerce*:

Prior to the new rules, a *financial professional* who did not give advice to a consumer on a regular basis was not a "fiduciary," and therefore was not subject to fiduciary standards under the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code (the "Code"). Unless fiduciaries qualify for an exemption, they are prohibited by ERISA and the Code from receiving commissions, which are considered to present a conflict of interest. Prior to the new rules, fiduciaries could qualify for an exemption known as the Prohibited Transaction Exemption 84–24 ("PTE 84–24"), which, if they qualified, allowed them to receive commissions on all annuity sales as long as the sale was as favorable to the consumer as an arms-length transaction and the adviser received no more than reasonable compensation.

The new rules modify the regulation of conflicts of interest in the market for retirement investment advice, and consist of: 1) a new definition of "fiduciary" *under ERISA and the Code*; 2) an amendment to, and partial revocation of, PTE 84–24; and 3) the creation of the Best Interest Contract Exemption ("BICE"). The first rule revises the definition of "fiduciary" under ERISA and the Code, and *eliminates the condition that investment advice must be provided "on a regular basis" to trigger fiduciary duties*. The second rule amends PTE 84–24, which

*Litig.*, No. C-05-04726RMW, 2007 WL 486367, at *7 (N.D. Cal. Feb. 12, 2007); *accord Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1138 (9th Cir. 1998) (holding that an insurer owes no fiduciary duty to its insured under California law); *Almon v. State Farm Fire & Cas. Co.*, 724 F. Supp. 765, 766 (S.D. Cal. 1989) ("[A]lthough the duty

---

provides exemptive relief to *fiduciaries who receive third party compensation* for transactions involving an ERISA plan or individual retirement account ("IRA"). The DOL excluded those selling fixed indexed annuities ("FIAs") as eligible for exemptions under amended PTE 84–24. The third rule, BICE, creates a new exemption for FIAs and variable annuities, and *allows fiduciaries to receive commissions on the sale of such annuities only if they adhere to certain conditions*, including signing a written contract with the consumer that contains enumerated provisions.

*Chamber of Commerce*, 2017 WL 514424, at *1 (emphases added).

Multiple hurdles render Plaintiff's supplemental legal authorities inapposite. *Chamber of Commerce* and *Mkt. Synergy* both involved administrative law challenges to federal rulemaking regarding investment advisors' fiduciary duties with respect to ERISA plans and IRA accounts. Also, the President has issued a memorandum directing the Secretary of Labor to reexamine these rules. *Id.* at *1 n.1. Even setting aside these hurdles, Plaintiff's attempt to martial the cases in his favor still fails.

Plaintiff misreads the DOL rules and the two decisions as creating a blanket obligation "requiring FIA issuers . . . to adhere to fiduciary responsibilities" and as creating "a fiduciary relationship" with every "purchase of an FIA." (Dkt. No. 152 at 3, 6.) Rather, the first DOL rule "redefined who is a fiduciary under ERISA" and redefined the "scope of the statutory definition of fiduciary investment advice." 2017 WL 514424, at *6. Defendants have not provided "investment advice," as defined by the DOL rule, *see id.*, to Plaintiff. Instead, Defendants directed Plaintiff to consult his agent, rather than ING, for advice. (Leigh Decl. Ex. 3, Abbit Depo. at 43:17–46:7, 65:21–22, Dkt. No. 130-6 at 13–14, 18; Hutton Decl. Ex. G at Oppo. 0288, Dkt. No. 141-11 at 3.) Indeed, *Chamber of Commerce* recognizes that "the Fiduciary Rule plainly does not make one a fiduciary for selling a product without a recommendation." *Chamber of Commerce*, 2017 WL 514424, at *11. The sales brochure and application—the only materials Plaintiff received from Defendants—are "general marketing materials" affirmatively excluded from "investment advice." 81 Fed. Reg. 20946-01.

In addition, neither the second nor third DOL rules apply to Defendants in the manner Plaintiff asserts, as Defendants have not provided Plaintiff with investment advice. *See Chamber of Commerce*, 2017 WL 514424, at *7 ("The DOL's final revised PTE 84–24 eliminated the 2010 proposal's exemption for FIAs. Therefore, fiduciaries who provide investment advice for fixed rate annuities can obtain exemptions under PTE 84–24, but those selling FIAs and variable annuities cannot use PTE 84–24 to exempt their receipt of third-party compensation, including commissions. Instead, under the final rules, BICE, described below, is their only option for obtaining exemptive relief from the prohibited transaction rules under ERISA and the Code."); 81 Fed. Reg. 21002-01 ("[BICE] allows entities such as registered investment advisers, broker-dealers and insurance companies, and their agents and representatives, that are ERISA or Code fiduciaries by reason of the provision of investment advice, to receive compensation that may otherwise give rise to prohibited transactions as a result of their advice to plan participants and beneficiaries, IRA owners and certain plan fiduciaries (including small plan sponsors.").

3:13-cv-02310-GPC-WVG

between the defendant and plaintiffs is fiduciary in nature, there is no independent cause of action for breach of fiduciary duty.").

"'[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.'" *City of Hope Nat. Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 386 (Cal. 2008) (quoting *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 221 (Cal. 1983)). Because the insurer-insured relationship does not impose a fiduciary duty as a matter of law, Defendants must "knowingly undertake to act on behalf and for the benefit of Plaintiff" before they can be charged with a fiduciary obligation to Plaintiff. *Id.*; *see also Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966, 973 (Cal. Ct. App. 2003) ("An insurer is not a fiduciary, and owes no obligation to consider the interests of its insured above its own.").

In line with this view, courts have allowed insured plaintiffs to proceed with claims for a breach of fiduciary duty against insurers where affirmative representations and actions by insurers created a fiduciary relationship that would otherwise not exist as a matter of law. *See, e.g.*, *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071, 1086–88 (S.D. Cal. 2006) (denying motion to dismiss plaintiffs' breach of fiduciary duty claim, where the insurers' "sales agents allegedly held themselves out as objective financial planners who act in Plaintiffs' best interests" and where the insureds were "senior citizens" who purchased "allegedly complex financial instruments which the average person cannot understand"); *Negrete v. Fid. & Guar. Life Ins. Co.*, 444 F. Supp. 2d 998, 1004 (C.D. Cal. 2006) (denying motion to dismiss plaintiffs' breach of fiduciary duty claim, where plaintiffs alleged that defendant insurers "assumed fiduciary duties" to plaintiffs "[b]y virtue of their purported positions as financial advisors, estate planning specialists, and because of their superior knowledge and ability to manipulate and control senior citizens' finances and legal status"); *Fischer v. Aviva Life & Annuity Co.*, No. 2:10-CV-1693-GEB-EFB, 2010 WL 3582559, at *6 (E.D. Cal. Sept. 10, 2010) (denying

motion to dismiss plaintiffs' claim for breach of fiduciary duty where plaintiffs alleged that defendant insurers "acted as investment advisors" for plaintiffs); *Estate of Migliaccio v. Midland Nat'l. Life Ins. Co.*, 436 F. Supp. 2d 1095, 1108 (C.D. Cal. 2006), *as amended* (Aug. 21, 2006) (denying motion to dismiss plaintiffs' claim for breach of fiduciary duty where plaintiffs supplied "extensive allegations that defendants trained their sales agents to lure seniors citizens into their confidence by offering assistance with estate and financial planning, ultimately to sell them improper annuities using standardized marketing materials and annuity contracts").

The California Supreme Court has recognized that while the following four factors may be typical of a fiduciary relationship, the fact that a relationship between parties exhibits these characteristics, which "are common in many a contractual arrangement," does not necessarily render the relationship fiduciary:

> (1) one party entrusts its affairs, interests or property to another; (2) there is a grant of broad discretion to another, generally because of a disparity in expertise or knowledge; (3) the two parties have an "asymmetrical access to information," meaning one party has little ability to monitor the other and must rely on the truth of the other party's representations; and (4) one party is vulnerable and dependent upon the other.

*City of Hope Nat. Med. Ctr.*, 43 Cal. 4th at 387–88 (internal citations omitted).

Here, Defendants contend that summary judgment is warranted because Plaintiff and Defendants are not in a fiduciary relationship. (Dkt. No. 130-1 at 17–18.) Specifically, Defendants assert that they did not undertake to act on behalf of and solely for Plaintiff's benefit. (*Id.*) Defendants also contend that Plaintiff has not suffered any damages resulting from any breach. (*Id.*)

This Court denied Defendants' motion to dismiss Plaintiff's breach of fiduciary duty claim and allowed it to proceed. (Dkt. No. 19 at 13–14.) However, at the summary judgment stage, Plaintiff has not produced evidence showing a genuine dispute of material fact as to the existence of a fiduciary relationship with Defendants.

Plaintiff cites the FIA application he signed, wherein Defendants stated, "The price

[of the annuity contract] also covers the cost of contract guarantees, other costs such as the design, manufacture and service of the contracts, as well as the investment management needed to support the contracts' values." (Hutton Decl. Ex. E at Oppo. 0214, Dkt. No. 144-6 at 13.) However, Defendants include a caveat on the same page: "You should discuss your retirement planning objectives, anticipated financial needs and risk tolerance with your agent to make sure this annuity meets your current financial needs and objectives." (*Id.*) Plaintiff signed and dated below, acknowledging that he read the document and understood its contents. (*Id.*) Rather than holding themselves out as objective financial or estate planning advisors, Defendants provided a clear directive referring Plaintiff to his agent for financial advice.

Plaintiff also cites a letter from Michael Smith, ING's President, thanking Plaintiff for his purchase. (Hutton Decl. Ex. G at Oppo. 0288, Dkt. No. 141-11 at 3.) The letter states, in relevant part:

> We know that choosing to purchase an annuity product in today's ever-changing marketplace is a big decision. That's why we want to thank you and welcome you to the growing number of contract owners who have chosen the ING family of companies as their preferred financial services provider.
>
> ING USA Annuity and Life Insurance Company, the issuer of your annuity contract, is a member of the ING family of companies, a first-class global organization that strives to offer a fresh financial planning perspective to its customers while forging successful lifelong relationships.
>
> Our commitment to you does not end at the insurance of your enclosed contract. Rather, our commitment to you begins.

(*Id.*) The letter ends, "Again, thank you for the trust and confidence you have placed with us." (*Id.*)

As recognized in *City of Hope Nat. Med. Ctr.*, 43 Cal. 4th at 387–88, the fact that a contract results in one party entrusting its affairs, interests, or property to another is commonplace—it does not transform the relationship into a fiduciary one as a matter of law. Moreover, Defendants sent this letter to Plaintiff *after* he purchased his contract—

this letter does not show that Defendants affirmatively held themselves out to Plaintiff as objective financial advisors, estate planning specialists, or the like, or that Plaintiff understood Defendants to occupy such roles. Rather, Plaintiff testified in his deposition that he "assumed" that ING was a for-profit company, that he "didn't speak to anybody from ING" before purchasing his contract, and that he contacted his agent, rather than ING, with questions about his statements after his purchase. (Leigh Decl. Ex. 3, Abbit Depo. at 43:17–46:7, 65:21–22, 112:14–16, Dkt. No. 130-6 at 13–14, 18, 30.)

Plaintiff also cites Defendants' discretion to set Monthly Caps for the Monthly Cap Index Strategy on his contract. (Hutton Decl. Ex. B at Oppo. 0075; Dkt. No. 144-3 at 38.) As explained above, *supra* Part II, the contract does not confer upon Defendants "complete discretion and control over the performance of Mr. Abbit's account." (Dkt. No. 141 at 17.) Rather, Defendants' discretion over the performance of Plaintiff's contract is limited by express contract parameters, including the specific Index Credit calculation derived from the performance of the S&P 500. Indeed, as Plaintiff admits, Plaintiff is the one who chooses which of the available interest-crediting strategies will apply to his contract; while Defendants have discretion to adjust certain features of each strategy and thereby "shape[] the outcome," Defendants certainly do not retain "complete discretion and control over the performance of [Plaintiff's] account." (Dkt. No. 141 at 17–18.) Defendants' limited discretion must be exercised in good faith, in accordance with the covenant of good faith and fair dealing—it does not give rise to an independent common law claim for breach of fiduciary duty. *See Casey v. Metro. Life Ins. Co.*, 688 F. Supp. 2d 1086, 1101 (E.D. Cal. 2010) (adopting "the sounder approach" that a breach of fiduciary duty claim against an insurer "is analyzed under the covenant of good faith and fair dealing" under California law, rather than as a standalone claim); *Carma Developers*, 2 Cal. 4th at 372 ("The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith."); *Brady v. Conseco, Inc.*, No. C 08-05746 SI, 2009 WL 2356201, at *6 (N.D. Cal. July 29, 2009) (dismissing with prejudice

plaintiffs' claim for breach of fiduciary duty where "plaintiffs' complaint allegations establish[ed] that policyholders had various options about how to use their policies, not that they relied on defendants for investment advice," and where defendants did not "act[] as financial advisors and estate planning specialists").

In light of the foregoing, the Court concludes that Plaintiff has failed to show a genuine dispute of material fact regarding the existence of a fiduciary relationship between Plaintiff and Defendants.[8]  Defendants' motion for summary judgment on this claim is accordingly **GRANTED**.

### IV.    Fraud

Defendants contend that Plaintiff's fraud claims fail because (1) he cannot identify false statements on which he relied, and (2) Defendants have no obligation to disclose the internal pricing information Plaintiff seeks.  (Dkt. No. 130-1 at 18–22.)  Finally, Defendants repeat their argument that Plaintiff cannot prove damages.[9]  (*Id.*)

#### A. False Representation

"To state a claim for fraud or intentional misrepresentation under California law, a Plaintiff must allege: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage."  *Baltazar v. Apple, Inc.*, No. CV-10-3231-JF, 2011 WL 588209, at *3 (N.D. Cal. Feb. 10, 2011) (citing *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (Cal. 1996)).

Defendants contend that the statements Plaintiff identified from a sales brochure are not false, and are not statements of fact on which Plaintiff relied.  (Dkt. No. 130-1 at 19 (citing Dkt. No. 20, FAC ¶¶ 153–54).)  The statements include: (i) "The FIAs offered

---

[8] Because the Court concludes that Plaintiff has not shown a genuine dispute of material fact as to the existence of a fiduciary duty, the Court does not continue on to discuss the issue of damages.

[9] Having concluded that no genuine dispute of material fact exists as to any affirmative misrepresentations or material omissions by Defendants, the Court does not continue on to discuss the issue of damages.

'guarantees' to 'protect' retirement savings while offering investment earnings 'linked' to the S&P 500 Index"; (ii) "The FIAs would 'Protect Your Assets' while 'fueling the value of your annuity' to 'build up your retirement savings'"; and (iii) "The FIAs were designed to provide 'protection of principal.'" (*Id.*) However, Plaintiff does not respond directly to Defendants' argument. While Plaintiff's FAC pled fraud claims based on Defendants' statements in a sales brochure, Plaintiff's opposition brief focuses only on statements contained within his FIA *application*. Instead of responding to Defendants' motion for summary judgment on the claim he initially pled, Plaintiff pivots to his "based on" argument and "extra-contractual charges" argument. For this reason alone, summary judgment is proper as to Plaintiff's misrepresentation claims as originally pled. *See Shakur*, 514 F.3d at 892; *Resolution Trust Corp.*, 43 F.3d at 599.

Nonetheless, Plaintiff's new false representation argument also fails to create a genuine dispute of material fact. Plaintiff identifies two statements from the disclosures that he signed and acknowledged as part of his application.[10] (Dkt. No. 141 at 25–26.)

---

[10] Plaintiff also misattributes a statement to Defendants. Defendants did not guarantee that the disclosure's contents did not "differ from the sales, material, illustrations, or proposals" that Plaintiff might have received from Copley. (Dkt. No. 141 at 25.) Rather, Plaintiff selectively quotes from, and misconstrues, the "Agent Statement" signed by Copley, wherein *Copley* certified that he "ha[d] not made statements that differ from the sales materials, illustrations, or proposals" used to sell the annuity. (Hutton Decl. Ex. E at Oppo. 0214, Dkt. No. 144-6 at 13.)

In his Separate Statement of Undisputed Facts, Plaintiff also lists, without explanation or pin citations, six statements in the FIA application as affirmative misrepresentations. (Pl's SSUF ¶¶ 24–25, Dkt. No. 144-1 at 22.) Again, while summary judgment is warranted for Plaintiff's failure to respond to with respect to his claim as originally pled, Plaintiff has not shown how the following statements are affirmative misrepresentations.

    1.  "You can use this annuity to save for retirement and to receive retirement income for life." (Hutton Decl. Ex. E at Oppo. 0212, Dkt. No. 144-6 at 11.)

As a starting matter, the FIA application disclosure informed Plaintiff: "This document reviews important points to think about before you buy this ING USA Annuity and Life Insurance Company annuity. This document is not part of your contract, and you should refer to your contract for complete details." (Hutton Decl. Ex. E at Oppo. 0212, Dkt. No. 144-6 at 11.) Moreover, the application directed Plaintiff to "discuss your retirement planning objectives, anticipated financial needs and risk tolerance with your agent to make sure this annuity meets your current financial needs and objectives." (Hutton Decl. Ex. E at Oppo. 0214, Dkt. No. 144-6 at 13.) The application further stated, "The contract does not directly participate in any stock or equity investments. Any values shown, other than guaranteed

Plaintiff asserts that the following statements are false or misleading: (1) "The value of this annuity may also grow through index credits that depend on the performance of the S&P 500 index, a nationally recognized market index"; and (2) "There are not other fees or charges on this annuity, but there may be additional fees with optional riders." (Hutton Decl. Ex. E at Oppo. 0212–13, Dkt. No. 144-6 at 11–12.) Plaintiff simply avers

---

minimum values, are not guarantees, promises or warranties." (Hutton Decl. Ex. E at Oppo. 0210, Dkt. No. 144-6 at 9.) Plaintiff signed and dated below, acknowledging that he read the document and understood its contents. (*Id.*) Moreover, it is undisputed that Plaintiff's annuity has earned interest and grown in value. (*See, e.g.*, Dkt. No. 130-1 at 11.)

  2. "This annuity is designed for people who are willing to let their assets build for at least 10 years." (Hutton Decl. Ex. E at Oppo. 0214, Dkt. No. 144-6 at 13.)

  Plaintiff has provided no evidence showing that the FIA was not designed in the manner described above. (*See, e.g.*, Leigh Decl. Ex. 1, Dkt. No. 130-4 at 10 ("The initial Minimum Guaranteed Strategy Value Rates shown above are set on the Contract Date and will not change for the first *ten* Contract Years.") (emphasis added).) Again, it is undisputed that Plaintiff's annuity has earned interest and grown in value. (*See, e.g.*, Dkt. No. 130-1 at 11.)

  3. "There are no other fees or charges on this annuity, but there may be additional fees with optional riders." (Hutton Decl. Ex. E at Oppo. 0213, Dkt. No. 144-6 at 12.)

  Again, as explained above, beyond arguing that Defendants sought to meet internal ROI targets and optimize profit, Plaintiff has not shown how there have been any extra-contractual fees or charges on his annuity.

  4. "The value of this annuity may also grow through index credits that depend on the performance of the S&P 500 index, a nationally recognized market index." (Hutton Decl. Ex. E at Oppo. 0212, Dkt. No. 144-6 at 11.)

  Again, as explained above, *supra* Part II.C, Plaintiff's interpretation of "based on" is unsupported by the contract or by the applicable law, and he has not shown, in any event, how the interest credited to his account has not depended on the performance of the S&P 500 index.

  5. "We set the price of an annuity contract, and the price reflects the compensation we pay for the sale of the annuity contracts. The price also covers the cost of contract guarantees, other costs such as the design, manufacture and service of the contracts, as well as the investment management needed to support the contracts' values." (Hutton Decl. Ex. E at Oppo. 0214, Dkt. No. 144-6 at 13.)

  Plaintiff has not offered any explanation for how this representation is false. If anything, this statement reflects Defendants' discretion to set the price of an annuity contract, and that Defendants have to account for various costs.

  6. The contract's "guaranteed values will at no time be less than the minimum required by the laws of the state in which this Contract is issued." (Pl's SSUF ¶ 24, Dkt. No. 144-1 at 22.)

  Although this statement does not appear to be in the FIA application, Plaintiff has not shown how this statement, wherever it appears, is fraudulent. The Court has already determined in its prior Order that Plaintiff has not raised a genuine dispute of material fact as to whether Defendants have ever breached the express Minimum Guaranteed Strategy Value terms of the contract. (Dkt. No. 117 at 5–9.)

that "Defendants knew of the falsity of their statements in the disclosure form at the time they were made," because Defendants prioritized optimizing their internal ROI targets such that "these extra-contractual charges . . . eviscerate[d] Mr. Abbit's substantive participation in the underlying index, in violation of Cal. Ins. Code § 10168.25(e)" (Dkt. No. 141 at 25.) The Court has already rejected Plaintiff's "substantive participation" argument, *supra* Part II.B, and Plaintiff's "based on" argument, *supra* Part II.C.

To the extent Plaintiff's argument about "extra-contractual charges" stands independently from his argument about "substantive participation," the argument fails for the reasons articulated below, *infra* Part IV.B, and because Plaintiff has not shown how Defendants' internal pricing and profit strategies render any representation fraudulent, *see, e.g.*, *Phillips v. Am. Int'l Grp., Inc.*, 498 F. Supp. 2d 690, 698 (S.D.N.Y. 2007) (dismissing with prejudice plaintiff's fraud claim where plaintiff alleged that "Defendants designed the Bonus Annuity Contracts to contain undisclosed penalties, costs and/or charges that resulted in an increased 'spread,' which was designed to recoup and recapture the entire bonus credited to Plaintiff in year one and compensate Defendants for the higher cost of capital/surplus strain associated with Bonus Annuity Contracts"). The contract clearly afforded Defendants discretion to set Monthly Caps and adjust other interest-crediting parameters. (*See* Leigh Decl. Ex. 1 §§ 6–6.5, Dkt. No. 130-4 at 16–20.) Plaintiff expressly acknowledged in his FIA application that "[a]ny values shown, other than guaranteed minimum values, are not guarantees, promises or warranties." (Hutton Decl. Ex. E at Oppo. 0210, Dkt. No. 144-6 at 9.) And the hypothetical interest credit illustrations provided in Plaintiff's FIA application show the possibility of him earning 0% in index credits. (Hutton Decl. Ex. E at Oppo. 0215–18, Dkt. No. 144-6 at 14–17.) Plaintiff has not shown a genuine dispute of material fact as to whether the statements in the FIA application were affirmative misrepresentations.

## B. Concealment

To state a claim for concealment, a plaintiff must allege: (1) the concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to

the plaintiff; (3) that the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) that the plaintiff was unaware of the fact and would have acted differently if he or she had known of the concealed or suppressed fact; and (5) that the plaintiff sustained damage as a result of the concealment or suppression of the fact.

*Richter v. CC-Palo Alto, Inc.*, 176 F. Supp. 3d 877, 897 (N.D. Cal. 2016) (quoting *Graham v. Bank of America, N.A.*, 226 Cal. App. 4th 594, 606 (Cal. Ct. App. 2014)).

Defendants contend that Plaintiff's concealment claim fails because Defendants had no duty to disclose the information Plaintiff identified in his FAC. (Dkt. No. 130-1 at 20.) Specifically, Plaintiff alleged that ING USA failed to disclose: (i) the "existence of embedded derivatives under the FIA contracts"; and (ii) ING USA's "inherent conflicts of interest in retaining investment decisions under the FIA contract." (*Id.* (quoting Dkt. No. 20, FAC ¶¶ 153(c), 153(d)).)

With respect to the first alleged failure to disclose, the contract spells out how the interest credits under the different crediting strategies are derived in part from changes in the S&P 500 Index. (*See* Hutton Decl. Ex. G at Oppo. 0305, Dkt. No. 141-11 at 17.) Moreover, Defendant discloses the fact that its FIA contracts contain embedded derivatives in its publicly filed SEC disclosures. (*See, e.g.*, Hutton Decl. Ex. M at Oppo. 0619, Dkt. No. 141-17 at 7.) With respect to the second alleged failure to disclose, Defendants argue that they had no duty to disclose their internal pricing and ratemaking policies. *See Levine v. Blue Shield of California*, 189 Cal. App. 4th 1117, 1132 (Cal. Ct. App. 2010) (quoting *Cirzoveto v. AIG Annuity Ins. Co.*, 625 F. Supp. 2d 623, 631 (W.D. Tenn. 2009) ("The Court finds that Defendant had no duty to disclose its internal ratemaking and pricing procedures related to the annuity. Plaintiff's fraudulent concealment claim, therefore, fails as a matter of law.")); *c.f. Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092–93 (9th Cir. 2015) (rejecting plaintiff's argument that insurer was required to disclose its internal policy of "recoup[ing] the 10% premium bonus in plaintiff's annuity by "crediting lower index credits to the Annuity than it might have in an annuity contract without the bonus feature"). And to the extent Defendants' profit

objectives created a conflict of interest, Plaintiff was not unaware that Defendants are for-profit entities—Plaintiff "assumed" that ING was a for-profit company. (Leigh Decl. Ex. 3, Abbit Depo. at 112:14–16, Dkt. No. 130-6 at 30.)

Again, Plaintiff does not directly respond to Defendants' argument, but returns to his "based on" argument and "extra-contractual charges" argument, (Dkt. No. 141 at 26), both of which the Court has already rejected, *supra* Parts I, II.C, and IV.A. While Plaintiff's failure to respond warrants summary judgment, *see Shakur*, 514 F.3d at 892, Plaintiff's new theories also do not support a concealment claim. Plaintiff newly alleges a slew of omissions by Defendants, including Defendants' "actual crediting practices, hidden charges, conflicts of interest, and Defendants' losses in rising equity markets that were charged back against the options budget used to support the investment."[11] (*Id.*) All of these "omissions" revolve around Defendants' profit-optimization objectives. Even assuming such omissions were material, Plaintiff has not overcome Defendants' argument that it had no *duty* to disclose its internal ROI targets, pricing, and ratemaking policies to him, *see Richter*, 176 F. Supp. 3d at 897. Nor has Plaintiff overcome Defendants' discretion under the contract to set Monthly Caps and adjust interest-crediting parameters, or the contract's clear description of how such Monthly Caps and other parameters factor into the calculation of interest credits. (*See* §§ 6–6.5, Dkt. No. 130-4 at 16–20.)

---

[11] Plaintiff points to Defendants' Form 10-K for the fiscal year ending on December 31, 2010 to show that Defendants maintained a "short" position with respect to increases in equity markets, a strategy which resulted in Defendants losing significant amounts of money and a corresponding reduction in annuitants' monthly caps and rates. (Dkt. No. 144 at 12 n.3; Dkt. No. 141-17 at 64, Hutton Decl. Ex. M at Oppo. 0676; *see also* Dkt. No. 141-23 at 17, Hutton Decl. Ex. S at Oppo. 0986.) However, the page in the 10-K to which Plaintiff refers addresses Defendants' financial situation in 2008 and 2009, before Plaintiff purchased his contract. (*See* Dkt. No. 141-17 at 64, Hutton Decl. Ex. M at Oppo. 0676 (describing decrease in total revenue for the year ending on December 31, 2009).) As Defendants argued at the hearing, Defendants' total net realized capital losses in 2009 factored into Defendants' determination of what the relevant contract parameters and monthly caps would be in 2010, when Plaintiff purchased his contract. Finally, to the extent Plaintiff argues that Defendants were concealing this profit strategy and related information, the Form 10-K and its contents were publicly disclosed.

In sum, Plaintiff has not responded directly to Defendants' arguments, and Plaintiff has not identified any fraudulent statement or duty to disclose material facts. The Court accordingly **GRANTS** Defendants' motion for summary judgment on Plaintiff's fraud claims.

## V. Violation of the UCL and FAL

Defendants contend that Plaintiff's UCL and FAL claims, pled on a theory of "deceptive and misleading advertising," fail (1) because Plaintiff cannot prove that any material information was omitted from the sales brochure at issue, (2) because the express representations in the sales brochure are factually true, to the extent they are not inactionable puffery, and (3) because Plaintiff cannot show any likelihood of deception or actual injury from the sales brochure. (Dkt. No. 130-1 at 22–30.)

Again, Plaintiff does not directly respond to Defendants' argument, but shifts to his "extra-contractual charges" argument and "substantive participation" argument. (Dkt. No. 141 at 27–28.) He does not respond in any way to Defendants' argument regarding the advertising allegations pled in his FAC. (*See id.*) Defendants are entitled to summary judgment on these claims for Plaintiff's failure to respond with respect to his UCL and FAL claims as originally pled. *See Shakur*, 514 F.3d at 892; *Resolution Trust Corp.*, 43 F.3d at 599. Nonetheless, Plaintiff's new arguments still fail as a matter of law.

Plaintiff now reiterates his "extra-contractual charges" argument and asserts that his "claims stem predominantly from a central promise made by Defendants: that other than surrender charges, bonus recapture (if applicable), and market value adjustments related to early withdrawals, there are no other fees or expenses that affect the value of Plaintiff's account." (Dkt. No. 141 at 27.) This argument, however, fails for the same reasons articulated above, *supra* Parts I and IV.

Nor is Plaintiff's argument that "representing that there are no hidden charges" is *ipso facto* "an assertion likely to deceive the public" availing. (Dkt. No. 141 at 28.) Defendants represented in their sales brochure and FIA application that Plaintiff's account might earn zero or minimal interest. The FIA sales brochure includes

descriptions and illustrations of scenarios in which S&P 500 Index-derivative strategies earned zero or minimal interest.  (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 4–10.)  In describing the Monthly Cap Index Strategy, the sales brochure expressly states:

> A monthly index cap is applied to positive monthly changes, but a floor is not applied to negative monthly changes.  As a result, negative monthly changes may cause the index credit for this strategy to be zero for the contract year even if the overall annual index change is positive.  The monthly index cap rate is declared in advance, guaranteed for one year, and subject to change annually.

(Leigh Decl. Ex. 2, Dkt. No. 130-5 at 5.)  The sales brochure further included a disclaimer that "[p]roducts offering a bonus may offer lower credited interest rates, participation rates, index caps, monthly caps, and/or higher index spreads than products not offering a bonus.  Over time and under certain circumstances, the amount of the bonus may be more than offset by the lower credited interest rates," etc.  (Leigh Decl. Ex. 2, Dkt. No. 130-5 at 3.)  In addition, in applying for his FIA, Plaintiff acknowledged that "[a]ny values shown, other than guaranteed minimum values, are not guarantees, promises or warranties."  (Hutton Decl. Ex. E at Oppo. 0210, Dkt. No. 144-6 at 9.)  Multiple hypothetical interest credit illustrations in the application show the possibility of earning 0% in index credits.  (Hutton Decl. Ex. E at Oppo. 0215–18, Dkt. No. 144-6 at 14–17.)  Plaintiff has not responded with evidence showing a genuine dispute of material fact as to the likelihood of deception from these materials.

Plaintiff also asserts that Defendants' failure to maintain "substantive participation" in violation of Cal. Ins. Code § 10168.25(e) serves as a predicate violation for the "unlawful" prong of the UCL.  (Dkt. No. 141 at 28.)  However, as explained above, *supra* Part II.B.1, Plaintiff's "substantive participation" theory is grounded in the implied covenant of good faith and fair dealing, not in Cal. Ins. Code § 10168.25(e).  And to the extent Plaintiff maintains that Defendants have failed to maintain minimum nonforfeiture amounts in violation of the statute, the Court has already determined in a prior Order that Plaintiff has not raised a genuine dispute of material fact as to whether

Defendants have ever breached the express Minimum Guaranteed Strategy Value terms of the contract. (Dkt. No. 117 at 5–9.)

The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's FAL and UCL claims.

## VI. Failure to Supervise

Defendants move for summary judgment on Plaintiff's failure to supervise claim on two grounds. First, Defendants argues that the allegations underlying Plaintiff's failure to supervise claim fail. (Dkt. No. 130-1 at 30–31.) Second, Defendants argue that they cannot be liable for failure to supervise Copley, who was an independent agent who had no authority to bind ING USA. (*Id.*)

### A. Underlying Allegations

In his FAC, Plaintiff alleged that Defendants failed to supervise Copley in two ways. First,

> the FIAs were embedded with complex structured derivatives for which the ING sales agents received little or no pricing information, no training, no testing, and no meaningful supervision or controls designed to ensure that the agents understood the true suitability of these products for senior citizens or the information needed to explain to the senior citizens exactly what they were buying.

(FAC ¶ 175.) Second,

> ING also failed to supervise its agents by allowing unregistered representatives to sell securities in California. In doing so, ING side-stepped important regulatory rules and notices. In any event, ING either knew or should have known that industry standards for the sale of structured products by their representatives required a "seller-beware" approach to the issuance of FIAs by virtue of regulatory notices, such as NASD Notice to Members 5-50.

(FAC ¶ 176.)

With respect to the second allegation, the Court has concluded that the FIAs are not unregistered securities. (Dkt. No. 117 at 9–10.) With respect to the first allegation, Defendants reassert their argument that they have no duty to disclose their internal pricing information, and that Plaintiff's contract contains an "embedded derivative" only

41

to the extent that a portion of the interest credits on his contract derive from positive net movement in the S&P 500 Index, as provided for in § 6 of his contract. (Dkt. No. 130-1 at 30–31.) Even assuming *arguendo* that Defendants had a duty to supervise Copley, Plaintiff has not responded to Defendants' arguments regarding these underlying allegations. (Dkt. No. 141 at 30–31.) Summary judgment is warranted for Plaintiff's failure to respond alone. *See Shakur*, 514 F.3d at 892; *Resolution Trust Corp.*, 43 F.3d at 599.

## B. Existence of a Duty

In any event, there is no genuine dispute of material fact regarding the existence of a duty to supervise Copley. While "the existence or extent of an agency relationship is a question of fact . . . summary judgment is appropriate where, as here, the evidence is undisputed and susceptible of but a single inference." *Universal Bank v. Lawyers Title Ins. Corp.*, 62 Cal. App. 4th 1062, 1066 (Cal. Ct. App. 1997).

> The essential characteristics of an agency relationship . . . are as follows: (1) An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him.

*Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148 Cal. App. 4th 937, 964 (Cal. Ct. App. 2007), *as modified on denial of reh'g* (Apr. 17, 2007).

In support of his argument that Defendants were "duty-bound to undertake supervisory measures for the sale of their unregistered EIAs," (Dkt. No. 141 at 31), Plaintiff cites to the National Association of Securities Dealers' ("NASD's") 2005 rule, which requires a firm to supervise "associated person[s]" selling unregistered EIAs through the firm, (Hutton Decl. Ex. K at Oppo. 0564, Dkt. No. 144-11 at 119). However, Defendants are not members of the NASD or FINRA, NASD's successor entity, and are accordingly not bound by NASD rules. (Dkt. No. 149 at 12 (citing Hutton Decl. Ex. K at Oppo. 0565 n.1, Dkt. No. 144-11 at 119 n.1).)

Defendants used independent, third-party marketing organizations, also referred to as "national marketing organizations," to distribute their insurance-based products and annuities. (Leigh Decl. Ex. 4, Tope Depo. 17:1–18, Dkt. No. 130-7 at 7.) Defendants do not have "company-owned field wholesalers"; rather, independent agents sell Defendants' and Defendants' competitors' products. (*Id.*) Plaintiff acknowledges in his supplemental briefing that Copley was an "independent" agent. (Dkt. No. 152 at 5.) Copley testified that in the 2009 and 2010 time frame, he sold annuity products from "around ten" different companies. (Leigh Decl. Ex. 14, Copley Depo. 11:6–9, Dkt. No. 130-17 at 5.) While Defendants required Copley to adhere to ING's Business Guidelines and General Advertising Rules, (*see, e.g.*, Hutton Decl. Ex. P at Oppo. 0929–34, Dkt. No. 144-15 at 50–55), it is undisputed that Defendants were free to accept or reject Plaintiff's FIA application after Copley submitted it, (Dkt. No. 130-1 at 31 (citing Leigh Decl. Ex. 15, Dkt. No. 130-18)). Copley had no authority to bind Defendants or alter the legal relations between Defendants and Plaintiff. *C.f. Marsh & McLennan of Cal., Inc. v. City of Los Angeles*, 62 Cal. App. 3d 108, 118 (Cal. Ct. App. 1976) (observing that "insurance brokers, with no binding authority, are not agents of insurance companies, but are rather independent contractors").

The Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's failure to supervise claim.

## VII.   Rule 56(d) Request

In its opposition to Defendants' motion for summary judgment, Plaintiff brought a Rule 56(d) request. After the hearing, the Court granted Plaintiff leave to file supplemental briefing and evidence in opposition to Defendants' motion. (Dkt. No. 164.) The supplemental evidence Plaintiff proffered stemmed from discovery Plaintiff took after the Rule 56(d) request was filed. In light of the fact that the Court allowed Plaintiff to file supplemental evidence and briefing based on recent discovery, and for the reasons that follow, the Court declines to grant Plaintiff's Rule 56(d) request.

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by

affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). To meet this burden, Plaintiff "must show (1) that [he] ha[s] set forth in affidavit form the specific facts that [he] hope[s] to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

Plaintiff lists two categories of evidence and summarily describes how the facts he hopes to obtain therein are essential to his opposition. First, Plaintiff seeks

> [i]nformation showing how ING calculates and values equity-index benefits for Mr. Abbit (including the calculations of options values and obligations for his equity-indexed benefits), which is key to understanding how the investment is executed and managed by Defendants. This information also evidences the disparity in value between the purchase price and the actual worth of the investments, relevant to Plaintiff's UCL and FAL claims. Evidence that ING based its rate-setting decisions upon factors independent of the performance of the S&P 500 Index, and did not provide the required value equity-indexed benefits, will defeat Defendants' Motion for Summary Judgment by demonstrating Defendants' fiduciary duties, breach of those duties, the falsity of Defendants' statements about investment execution and performance, and the inherent unfairness of the investment.

(Dkt. No. 141-3 at 3.)

Plaintiff's request for information regarding the calculations of options values is moot, as Plaintiff has taken relevant discovery from Defendants and supplemented the record after obtaining leave from the Court to do so. In addition, the Court observes that Plaintiff has not set forth specific facts, but rather requests a broad category of information. Even if Plaintiff had met his burden to set forth specific facts, Plaintiff does not set forth how the information sought would be essential to resisting Defendants' motion for summary judgment on his breach of contract, breach of the implied covenant of good faith and fair dealing, and failure to supervise claims.

As for Plaintiff's breach of fiduciary duty claim, the information Plaintiff seeks is immaterial to the question of whether Defendants owed a fiduciary duty to Plaintiff in the first instance. As explained above, *supra* Part III, Plaintiff has not shown any affirmative acts or representations by Defendants indicating Defendants knowingly undertook to act on his behalf as a fiduciary. Any affirmative representations Defendants made to Plaintiff are facts within Plaintiff's control.

Plaintiff's hope to discover "the falsity of Defendants' statements about investment execution and performance" is broad and nonspecific. Moreover, Plaintiff has not endeavored to respond to Defendants' arguments regarding his fraud, UCL, and FAL claims as originally pled in his FAC. *See supra* Parts IV and V. Plaintiff has abandoned the allegations underlying his initial fraud, UCL, and FAL claims and now relies on his new "based on," "substantive participation," and "extra-contractual charges" arguments, all of which the Court has rejected for the reasons detailed throughout this Order. Plaintiff also has not shown that Defendants have any legal duty to disclose internal pricing and valuation information.

Plaintiff's second request is as follows:

> information showing how ING invests premiums and hedges risk is key to understanding how considerations separate from the S&P 500 Index impact the return on investment that clients ultimately receive. Evidence that ING based its equity-indexed factors, risk hedging strategies, and other consideration independent of the performance of the S&P 500 Index, will defeat Defendants' Motion for Summary Judgment by demonstrating Defendants' fiduciary duties, breach of those duties, the falsity of Defendants' statements about investment execution and performance, and the inherent unfairness of the investment.

(Dkt. No. 141-3 at 3–4.) The Court again observes that Plaintiff has not set forth specific facts that he hopes to elicit from further discovery. "[H]ow ING invests premiums and hedges risk" is overbroad. Even if Plaintiff had met his burden to set forth specific facts, Plaintiff's "based on" theory still fails as a matter of law, for the reasons described above, *supra* Part II.C. By extension, theories flowing from the "based on" argument will not benefit from further discovery.

The Court accordingly **DENIES** Plaintiff's Rule 56(d) request.

**CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's remaining claims.

**IT IS SO ORDERED.**

Dated: May 16, 2017

Hon. Gonzalo P. Curiel
United States District Judge

3:13-cv-02310-GPC-WVG